Matthew C. Helland, CA State Bar No. 250451
Helland@nka.com
Daniel S. Brome, CA State Bar No. 278915
dbrome@nka.com
NICHOLS KASTER, LLP
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Jason Christopher Marsili (CA SBN 233980)
jmarsili@rmrllp.com
ROSEN MARSILI RAPP LLP
3600 Wilshire Blvd., Suite I 800
Los Angeles, CA 90010-2622
Telephone: (213) 389-6050
Facsimile: (213) 389-0663

*Attorneys for Plaintiff and Others Similarly Situated*
*Additional Counsel Listed on Following Page*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lorenzo Dominguez, individually, on behalf of others similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>Better Mortgage Corporation,<br><br>Defendant. | Case No. **8:20-cv-01784-JLS-KES**<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO INVALIDATE UNCOUNSELED RELEASES AND WAIVER AGREEMENTS OBTAINED *EX PARTE* AND FOR CORRECTIVE NOTICE**<br><br>Date:        March 25, 2022<br>Time:      10:30 a.m.<br>Courtroom:  10A |

C. Andrew Head (admitted *pro hac vice*)
ahead@headlawfirm.com
Bethany Hilbert (admitted *pro hac vice*)
bhilbert@headlawfirm.com
HEAD LAW FIRM, LLC
730 Peachtree St NE, Suite 600
Atlanta, GA 30308 (virtual office)
4422 N. Ravenswood Ave.
Chicago, IL 60640 (resident office)
Telephone: (404) 924-4151
Facsimile: (404) 796-7338

# TABLES OF CONTENTS

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES ............................................................................iii

I.      INTRODUCTION ..................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND ............................1

    A. Employment Agreement: Forced Arbitration and Class/Collective
    Waivers .......................................................................................................2

    B. The Release Agreement .........................................................................3

    C. Defendant Defaults While Completing its First Rollout – *Then
    Persists* .......................................................................................................4

III.    ARGUMENT AND CITATION OF AUTHORITIES .............................5

    A. The Court is Authorized to Invalidate *Ex Parte* Waivers .............................5

        i.     Authority to manage class/collective communications ........................5

        ii.    Obtaining *ex parte* waivers frustrates Rule 23 and FLSA
        notice .......................................................................................................6

        iii.   Obtaining employees' *ex parte* waivers is inherently
        coercive .......................................................................................................7

        iv.    The timing and rollout methods indicate intentional
        interference.................................................................................................8

    B. Even On Its Own, the Arbitration Agreement Should be
    Invalidated ............................................................................................... 10

        i.     Only putative class/collective members were targeted...................... 10

        ii.    The Arbitration Agreement misled by omission ............................... 10

        iii.   Conspicuously absent were any assurances of no retaliation
        for not signing or similar protections.................................. 13

    C. Even On Its Own, the Release Agreement Should be Invalidated ............... 14

        i.     Defendant did not provide an actual copy of the Complaint.............. 14

ii.    Defendant prevented an informed decision on potential claim value ................................................................................... 16

iii.   The Release Agreement was contradictory, misleading, intimidating, and interfered with the purposes of Rule 23 and FLSA opt-in notice.............................................................. 17

D. Viewing the Rollout of the Agreements under the Totality of the Circumstances, the Court Should Invalidate Both Agreements or Allow Corrective Notice and Opportunity to Void........................................ 22

IV.   Conclusion ............................................................................. 25

## TABLES OF AUTHORITIES

**Cases**

*Acosta v. Sw. Fuel Mgmt.*, 2018 LEXIS 203389 (C.D. Cal. Feb. 20, 2018) ................. 6, 7

*Acosta v. Sw. Fuel Mgmt.*, 2018 LEXIS 22554 (C.D. Cal. Feb. 2, 2018) ........................ 19

*Altamirano-Santiago v. Better Produce, Inc.*, 2020 LEXIS 164654
  (C.D. Cal. Sep. 8, 2020) ................................................................................ 8

*Astarita v. Menard, Inc.*, 2019 LEXIS 194337 (W.D. Mo. Nov. 8, 2019) ....................... 24

*Balasanyan v. Nordstrom, Inc.*, 2012 LEXIS 30809 (S.D. Cal. Mar. 8, 2012) ............. 6, 24

*Belt v. Emcare Inc.*, 299 F. Supp. 2d 664 (E.D. Tex. 2003) ............................................. 21

*Billingsley v. Citi Trends, Inc.*, 560 Fed. Appx. 914 (11th Cir. 2014) ......................... 6, 10

*Camp v. Alexander*, 300 F.R.D. 617 (N.D. Cal. 2014) ...................................................... 22

*Chalian v. CVS Pharmacy*, 2020 LEXIS 219752 (C.D. Cal. Nov. 20, 2020) .................. 24

*Chamber of Commerce of the United States v. Bonta*, ___ F.3d ___,
  2021 U.S. App. LEXIS 27659 (9th Cir. Sep. 15, 2021) ................................................. 2

*Cty. of Santa Clara v. Astra USA, Inc.*, 2010 LEXIS 78312
  (N.D. Cal. July 8, 2010) ......................................................................................... 16, 22

*Domingo v. New Eng. Fish Co.*, 727 F.2d 1429 (9th Cir. 1984) ....................................... 6

*Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509
  (N.D. Cal. Sept. 29, 2010) ........................................................................................ 6, 7

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981) ............................................................... 5, 6

*In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237
  (S.D.N.Y. 2005) ........................................................................................................ 11

*In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555 (S.D.N.Y. 2004) ........... 7

*In re NFL's Sunday Ticket Antitrust Litig.*, 2021 LEXIS 111365
  (C.D. Cal. Apr. 20, 2021) ......................................................................................... 10

*Irvine v. Destination Wild Dunes Mgmt.*, 132 F. Supp. 3d 705 (D.S.C. 2015) ................. 7

*Iskanian v. CLS Transp. L.A., LLC*, 59 Cal. 4th 348 (2014) ........................................... 20

*Jimenez v. Menzies Aviation Inc.*, 2015 LEXIS 108223

1    (N.D. Cal. Aug. 17, 2015)..................................................................11, 24

2  *Johnson v. Serenity Transp., Inc.*, 2017 LEXIS 156804 (N.D. Cal. Sep. 25, 2017).........15

3  *Julian v. Glenair, Inc.*, 17 Cal. App. 5th 853 (2017).........................................................20

4  *Kirby v. Kindred Healthcare Operating,* 2020 LEXIS 146449

5    (C.D. Cal. May 1, 2020) ............................................................................*passim*

6  *Kleiner v. First Nat'l Bank*, 751 F.2d 1193 (11th Cir. 1985) ...........................................9

7  *Kutzman v. Derrel's Mini Storage, Inc.*, 354 F. Supp. 3d 1149

8    (E.D. Cal. 2018).........................................................................16, 21, 23

9  *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2001 LEXIS 18370

10    (N.D. Ill. Nov. 9, 2001)....................................................................20

11  *Marino v. CACafe, Inc.*, 2017 LEXIS 64947 (N.D. Cal. Apr. 28, 2017) ......................8, 9

12  *McKee v. Audible, Inc.*, 2018 LEXIS 179978 (C.D. Cal. Apr. 6, 2018) ...............6, 24, 25

13  *Mevorah v. Wells Fargo Home Mortg., Inc.*, 2005 LEXIS 28615

14    (N.D. Cal. Nov. 17, 2005)...........................................................18

15  *Molyneux v. Securitas Sec. Servs. USA, Inc.*, 2011 LEXIS 156173

16    (S.D. Iowa July 8, 2011) ............................................................8, 13

17  *Nasrallah v. Lakefront Lines, Inc.*, 2017 LEXIS 80500 (N.D. Ohio May 25, 2017)........19

18  *O'Conner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593 (S.D.N.Y. 2020)...............10, 11, 24

19  *Ontiveros v. Safelite Fulfillment, Inc.*, 2017 LEXIS 222414

20    (C.D. Cal. Oct. 16, 2017)...........................................................15

21  *Piekarski v. Amedisys Illinois, LLC*, 4 F. Supp. 3d 952 (N.D. Ill. 2013) ..............12, 15, 24

22  *Portillo v. Nat'l Freight, Inc.*, 2021 LEXIS 148725 (D.N.J. Aug. 9, 2021) ....................18

23  *Potts v. Nashville Limo & Transp., LLC*, 2016 LEXIS 53217

24    (M.D. Tenn. Apr. 19, 2016).........................................................8

25  *Quezada v. Schneider Logistics Transloading & Distribution*, 2013 LEXIS 47639

26    (C.D. Cal. Mar. 25, 2013) ..........................................................7

27  *Reed v. Sci. Games Corp.*, 2021 LEXIS 113805 (W.D. Wash. June 17, 2021)...............13

28  *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, 162 F. Supp. 3d 490

(W.D.N.C. 2016)..................................................................................20

*Rivera v. FIS Operations, LLC*, 2019 LEXIS 173205 (C.D. Cal. Oct. 2, 2019)...............23

*Salazar v. Driver Provider Phx. LLC*, 2021 LEXIS 66082 (D. Ariz. Apr. 5, 2021).....9, 11

*Slavkov v. Fast Water Heater I, LP*, 2015 LEXIS 149013

(N.D. Cal. Nov. 2, 2015).......................................................................6, 20, 22

*Smith v. Keypoint Gov't Sols., Inc.*, 2015 LEXIS 81308 (D. Colo. June 23, 2015)..........14

*Stafford v. Brink's, Inc.*, 2015 LEXIS 192037 (C.D. Cal. Aug. 14, 2015)..................7, 15

*Talavera v. Leprino Foods Co.*, 2016 LEXIS 29633 (E.D. Cal. Mar. 8, 2016) ...............23

*Tomkins v. Amedisys, Inc.*, 2014 LEXIS 3661 (D. Conn. Jan. 13, 2014)..........................8

*Williams v. Securitas Sec. Servs. USA, Inc.*, 2011 LEXIS 75502

(E.D. Pa. July 13, 2011)................................................................................6

*Zamboni v. Pepe W. 48th St. LLC*, 2013 LEXIS 34201 (S.D.N.Y. Mar. 12, 2013)..........11

## I.   INTRODUCTION

Upon being served with process on September 28, 2020 in this action alleging a nationwide Fair Labor Standards Act ("FLSA") collective action and California Labor Code class action – but without contacting Plaintiff's counsel or notifying the Court – Defendant Better Mortgage Corp. ("Defendant" or "Better") called a mandatory Zoom video meeting with all currently employed putative class/collective members on October 19, 2020 to announce three new agreements to be signed:

i.   A 14-page at-will employment agreement ("Employment Agreement"), with arbitration and class/collective waiver terms on its last 2 pages, without disclosing anywhere in that agreement (i) this lawsuit or (ii) the effect that signing would have on potentially recovering from or participating in it;

ii.   A Retention Bonus Agreement ("Retention Agreement") offering a $10,000 bonus for remaining employed through April 31, 2021; and

iii.   A Release Agreement ("Release Agreement") offering "$5,000…in exchange for a release of [all state law and PAGA claims]" citing this lawsuit, but only if they "sign and return this agreement within five (5) days of its receipt."

Plaintiff now moves, under Fed. R. Civ. P. 23(d), the Court's inherent power to manage parties' litigation conduct, and the Court's supervisory power over class/collective notice processes, for an order invalidating (or opportunity to void) the signed Release and Arbitration Agreements ("Waivers") as to the claims and participation in this pending action, and restricting Defendant's *ex parte* communications with putative class and collective action members seeking a waiver of litigation rights in this case.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Defendant was served with process in this case on September 28, 2020. (Proof of Service [ECF 15].) Defendant, which employed a Deputy General Counsel, retained the Constangy firm "[i]n September 2020" to represent it "in this matter" (Bauer Declaration [ECF 34-1], ¶ 2) but waited until after the waiver rollout at issue to file an appearance.

1    On October 19, 2020, Defendant called a mandatory attendance Zoom meeting
2    conducted by the Director of Underwriting and HR with its currently employed
3    Underwriters (i.e., all currently employed putative class and collective action members).
4    (Chaidez Decl. ¶ 3.) Defendant told them that a former employee had filed a lawsuit for
5    overtime, "which brings us to" new employment terms and agreements. (*Id.*) But it was
6    careful not to disclose the name of the employee or his counsel, or what court or a case
7    number, or that he was as an Underwriter, much less that the case was about Underwriter
8    overtime or was filed as a class and collective action potentially affecting them which
9    they had a present right to join. (*Id.*, ¶¶ 3-4.) Defendant merely said they could "look it up
10   [them]selves," but withheld all information to prevent exactly that. (*Id.*)

11   The Underwriters were told "we need you to sign" the Employment Agreement
12   (and, upon information and belief, were told the same as to the Release Agreement). (*Id.*,
13   ¶ 3.) The only agreement that the presenters described as "voluntary" was the Retention
14   Agreement. (*Id.*) They were told to contact HR with any questions. (*Id.*, ¶ 4.)

15   After the meeting, all currently employed Underwriters (but no others) were sent a
16   separate DocuSign email to e-sign each agreement, which stated in the subject line, and
17   twice in the body of the email (including once in larger font): "Please DocuSign: [title of
18   agreement]," and in bold font warned: "**Do Not Share This Email**." (*Id.*, ¶ 5, Ex., 1-3.)

19   **A. Employment Agreement: Forced Arbitration and Class/Collective Waivers**[1]
20   The Employment Agreement explicitly stated: "As a condition of my employment
21   with [Better…] I agree to the following provisions[.]" (*Id.*, Ex. 1, p. 3.) Its At-Will
22   section notified Underwriters that their "employment relationship may be terminated at
23   any time, with or without good cause or for any or no cause." (*Id.*) It gave no assurances
24   that there would be no retaliation or adverse consequences if an employee chose not to

25   ───────────────
26   [1] Though not a basis for invalidating previously signed arbitration agreements, imposing a
27   forced arbitration agreement on California employees was made illegal by AB51, and
     remains illegal now that *Chamber of Commerce of the United States v. Bonta*, ___ F.3d
28   ___, 2021 U.S. App. LEXIS 27659 (9th Cir. Sep. 15, 2021) reversed the preliminary
     injunction of Labor Code section 432.6.

sign. And it required arbitration "only in my individual capacity, and not as a plaintiff, representative, or class member in any purported class, collective, or representative lawsuit" with the pertinent exception here only of "bringing a [PAGA] representative lawsuit or proceeding" or "claims that cannot be arbitrated under…law that expressly prohibits arbitration of a claim notwithstanding the application of the FAA." (*Id.*, at p. 15.) The agreement was required "in consideration of my employment[.]" (*Id.*, at pp. 3,7,15)

But the Zoom presentation had never identified this case or told Underwriters that it (or any case) had been filed on their behalf as a class/collective action for their unpaid overtime and other damages. (*Id.*, ¶¶ 3-4.) And nowhere in its 14 pages did the Employment Agreement, and its Arbitration Agreement appended as Exh. E, disclose this pending class and collective lawsuit, or that it had been filed on the Underwriters' behalf, much less disclose the name or any details of this lawsuit and its claims and counsel,[2] or disclose in any way that signing the Agreement could impact their then-available right to participate in this lawsuit as an opt-in plaintiff or as a member of a putative opt-out California class. (*Id.*, Exh. 1.) The arbitration agreement had no carve out for pending litigation filed on their behalf, and it did not contain an opt-out provision. (*Id.*)

**B. The Release Agreement**

By a separate DocuSign email, Underwriters were presented with a Release Agreement that they "must…sign and return …within five (5) days of its receipt" to receive the lump sum $5,000 offered to all regardless of variations in weeks worked, salary, or other factors determining potential damages. (*Id.*, Exh. 3, p.3.)

In the text of the Release Agreement, unlike the Employment Agreement, Defendant for the first (and only) time identified this lawsuit and disclosed a (one-sided) summary of its pending claims filed on their behalf (but provided nothing from which the

---

[2] Although it stated "I agree that I have been provided an opportunity to seek the advice of an attorney of my choice before signing this Agreement," it did not identify Plaintiff's counsel, or disclose that counsel seeks to represent them in this case on contingency.

1  non-lawyer employees could determine potential value of the claims being released, or

2  even determine what hours triggered overtime pay). (*Id.*, pp. 3-4.) Defendant chose not to

3  provide or attach a copy of the Complaint with the Release Agreement although it could

4  easily have done so. Instead, after its new Employment Agreement reminded

5  Underwriters that Defendant may, without notice, review their company and personal

6  media devices to review website browsing history,[3] the Release Agreement listed a URL

7  link to a .pdf of the Complaint posted (at the time of initial distribution, but no longer

8  available after October 23rd)[4] on Plaintiff's counsel's case website. (*Id.*, p. 4.) This meant

9  employees utilizing their employer-searchable computer systems would create a digital

10  trail of interest (indicating potential "disloyalty" to their employer) if they clicked it.

11  The purportedly released claims broadly included "any and all claims (except those

12  under the FLSA) that were or could have been asserted in the Lawsuit," including

13  "claims under the …California Private Attorneys' General Act." (*Id.*)

14  **C. Defendant Defaults While Completing its First Rollout —*Then Persists*.**

15  Defendant failed to timely appear or respond to the Complaint, prompting entry of

16  default on October 27, 2020. That same day, Defendant contacted Plaintiff's counsel for

17  the first time through its (initial) outside counsel, demanded that Plaintiff consent to

18

19  [3] The Employment Agreement waived any expectation of privacy in both Company and

20  personal computer/media devices and systems, stating Defendant "without further notice" may "at its sole discretion… have reasonable access…to such personal [] Systems to

21  review [or] retrieve…Company information," may "audit and search all [of its company

22  media] items and systems including "access[ and] review…[of] all website visits," and may "monitor usage of the Internet, including websites visited and any information I have

23  downloaded." (*Id.*, Ex. 1, pp. 5, 7.)

24  [4] Nichols Kaster, Plaintiff's counsel, changed its case website for this litigation on October 23, 2020. On and after that date, the URL link listed in the Release Agreement

25  no longer directed to a .pdf of the Complaint, instead landing on a general case summary page regarding eligibility, additional information, and case updates –which did not

26  contain a .pdf of the Complaint or recite its contents. Despite the inability to access the

27  Complaint by clicking the URL provided on or after October 23rd (day 3 of the 5-day eligibility period), Defendant never gave Underwriters a copy of the Complaint and

28  continued accepting Agreements presented and/or signed after that .pdf was inaccessible.

opening default, and filed an entry of appearance. (Head Decl. ¶ 3.) Plaintiff immediately asked about and objected to the *ex parte* waiver rollout. (*Id.*) After a brief stay, Defendant filed its unopposed[5] motion to open default, which the Court granted. [ECF Nos. 34, 42.]

Incredibly, despite knowing Plaintiff's objections to *ex parte* rollout of arbitration agreements to putative class/collective members since October 2020, Defendant revealed for the first time during a September 24, 2021 meet-and-confer that it has continued to obtain signed arbitration agreements from newly hired Underwriters – ***without disclosing any information regarding this pending lawsuit filed on their behalf***. (Head Decl. ¶ 5.)

## III. ARGUMENT AND CITATION OF AUTHORITIES

The material facts of Defendant's waiver-gathering blitz are substantially similar to, and in many ways more egregious than, those that led this Court in *Kirby v. Kindred Healthcare Operating*, 2020 U.S. Dist. LEXIS 146449 (C.D. Cal. May 1, 2020) (Staton, J.), to declare the settlement releases obtained *ex parte* voidable, order curative notice, restrict defendant's *ex parte* communications with putative class members, and require defendant to produce a list of the individuals contacted regarding settlement. The Court should order similar relief here.

### A. The Court is Authorized to Invalidate *Ex Parte* Waivers

#### i. Authority to manage class/collective communications.

"Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). In putative class actions like this one, district courts exercise that authority under Fed. R. Civ. P. 23(d). *Id.* at 99. Courts have, and properly exercise, that authority before class or

---

[5] Due to the lenient standard for opening default, and to limit disputes and focus their battles, Plaintiff did not oppose Defendant's motion to open default. Per the parties' Stipulations, Defendant agreed to continue tolling conditioned on ceasing litigation activity until the Court ruled on default, and the parties agreed that no delay of litigation activity by stipulation could be construed adversely to (or as in any way waiving) Plaintiff's position. Plaintiff files this motion under those terms, prior to any discovery.

collective action certification. *See, e.g., McKee v. Audible, Inc.*, 2018 U.S. Dist. LEXIS 179978, at *19-20 (C.D. Cal. Apr. 6, 2018) (rejecting argument that issue is premature: "[court's] Rule 23(d) powers may be exercised before class certification.").

The Court's authority applies with equal force in FLSA collective actions like this one. *Acosta v. Sw. Fuel Mgmt.*, 2018 U.S. Dist. LEXIS 203389, at *2 n.2 (C.D. Cal. Feb. 20, 2018). Indeed, the Court's power to prohibit a defendant from making "unsupervised, unilateral communications with the plaintiff class…is especially true given the opt-in nature of FLSA collective actions." *Billingsley v. Citi Trends, Inc.*, 560 Fed. Appx. 914, 923-24 (11th Cir. 2014) (invalidating arbitration agreements obtained from targeted currently employed potential FLSA collective action members after suit was filed).

Importantly, "an order under *Gulf Oil* does not require a finding of actual misconduct—rather, the key is whether there is potential interference with the rights of the parties in a class action." *Kirby*, 2020 U.S. Dist. LEXIS 146449 at *4 (citing *Slavkov v. Fast Water Heater I, LP*, No. 14-cv-04324-JST, 2015 U.S. Dist. LEXIS 149013, at *6 (N.D. Cal. Nov. 2, 2015) (internal quotation marks omitted)).

### ii. Obtaining *ex parte* waivers frustrates Rule 23 and FLSA notice.

"Obtaining opt-out forms *ex parte* at this stage of the litigation—before a class has been certified by the Court—unquestionably frustrates the purposes of Rule 23." *Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 518 (N.D. Cal. Sept. 29, 2010). Among the "principal concerns" that could justify restrictions upon communications are "solicitation by defendants of requests to opt out." *Domingo v. New Eng. Fish Co.*, 727 F.2d 1429, 1441 (9th Cir. 1984). Courts have thus exercised their discretion under Rule 23(d) to invalidate class action waivers obtained under similar circumstances to those presented here. *See, e.g.*, *Balasanyan v. Nordstrom, Inc.*, 2012 U.S. Dist. LEXIS 30809, at *12 (S.D. Cal. Mar. 8, 2012) (imposition of a class action waiver while litigation was ongoing was an improper class communication); *Williams v. Securitas Sec. Servs. USA, Inc.*, 2011 U.S. Dist. LEXIS 75502, at *7 (E.D. Pa. July 13, 2011) (ruling agreement containing class waiver "is designed to thwart employees of [defendant] from

participating in this lawsuit."); *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 569-70 (S.D.N.Y. 2004) (holding defendants acted improperly by obtaining arbitration agreements from class members without the court's knowledge).

### iii.  Obtaining employees' *ex parte* waivers is inherently coercive.

"The risk of coercion and abuse is higher in the context of an employer-employee relationship," and this "inform[s] the Court's assessment of Defendants' conduct." *Kirby*, 2020 U.S. Dist. LEXIS 146449 at \*7 (citations omitted); *see also Stafford v. Brink's, Inc.*, 2015 U.S. Dist. LEXIS 192037, at \*9-10 (C.D. Cal. Aug. 14, 2015) ("the employer-employee relationship is likely to have some coercive effect over the putative class members."); *Acosta v. Sw. Fuel Mgmt.*, 2018 U.S. Dist. LEXIS 203389, at \*\*2, 16 n. 8 (C.D. Cal. Feb. 20, 2018) (where putative class members are at-will employees, the risk of coercion is particularly high and may in fact be inherent (collecting cases); "[t]he likelihood of retaliation or misleading employees is perhaps greatest during the course of a collective or class action involving or between an employer and its employees.").

That the Underwriters' manager and HR announced there were agreements "we need you to sign," during work hours in a mandatory attendance live Zoom video meeting, makes it even more coercive (in *Kirby*, most were merely mailed to their homes). *See, e.g., Guifu Li*, 270 F.R.D. at 512 (invalidating opt-outs where "Defendants admit that they presented opt-out forms to [to putative class members] during required, one-on-one meetings with managers during work hours and at the workplace"); *Quezada v. Schneider Logistics Transloading & Distribution*, 2013 U.S. Dist. LEXIS 47639, at \*16 (C.D. Cal. Mar. 25, 2013) (impermissibly coercive when employees were ordered to attend the meetings); *Irvine v. Destination Wild Dunes Mgmt.*, 132 F. Supp. 3d 705, 707 (D.S.C. 2015) (declining to credit defendant's contention that in-person meetings were voluntary: "the reality was that the [at-will] employees received a direct order from supervisory or human resource personnel to appear during work hours while on the company's clock.").

"The potential for coercion is even more significantly heightened where[,]" as here, "an employer solicits opt-outs ex-parte." *Altamirano-Santiago v. Better Produce, Inc.*, 2020 U.S. Dist. LEXIS 164654, at *8 (C.D. Cal. Sep. 8, 2020) (collecting cases). Defendant "pushed the potential for coercion to the edge by failing to provide plaintiffs' counsel and this court with notice prior to unilaterally communicating with putative class members regarding their rights in this particular litigation." *Molyneux v. Securitas Sec. Servs. USA, Inc.*, 2011 U.S. Dist. LEXIS 156173, at *13 (S.D. Iowa July 8, 2011) (curative notice, approved additional period to opt-out of arbitration agreements). Defendant represents that nearly all Underwriters signed the Employment and/or Release Agreements. (Head Decl., ¶ 6). This strongly "suggests a degree of coercion." *Marino v. CACafe, Inc.*, 2017 U.S. Dist. LEXIS 64947, at *6 (N.D. Cal. Apr. 28, 2017). Plaintiff intends to conduct full discovery to confirm those and other facts related to this motion.

Even absent a finding of coercion, however, the court may still remedy the effects of any communications between the defendants and their former employees if those communications were misleading. *Potts v. Nashville Limo & Transp., LLC*, 2016 U.S. Dist. LEXIS 53217, *54-55 (M.D. Tenn. Apr. 19, 2016).

### iv.  The timing and rollout methods indicate intentional interference.

Defendant's conduct is uniquely egregious in this case because upon being served with process, it commenced its rollout of the arbitration and release agreements and waited until it was completed before contacting Plaintiff's counsel and entering an appearance. By keeping not only its waiver rollout campaign secret from the Court and counsel, but also even the identity of Defendant's counsel, until it had effectively completed its *ex parte* blitz and obtained uncounseled signed waivers from potential class/collective members (whose contact information had not yet been provided, unlike in *Kirby*), Plaintiffs' counsel were deprived of the opportunity to communicate with those class/collective members or with defense counsel to address (and potentially halt) this sort of *ex parte* communication campaign. *See generally Tomkins v. Amedisys, Inc.*, 2014 U.S. Dist. LEXIS 3661, at *4 (D. Conn. Jan. 13, 2014) (invalidating arbitration

agreements rolled out after class action filed; court was concerned that employer sent them "to…putative class members seeking to release their right to pursue claims as a class in this and other lawsuits without any notice to plaintiffs' counsel or the Court.").

That secrecy, coupled with the haste with which Defendant sought to complete its rollout before appearing before the Court, constitutes additional evidence supporting invalidation. *See, e.g., Marino*, 2017 U.S. Dist. LEXIS 64947, at *5-6 ("While the evidence does not indicate the high degree of coercion present in other cases, the fact remains that defendant [] communicated with putative class members after the lawsuit was filed, but before they had received any formal notice and before plaintiff's counsel had been given an opportunity to communicate with them. The speed with which the emailed release requests were distributed after [being] served with the lawsuit; coupled with defendants' continued resistance to providing putative class member contact information, suggest that defendants sought to ensure that putative class members were not given full information before they signed the releases."). Appellate court authority has affirmed invalidating *ex parte* opt-outs where, as here, "[s]ecrecy and haste shrouded the undertaking." *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1197 (11th Cir. 1985).

The likelihood of abuse was compounded by the extremely short period imposed on its current employees within which to consider the agreements, which was designed to thwart informed, reasoned, and counseled decision-making. On the mandatory attendance Zoom video conference with all currently employed Underwriters, management and HR informed them that the Employment Agreement (as with the other agreements) all had to be signed and returned within a mere 5 days (4 business days, 1 weekend days) – and the Release itself explicitly stated that Underwriters are only eligible if they sign and return the agreement within 5 days of its receipt. (Chaidez Decl., ¶ 4, Exh. 3, p. 3.) *See, e.g., Salazar v. Driver Provider Phx. LLC*, 2021 U.S. Dist. LEXIS 66082, at *9 (D. Ariz. Apr. 5, 2021) (coercion warranting invalidating arbitration agreements rolled out post-filing where employees were directed to sign and return within two business days); *O'Conner*

*v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593 (S.D.N.Y. 2020) (invalidating arbitration policy rolled out post-filing that management pressured employees to sign within 4 days).

**B. Even On Its Own, the Arbitration Agreement Should Be Invalidated.**

**i. Only putative class/collective members were targeted.**

This was no litigation-neutral rollout of a company policy that had been in the works well before suit was filed. To the contrary, Defendant targeted only the putative class/collective members in this litigation after being served with process in this litigation, requiring for the first time arbitration agreements giving up rights to a jury trial and participation in any class or collective action. *See generally Billingsley*, 560 F. App'x 919 (affirming invalidation of arbitration agreement where district court found the "ADR roll-out was a hurried reaction specifically targeted at curtailing this litigation"); *In re NFL's Sunday Ticket Antitrust Litig.*, 2021 U.S. Dist. LEXIS 111365, at *10 (C.D. Cal. Apr. 20, 2021) (noting facts that would support post-filing rollout of new arbitration terms to putative class include if "(1) they were [] singled out for receipt of the [] agreement, (2) their pre-dispute agreements [did not] already contain[] an arbitration clause, and (3) the terms of arbitration were [not] more favorable to the plaintiffs").

**ii. The Arbitration Agreement misled by omission.**

The DocuSign email and its attached 14-page Employment Agreement with the appended Arbitration Agreement did not identify this case or even mention that any litigation had been filed as a potential class/collective action on behalf of the Underwriters, and it did not in any way alert Underwriters that if they signed the Employment Agreement they would be signing away a presently held right to join this case as an opt-in and/or participate in this case as a class member. It did not disclose the claims alleged or provide any information from which a lay person could estimate potential damages or the benefits of class/collective participation. It did not reference, attach, enclose, or otherwise provide a copy of the Complaint in this action, and it did not identify Plaintiff's counsel, or provide their contact information. Nor had Defendant disclosed any of that information in the mandatory Zoom meeting. (Chaidez Decl., ¶

3)*See Salazar*, 2021 U.S. Dist. LEXIS 66082, at *12-13 (D. Ariz. Apr. 5, 2021)
(invalidating effect of arbitration agreements on pending collective action where
agreements (i) did not disclose pending litigation or impact that signing would have on
participating, (ii) indicated agreement was a condition of employment, and (iii) gave only
two business days to review); *Zamboni v. Pepe W. 48th St. LLC*, 2013 U.S. Dist. LEXIS
34201, at *10 (S.D.N.Y. Mar. 12, 2013) ("[A] communication may be coercive where the
defendant interferes with participation by potential class members in the lawsuit or
misleads them by failing to reveal how some proposed transaction might affect their
rights in the litigation."); *In re Currency Conversion Fee Antitrust Litigation*, 361 F.
Supp. 2d 237, 254 (S.D.N.Y. 2005) (arbitration agreement rollout to putative class
members (without court's knowledge) held misleading where defendant omitted the
"critical information," including that "by failing to reject the arbitration clause, they were
forfeiting their rights as potential plaintiffs" in pending class action).

   "Failure to append the complaint, provide plaintiffs' counsel's contact
information, explain plaintiffs' claims, or clearly describe the status of the case are
commonly regarded (in various combinations) as omissions warranting corrective
action." *Kirby*, 2020 U.S. Dist. LEXIS 146449 at *9. That failure is made more egregious
because the Employment Agreement was a mandatory "condition of employment" made
"in consideration of my employment,"[6] and did not contain an opt-out provision allowing
opt-out from the Arbitration Agreement for even a limited rescission period after signing
– including once an Underwriter learns for the first time after signing that they just
excluded themselves from a class/collective action lawsuit that was filed on their behalf.

---

[6] *See, e.g., Jimenez v. Menzies Aviation Inc*, 2015 U.S. Dist. LEXIS 108223, at *16 n.5
(N.D. Cal. Aug. 17, 2015) (invalidating arbitration agreements, finding "condition of
employment" language "evidently ma[de] the agreement a condition of employment" but
"[a]t a minimum…gave the impression that it was a condition of employment,
confirming the risk of abuse."); *O'Conner*, 444 F. Supp. 3d at 598 (invalidating post-
filing arbitration agreements; language stating "as a condition of employment" and "in
consideration of my employment" meant it was required as a condition of employment).

-11-

Defendant may argue that it should nonetheless be given a free pass because its first and only disclosure of Plaintiff's name or the case caption, (one-sided) summary of claims, and identification of Plaintiff's counsel in this litigation was contained within the text of a separately emailed Release Agreement.[7] Not so. Its failure to identify this case during the meeting, or even mention this pending action in the Employment Agreement, much less attach or otherwise provide a copy of the Complaint before presenting it for signature, was a calculated choice; because "[i]t would have taken minimal effort or funds for Defendants to append the complaint to the letter they sent…failure to do so is strong evidence that they sought to ensure the putative class members would not have the complaint when making any decision…" *Kirby*, 2020 U.S. Dist. LEXIS 146449 at *10.

And by failing to include an opt-out period for rescinding after signing, any Underwriter who opened and e-signed the Employment Agreement first[8] before moving on to open and read the separately emailed Release Agreement was precluded by this subterfuge from then opting out of the class/collective waiver upon belatedly learning even the limited one-sided details provided regarding this class/collective action filed on their behalf – if, that is, they could even make that connection despite no disclosure in the arbitration provisions to that effect. Regardless, courts have invalidated arbitration agreements obtained *ex parte* from current employees even where the agreement itself – *unlike here* – listed the specific court case filed against the company affected by agreeing to arbitrate. *See, e.g., Piekarski v. Amedisys Illinois, LLC*, 4 F. Supp. 3d 952, 954 (N.D. Ill. 2013) (invalidating post-filing arbitration agreements because defendant failed to attach copies of Complaints and roll-out was calculated to reduce participation in pending

---

[7] *See* III.C.i and n.4 *infra* for additional argument regarding Defendant's calculated choice to require its employees to click a link to view a .pdf of the Complaint using their website browser rather than provide an actual copy, and the fact that the Complaint was not accessible by that link on and after October 23, 2020.

[8] The Release Agreement was not provided first sequentially or in any other way designed to ensure that a putative class/collective member must first read it before clicking, reading, and signing the separate Employment Agreement. (Chaidez Decl., ¶¶ 4, 7)

lawsuits, despite cover letter "not[ing] that employees who did not opt-out…would be barred from participating in any class actions, including [listed pending cases]."); *Molyneux*, 2011 U.S. Dist. LEXIS 156173, at *7 (allowing opt-out from arbitration agreement that specifically "list[ed] the specific actions, including this one").

Moreover, while the Release Agreement (but not the Employment/ Arbitration Agreement) stated that an FLSA collective action had been filed on their behalf but assured Underwriters that the Release Agreement was not releasing the right to "bring" those FLSA claims "that were asserted in the Lawsuit",[9] neither agreement alerted Underwriters that by signing the Arbitration Agreement an Underwriter would nonetheless be forfeiting their right to "bring" those FLSA claims "that were asserted in the Lawsuit" in the pending action.[10]

In sum, Defendant improperly extracted uncounseled waivers of rights to participate in this lawsuit "all without any acknowledgment of this litigation, description of the claims asserted, summary of the status of the case, input from the named plaintiff or her counsel, or oversight from the Court." *Reed v. Sci. Games Corp.*, No. C18-0565RSL, 2021 U.S. Dist. LEXIS 113805, at *11 (W.D. Wash. June 17, 2021) (refusing to enforce post-filing arbitration/class waiver agreement).

### iii. Conspicuously absent were any assurances of no retaliation for not signing or similar protections.

Courts considering whether to invalidate *ex parte* post-filing arbitration agreement blitz campaigns have also given weight to additional factors such as whether the

---

[9] "I…waive my right to bring, recover, release, and settle any and all claims (except those under the FLSA) that were or could have been asserted in the Lawsuit." (Release, p. 3).
[10] This motion is limited to remedying Defendant obtaining arbitration and waiver agreements by improper, misleading and coercive *ex parte* communications with putative class/collective members. While Plaintiff believes the arbitration agreements are also unenforceable as a matter of contract law, including due to unconscionability (and potential formation challenges to be asserted by alleged signatories), those enforceability issues are beyond the scope of the present motion but would be rendered moot if this motion is granted.

-13-

employer promised that no consequence would attach if an employee decided not to sign the agreements, and whether the employees were informed that extensions of the consideration period could and would be granted – both of which were lacking in this arbitration agreement rollout. *Cf. Smith v. Keypoint Gov't Sols., Inc.*, 2015 U.S. Dist. LEXIS 81308, at *10 (D. Colo. June 23, 2015) (declining to invalidate because arbitration agreements assured no retaliation for opting out and that they could request and receive extensions of the opt-out period). Only the Release Agreement assured no retaliation or consequences, but it expressly limited those assurances to the decision whether to sign "<u>this Agreement</u>." Defendant's choice not to give the same assurances for whether to sign the Employment/Arbitration Agreement was intentional.

### C. Even On Its Own, the Release Agreement Should be Invalidated.

#### i.  Defendant did not provide an actual copy of the Complaint.

In *Kirby*, as here, defendant did not provide a copy of the Complaint with the Release Agreement, evidencing a deliberate choice to obtain releases from employees who had not read the Complaint. There, the employer instead directed putative class members to obtain a copy from the court. Here, Defendant merely listed a link to Plaintiff's counsel's website to obtain a copy. But there is more to this than meets the eye, and it must be viewed in the overall context.

The At-Will Employment Agreement informed Underwriters that their employer "has the right to audit and search all [of its company media] items and systems, without further notice to me," including specifically "the right to access[ and] review…all website visits, and "the right to monitor usage of the Internet, including websites visited and any information I have downloaded."[11] Unlike reading a copy of the Complaint if one had been provided with the release (where an employer cannot monitor whether their eyeballs looked at it), and unlike physically visiting the courthouse to view one (same), requiring an Underwriter to click or affirmatively input a URL link in their web browser

---

[11] *See* fn. 3, *infra*.

to view a temporarily-available .pdf on Plaintiff's counsel's website would thereby create
a digital trail that Defendant could monitor to see which Underwriters indicated
disloyalty by affirmatively attempting to view the Complaint online. Whether due to the
chilling effect of fearing potential repercussions if they created that digital trail, or due to
a myriad of other factors all of which would have been negated by providing an actual
copy of the Complaint with each agreement affecting their rights in this litigation, the
facts here are unlike those cases where the employer provided an actual copy of the
Complaint when presenting the agreement, and fall within those cases like *Kirby* in which
the employer merely told employees how to go get the Complaint themselves. Again, this
was a calculated choice: "[i]t would have taken minimal effort or funds…to append the
complaint..." *Kirby*, 2020 U.S. Dist. LEXIS 146449 at *10; *see also Johnson v. Serenity
Transp., Inc.*, 2017 U.S. Dist. LEXIS 156804, at *21 (N.D. Cal. Sep. 25, 2017) (requiring
corrective notice and invalidating releases, despite defendant's contention that it (i)
emailed the Complaint to many of the drivers before sending the release and (ii) posted
the complaint next to the drivers' workplace mailboxes); *see also Piekarski*, 4 F. Supp.
3d at 956 (invalidating arbitration/class waivers rollout as likely to confuse and mislead
including because "if the employees wanted to access the complaint[] in this case….
employees would have to click a link to access [it]"); *Ontiveros v. Safelite Fulfillment,
Inc.*, 2017 U.S. Dist. LEXIS 222414, at *9 (C.D. Cal. Oct. 16, 2017) (concluding
defendant "did not include a copy of the [] Complaint" where plaintiff's motion disclosed
defendant merely told putative class members that the Complaint "can be accessed at
[court docket URLs]" and also "can be obtained from Plaintiff's counsel").

But even attaching a copy of the Complaint is not a get-out-of-Court-oversight-free
card, if under the totality of the circumstances (as here) other factors establish that the
rollout usurped the Court's authority over class/collective action notice management, and
created the likelihood for abuse depriving the putative class/collective members of the
ability to make an informed decision. *See, e.g., Stafford*, 2015 U.S. Dist. LEXIS 192037,
at *8 (holding even where defendant attached an actual copy of the Complaint to the

1  letter, "the Court concludes that in order to counteract the coercive nature of the

2  employer-employee communication, the putative class should be explicitly instructed that

3  they have more time to consider the offer, discuss with Plaintiff's counsel, and either

4  complete the settlement or withdraw their prior release as they choose."). And where

5  information is not "consistently presented in [each of] the ex parte communications,"

6  such as here where some employees read and signed an Arbitration Agreement before

7  learning of this pending lawsuit (or their rights to join or otherwise benefit from it) and

8  counsel's contact information; and some never saw a copy of the Complaint, courts have

9  found the entire campaign to be "misleading, obfuscating, and only serve[d] to counter

10  Defendant's neutral statements…." *Kutzman v. Derrel's Mini Storage, Inc.*, 354 F. Supp.

11  3d 1149, 1156-57 (E.D. Cal. 2018) (ordering settlement agreements are voidable).

12  **ii. Defendant prevented an informed decision on potential claim value.**

13  Regardless, Defendant provided <u>no information whatsoever</u> regarding the amount

14  of (or how to estimate) overtime wages, penalties, damages and interest that Plaintiff

15  claims each Underwriter was owed, or any explanation even of which overtime hours

16  were at issue (including, for California, hours over 8 in a day or any seventh day hours

17  even in weeks working less than 40 hours, with double time for hours over 12, etc.) or

18  what penalties and damages may apply,[12] or a method of estimating potential damages, or

19  that Plaintiff seeks to have Defendant pay all attorney's fees and costs in the case, or any

20  other information from which a lay person could make a reasoned judgment as to what

21  potential recovery they were giving up in exchange for the lump sum $5,000. *See Kirby*,

22  2020 U.S. Dist. LEXIS 146449, at *11 (releases voidable because they lacked "any

23  information about how that amount might compare to the value of their claims...[without

24  which] putative class members cannot make an informed decision about whether to

25  accept or reject the settlement offer); *Cty. of Santa Clara v. Astra USA, Inc.*, 2010 U.S.

26  Dist. LEXIS 78312, at *16 (N.D. Cal. July 8, 2010) (defendant's release "should not have

27

28  _____
[12] Although the Release required release of claims arising under any state's laws, it provided no information whatsoever regarding non-California claims being released.

concealed material information," and "at a minimum should have explained...how closely
[defendant's settlement] calculations aligned with plaintiff's allegations").

While it is true that the release in *Kirby* did not include plaintiff's counsel's name
and contact information, it did state that a copy of the complaint (which has that
information) could be obtained from the court (which was obtainable online by case
number search, and at the courthouse, for all 30 days) in addition to directing putative
class members to a third-party non-attorney HR Consultant whom they could either call
or text to presumably obtain that information. Here, although Defendant provided the
names and contact information for Plaintiff's counsel in (and only in, belatedly,) the
Release Agreement, the sentences preceding that indicated counsel only "represents
Lorenzo Dominguez, the Plaintiff." And although the Release advised Underwriters of a
"right to consult with an attorney of my choice" including Plaintiff's counsel, it warned
that "Better will not pay attorney's fees or costs, if any, associated with any consultation
with any attorney" – which is not only a false statement of law if plaintiffs prevail, but
was also designed to falsely imply that any attorney they contact would charge them a fee
for consultation.[13]  Regardless, Defendant preemptively negated the idea of contacting
counsel with questions by having instead told Underwriters during the meeting that they
should contact Defendant's HR employees (who control Underwriters' employment) with
any questions about the agreements being rolled out – a direct contradiction.

### iii.   The Release Agreement was contradictory, misleading, intimidating, and interfered with the purposes of Rule 23 and FLSA opt-in notice.

As addressed above, the release required decision within three business days but
gave no information that a non-lawyer could use to determine potential damages
available on the claims pled, much less potential individual amounts.

But the Release Agreement's language was also designed to confuse.

---

[13] The DocuSign emails had warned Underwriters "**Do Not Share This Email,**" making
no exception for sharing the documents with counsel, and the Employment Agreement
required employees to direct any questions whether information (such as the Agreements)
must be kept confidential to Defendant's General Counsel. (Chaidez Decl., Exhs. 1-3.)

1    Defendant intentionally chose legalese designed to confuse its non-lawyer

2  employees. In *Kirby*, defendants' description of plaintiffs' claims relied on terminology

3  from statutory titles (using "meal break" and "rest period" to describe plaintiff's claims)

4  – legalese with which this Court recognized putative class members "are probably not

5  familiar." *Kirby*, 2020 U.S. Dist. LEXIS 146449, at *10. The release here similarly relied

6  on terminology from statutory titles ("meal periods," "rest periods," "misclassified as

7  exempt," etc.), obfuscating what the law requires and an explanation of what Plaintiff

8  alleged in layman's terms. As this Court opined in *Kirby*, "Defendants could certainly

9  have provided an explanation of the release in layman's terms." *Id.*, at *13.

10    The release was intentionally[14] confusing as to its scope, indicating in places that it

11  only applies to the California claims (summarizing claims pled in Complaint as limited to

12  FLSA and "violation of California law"; "by signing this Agreement, I am precluded

13  from participating in any class action or settlement alleging violation of the California

14  Claims"), but then burying at the end of the two sentence release paragraph consisting of

15  16 lines of legalese a catch-all "for violations of the wage and hour laws of states and

16  localities other than California"). (Chaidez Decl., Exh. 3, pp. 3-5.)

17    It also required Underwriters to give directly contradictory statements, requiring

18  required them to state "I acknowledge that I have been paid all wages owed to me"[15] then

19  directly contradict that by saying "I acknowledge that a good faith dispute exists as to

20  whether I am owed wages, overtime, meal and rest break premiums, waiting time

21

22

---

[14] Malicious intent, though egregious, is not required; courts may correct the effects of
misleading communications that threatened the fairness of the litigation "even if this was
not [Defendant]'s intention." *Portillo v. Nat'l Freight, Inc.*, 2021 U.S. Dist. LEXIS
148725, at *13-14 (D.N.J. Aug. 9, 2021) (arbitration agreements obtained post-filing
without disclosing effect on participating in the pending lawsuit disregarded).
[15] Extracting a statement that no wages are owed attempts to "commit[ potential class
member] employees…to a set of facts that may be adverse to their interest and without
their having been fully informed of all aspects of the case." *Mevorah v. Wells Fargo
Home Mortg., Inc.*, 2005 U.S. Dist. LEXIS 28615, at *16 (N.D. Cal. Nov. 17, 2005).

-18-

1  penalties, and/or other penalties." An employee cannot both acknowledge that all owed

2  wages were paid, then attest to a good faith dispute whether all owed wages were paid.

3         This gambit was misleading for the additional reason that it would require

4  employees who were aware that they were owed overtime pay under California law, and

5  aware (as they indisputably were) that they did not receive any overtime pay, to falsely

6  attest that there was no dispute as to whether they had been paid all wages owed to them.

7  The release therefore misleadingly violated Labor Code 206.5, which prohibits "requiring

8  an employee, as a condition of being paid, to execute a statement of [pay owed for hours

9  worked] which the employer knows to be false." And by requiring this factual attestation,

10 "an employee may also be deterred from participating in an ongoing DOL investigation

11 if, for instance, she believes that the coerced declaration can subsequently be used against

12 her to claim (albeit mistakenly) that the employee perjured herself." *Acosta v. Sw. Fuel*

13 *Mgmt.*, 2018 U.S. Dist. LEXIS 22554, at *14 n.3 (C.D. Cal. Feb. 2, 2018). But worst of

14 all, this was a calculated effort to deter participation in the FLSA collective action by an

15 end run around the law prohibiting unsupervised releases of FLSA claims by private

16 agreement – because a non-lawyer employee who signs an attestation that they have been

17 paid all overtime wages owed will think that means they cannot then bring a FLSA claim

18 that they were owed overtime wages, and employers have argued exactly that.[16]

19        The release also did not accurately reflect what Defendant knew to be all of the

20 claims being asserted at that time on the Underwriters' behalf. Defendant received

21 service of Plaintiff's PAGA letter summarizing all claims asserted on behalf of the

22 aggrieved employee Underwriters on September 28, 2020. (Head Decl., ¶ 3.) But while

23 the release required waiver of the right to bring, or recover on, any PAGA claims,

24 Defendant never disclosed that a pre-requisite PAGA letter had been filed on their behalf,

25

26 [16] *Cf.*, *Nasrallah v. Lakefront Lines, Inc.*, 2017 U.S. Dist. LEXIS 80500, at *13 (N.D.

27 Ohio May 25, 2017) (employer argued plaintiff's "represent[ation] that she was paid for

28 all hours worked" in state law release barred later FLSA claim because it therefore established that there was no bona fide dispute that all hours were paid).

1    nor did it disclose the additional claims raised in that PAGA letter (for example, penalties

2    for failure to reimburse cell phone and home internet business expenses).

3           And by requiring release of PAGA claims that cannot be released by law,[17] the

4    Release Agreement violated rights guaranteed to California Underwriters under

5    California law – and misled them as to the applicable law, by failing to inform them that

6    a release requiring waiver of PAGA claims is prohibited by law. *See, e..g, Slavkov*, 2015

7    U.S. Dist. LEXIS 149013, at *18 (release held voidable as misleading because it sought

8    release of unwaivable claims including PAGA: "the letters neglected to inform the

9    recipients that some of those claims could not, in fact, be released solely through the

10   proffered agreement").[18] So too was its backdoor attempt to preemptively waive worker's

11   compensation claims that are non-waivable, by requiring as a condition of receiving

12   payment that the employee also attest "I am not aware of any facts (including any injuries

13   or illnesses) which might cause me to file a workers' compensation claim against Better."

14   (Chaidez Decl., Exh. 3, p. 5)

15          The release also did not clearly and accurately reflect the status of the case. First,

16   as in *Kirby*, it stated "no class has been certified," but as this Court recognized, "[a] non-

17

18   [17] Release agreements compelling the waiver of representative claims under PAGA are
     contrary to public policy and unenforceable as a matter of law. *See Iskanian v. CLS
19   Transp. L.A., LLC*, 59 Cal. 4th 348, 383 (2014) ("[I]t is contrary to public policy for an
20   employment agreement to eliminate th[e] choice [to bring PAGA actions] altogether by
     requiring employees to waive the right to bring a PAGA action before any dispute
21   arises." (citation omitted)); *Julian v. Glenair, Inc.*, 17 Cal. App. 5th 853, 865 (2017) (pre-
22   dispute agreements to waive PAGA claims violate public policy; employees not yet
     deputized to bring PAGA claims by their own prerequisite LWDA filing are pre-dispute).
23   [18] The Release Agreement was similarly misleading as to non-California underwriters
24   whose applicable state law statutory wage, overtime, meal or rest break, or
     reimbursement claims cannot be released by private agreement – including North
25   Carolina where Defendant maintains branch offices staffed by Underwriters. *See, e.g.,
26   Rehberg v. Flowers Baking Co. of Jamestown, LLC*, 162 F. Supp. 3d 490, 506-07
     (W.D.N.C. 2016) (North Carolina Wage and Hour Act claims cannot be released by
27   private agreement) (<u>citing</u> *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2001 U.S.
28   Dist. LEXIS 18370, at *22 (N.D. Ill. Nov. 9, 2001) (same as to Illinois wage claims)).

lawyer is highly unlikely to understand what that means." *Kirby*, 2020 U.S. Dist. LEXIS 146449, at \*11. It also failed to disclose that by the time of the October 2020 rollout, Defendant had defaulted by failing to timely answer the Complaint. And Defendant apparently continued accepting signed releases after October 29, 2020 without disclosing that by that time Defendant had affirmatively agreed to mediate the claims of all potential class/collective action members for potential early resolution.[19] *See, e.g., Kutzman*, 354 F. Supp. 3d at 1156 (communication of release was misleading because "[a]t no time were any of the putative class members apprised of the status of the case, including that the parties had scheduled a mediation in mid-December—a critical fact one might want to consider before deciding to settle.").

The Release was also designed to intimidate. In bolded text using larger font and spacing,[20] it highlighted that Underwriters had "**No Right to Continued Employment**" and prominently addressed "**Termination**" (unlike in *Kirby*), telling Underwriters "[t]he grant of this Release Payment opportunity does not give you any right to continue your employment relationship with Better…and you shall remain subject to discharge." (emphasis original) And it concluded by implicitly threatening that refusal to sign would indicate a lack of commitment to their employer: "We hope that this arrangement encourages your continued commitment to Better." The combined effect was to prey on possible "fears and concerns" of the putative class/collective members – preemptively chilling their opt-in participation in a collective action. *See Belt v. Emcare Inc.*, 299 F.

---

[19] The parties discussed potentially mediating all potential claims in the case by conference call held on October 29, 2020, and confirmed their agreement to mediate on November 2 or 3, 2020. (Head Decl. ¶ 4.) Defendant had likely already decided to seek mediation by October 19, 2020. Regardless, Defendant apparently continued to accept arbitration and release agreements from that initial rollout after October 29, 2020, continuing beyond November 3, 2020, without notifying putative class/collective action members of the changed status of the litigation regarding Defendant's agreement to mediate their claims.

[20] The Release Background (litigation disclosure) and Agreement of Release (release terms) paragraphs were communicated in smaller font, with tighter spacing, than the rest of the Release Agreement text such as Payment details.

Supp. 2d 664, 668 (E.D. Tex. 2003) (finding defendant's *ex parte* communication targeted at putative opt-ins regarding the case interfered with neutral notice, including because it "tapped into fears and concerns" held by the putative opt-in recipients).

Next, as with the *Kirby* release that conveyed the possibility that they could recover nothing in the litigation, the release here conveyed that "Better denies and disputes these claims," stated that any later settlement "could result in a settlement formula that provides less money to me," and required putative class members to (falsely) "acknowledge that I have been paid all wages owed to me," which (as the Court recognized in *Kirby*) "all but encourages putative class members not to join the class." *Kirby*, 2020 U.S. Dist. LEXIS 146449, at *11.

The release also broadly prohibited "***participating*** in any class action … alleging violation of the California claims" including as a witness, and the Employment Agreement's confidentiality terms would appear to prohibit even providing information as a witness in any such action. *See, e.g., Slavkov v. Fast Water Heater I, LP*, 2015 U.S. Dist. LEXIS 149013, at *12 (N.D. Cal. Nov. 2, 2015) (release requiring they not "participate" in class action and confidentiality agreement was misleading because non-lawyer employees would think it barred giving information or participating as a witness).

### D. Viewing the Rollout of the Agreements under the Totality of the Circumstances, the Court Should Invalidate Both Agreements or Allow Corrective Notice and Opportunity to Void.

"[E]x parte solicitation of opt-outs by a defendant before class certification is improper." *Camp v. Alexander*, 300 F.R.D. 617, 625 (N.D. Cal. 2014). Defendant "knew good and well that a Rule 23 certification was still on the table — this tactic cannot be allowed under Rule 23, for to rule otherwise would allow defendants to shift control of one proceeding from the district judge to the defense counsel." *Cty. of Santa Clara*, 2010 U.S. Dist. LEXIS 78312, at *22. "Indeed, misleading the putative plaintiffs, offering a potentially much decreased settlement, and not cooperating with the plaintiffs all show a lack of good faith." *Id.*, at *23.

1   As this Court found in *Kirby*: "[t]hese inadequacies and omissions combine to
2   render Defendants' communications with putative class members misleading" – rejecting
3   defendants' argument that they were not *required* to include the information identified as
4   missing as "reflect[ing] a misunderstanding of–or willful blindness to–the governing
5   standard, under which communications with putative class members must arm them with
6   enough information to make an '*independent, informed decision*.'" *Kirby*, 2020 U.S. Dist.
7   LEXIS 146449, at *11-12.

8   This is because the Court need only find that the rollout was likely to result in
9   abuses, under the totality of the circumstances as viewed by the entire context. *See, e.g.,*
10  *Talavera v. Leprino Foods Co.*, 2016 U.S. Dist. LEXIS 29633, at *14-15 (E.D. Cal. Mar.
11  8, 2016) ("Whether a communication is misleading or coercive—…[warranting] judicial
12  intervention—often depends not on one particular assertion, but rather the overall
13  message or impression left by the communication…a Court therefore 'must examine 'the
14  context in which the communications were made and the effect of the communications'")
15  (citations omitted). Courts recognize the chilling effect that this conduct has on
16  class/collective action participation. *Rivera v. FIS Operations, LLC*, 2019 U.S. Dist.
17  LEXIS 173205, at *7 (C.D. Cal. Oct. 2, 2019) (finding that post-filing arbitration
18  agreement rollout "will have a 'chilling effect' [because]…employees who otherwise
19  may have wanted to opt-in may think that they no longer have the right to do so.").

20  Similar relief was granted in *Kutzman* even though that court found "none of
21  Defendant's individual acts here rises to such an egregious level that makes it
22  immediately analogous to prior cases," and even that "there are many times when it
23  appears to be following the proper playbook, taking steps to inform its…employees about
24  the suit in plain, neutral terms" (which cannot be said of the Zoom meeting and
25  Employment/Arbitration Agreement here). *Kutzman*, 354 F. Supp. 3d at 1156. While the
26  court in *Kutzman* found that "Defendant made no overt threats to its employees, did
27  discuss some aspects of the case at various times with the putative members, and advised
28  them to seek outside counsel before agreeing to settle," the court nonetheless recognized

-23-

that "the standard is one requiring the facts be examined in totality" and found "Plaintiffs have met their burden to show misleading and coercive conduct on Defendant's part." *Id.*, at 1158. The court held "[g]iven the significant number of minor errant acts, the appropriate remedy is to send a curative notice to the putative class, make all settlement agreements voidable, …and consider awarding fees for this motion." *Id.*

Plaintiff submits that the evidence is sufficient to warrant invalidating the arbitration, class/collective action waiver, and release agreements as to any participation in, and claims raised by, this case. Courts frequently grant that relief. *See Jimenez*, 2015 U.S. Dist. LEXIS 108223, at *18 (deeming arbitration agreements unenforceable where employer implemented them after the putative class action was filed, did not inform employees of their effect on the pending action, and did not provide a reasonable opportunity to opt out); *accord McKee*, 2018 U.S. Dist. LEXIS 179978, at *15-16; *Balasanyan v. Nordstrom, Inc.*, 2012 U.S. Dist. LEXIS 30809, at *12 (S.D. Cal. Mar. 8, 2012); *Oconner*, 444 F. Supp. 3d at 598; *Astarita v. Menard, Inc.*, 2019 U.S. Dist. LEXIS 194337, at *8 (W.D. Mo. Nov. 8, 2019); *Piekarski*, 4 F. Supp. 3d at 956.

Plaintiff's request is narrowly focused on remedying the likely harm: the agreements should be deemed invalid only as to the putative class/collective members' claims arising from the facts pled, and as to their eligibility to participate as class or collective action members in this litigation. *See, e.g., O'Conner*, 444 F. Supp. 3d at 606.

Alternatively, and mindful of this Court's conclusion on an appropriate remedy in *Kirby*, Plaintiff requests an order issuing Court-approved curative notice in the form attached, with a thirty-day period within which Underwriters may reconsider any previously signed agreements as to this litigation and affirmatively ratify them after curative notice or void them by choosing not to do so. *See Kirby*, 2020 U.S. Dist. LEXIS 146449, at *15 (declaring individual settlements voidable after receiving Court-ordered curative notice). Plaintiff's proposed notice and reaffirmation process follows *Chalian v. CVS Pharmacy*, 2020 U.S. Dist. LEXIS 219752, at *6 (C.D. Cal. Nov. 20, 2020):

[T]he better approach is to invalidate those opt-outs, provide the corrective notice, and then the affected members can then make an affirmative choice whether to opt-out. This is not a burdensome process.

To avoid a recurrence, and to remedy the residual impact of a previous coercive and misleading blitz campaign on future decision-making, Defendant should be ordered to disclose in advance, meet and confer, and obtain prior approval from counsel or the Court of any intended communications potentially impacting this litigation during the applicable notice periods. *See McKee*, 2018 U.S. Dist. LEXIS 242208, at *7-8 (requiring defendant to get prior approval, from counsel or the court, of and before any class/collective communication that "would have a direct and immediate impact on the litigation, such as contact related to arbitration provisions, class action waiver, or any contact that could impact settlement or putative class members' rights in this litigation.").

## IV.    CONCLUSION

For these reasons, Plaintiff requests that the Court invalidate all release agreements and arbitration agreements, as to these putative class and collective members' participation, and claims arising from facts pled, in this litigation.

In the alternative, Plaintiff requests that the Court:

1. Order Defendant to identify all individuals it contacted regarding the agreements (specifying whether and what they signed) and their mail and email addresses;

2. Authorize Plaintiff to distribute the proposed Corrective Notice and forms (Head Decl., ¶ 7, Exh. 1) to those individuals by mail and email,

3. Authorize signatories to rescind any of their previously signed agreements by choosing not to affirmatively accept them again after corrective notice within a 30 day reconsideration period, with each retaining amounts paid subject to potential offset by Defendant against any recovery they may obtain in this action; and

4. Require Defendant to obtain Plaintiff's counsel's or Court approval before any communications with putative class/collective members during the reconsideration period (and any other applicable opt-in or exclusion period) that could potentially impact their participation or claims raised in this case.

Dated: October 1, 2021

**HEAD LAW FIRM, LLC
NICHOLS KASTER, LLP**

By:   /s/ C. Andrew Head
C. Andrew Head

Attorney for Plaintiff and Others Similarly Situated