Matthew C. Helland, CA State Bar No. 250451
Helland@nka.com
Daniel S. Brome, CA State Bar No. 278915
dbrome@nka.com
NICHOLS KASTER, LLP
235 Montgomery St., Suite 810
San Francisco, CA  94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Jason Christopher Marsili (CA SBN 233980)
jmarsili@rmrllp.com
ROSEN MARSILI RAPP LLP
3600 Wilshire Blvd., Suite I 800
Los Angeles, CA  90010-2622
Telephone: (213) 389-6050
Facsimile: (213) 389-0663

*Attorneys for Plaintiff and Others Similarly Situated*
*Additional Counsel Listed on Following Page*

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Lorenzo Dominguez, individually, on behalf of others similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>Better Mortgage Corporation,<br><br>Defendant. | **Case No. 8:20-cv-01784-JLS-KES**<br><br>**Declaration of Rudy Chaidez** |

C. Andrew Head (admitted *pro hac vice*)
ahead@headlawfirm.com
Bethany Hilbert (admitted *pro hac vice*)
bhilbert@headlawfirm.com
HEAD LAW FIRM, LLC
730 Peachtree St NE, Suite 600
Atlanta, GA 30308 (virtual office)
4422 N. Ravenswood Ave.
Chicago, IL 60640 (resident office)
Telephone: (404) 924-4151
Facsimile: (404) 796-7338

DECLARATION OF RUDY CHAIDEZ

1.     My name is Rudy Chaidez.  I am over the age of eighteen and competent to testify to the matters set forth in this declaration.  I make this declaration based on my own personal knowledge.

2.     I worked for Better as a mortgage underwriter from approximately January, 2020 until October, 2020.

3.     On October 19, 2020, Better management called a mandatory attendance Zoom video meeting with all of its currently employed Underwriters. During that Zoom meeting conducted by the Director of Underwriting and HR, we (I and the other Underwriters from all over the country) were told by the presenters that "we like to be transparent" (or words to that effect), that Better strongly disagrees with a certain (unidentified) lawsuit that has been filed against the company for overtime (without identifying the person(s) or the position(s) allegedly claiming overtime pay), and that they are going to do everything in their power to fight it, which brings them to the new terms of employment and agreements which they said they needed us to sign. We (the Underwriters) were specifically told "we need you to sign" the new Employment Agreement (and, to the best of my recollection, we were told the same as to the Release Agreement) – it was clearly conveyed to us that signing the new Employment Agreement was mandatory (and again, to the best of my recollection, that was also indicated as to the Release Agreement). The only agreement that the presenters described to us as "voluntary" was the Retention Agreement; they did, however, say that in order to get the retention bonus you had to sign the other two agreements.

4.     During that meeting, which was mandatory and during regular work hours:

a.  They never gave the name of the person who sued or the name of the case, and instead merely said if we wanted to we could look it up ourselves. They did not say how we could supposedly do that.

b.  They never told us what the case was about other than it was for

overtime; they never told us what job the person who sued had worked for Better, and they never told us that the case was about overtime pay for performing underwriting work, or that it was on behalf of any other individuals much less that it was on behalf of us as Underwriters, or that it was a class action or any other sort of action that might affect more than the one person who sued, or that we had a right to join the case or that we might be affected by the case.

c.  They never told us why the person who sued thought that he or she (never identified) was owed overtime pay, or for what work, or what hours.

d.  They never told us that the person who sued had a lawyer, much less who that person's lawyer(s) were or how to find that out much less how to contact them.

e.  They never told us why they disagreed with the suit, or why they were going to do everything in their power to fight it, or why the person who sued was not owed overtime.

f.  They did not ask us if any of us were represented by an attorney regarding our employment and they did not announce any exceptions that would apply to their instructions if we were represented by an attorney regarding our employment. They did not say anything that indicated we could or should consult with an attorney before making any decisions about the agreements they were presenting.

g.  They did not give us anything in writing that we could take away to consider – the first thing we received in writing was the DocuSign invites to sign agreements after the meeting. They did not tell us that we could, should, or even were permitted to record the Zoom meeting.

h.  To the best of my recollection, they did not tell us that the Employment Agreement they would be distributing included an arbitration agreement

with a class and collective action waiver. They did not tell us that if we signed the Employment Agreement, it would mean we would be not be affected by, and could not in any way participate in, whatever lawsuit had been filed. They did not tell us that it was the Employment Agreement, rather than the Release Agreement, that would give up our rights to participate in any way in, or benefit in any way from, that lawsuit. They did not tell us that we could sign the Retention Agreement without signing the other two agreements and still get paid the $10,000 retention bonus for signing only that one agreement. They did not tell us that we could sign the Release Agreement without signing the Employment Agreement and still receive the $5,000 release payment. They did not tell us that they would not be keeping track of or paying attention to whether we signed the agreements.

i.   They did not tell us that we must or even should read all of the agreements first before signing any one of them. They did not tell us that we must or should read the agreements in any particular sequence. They did not tell us that any agreement might have information in it that related to any other agreement.

j.   They did not tell us anything that would indicate that once you signed an agreement you could opt-out of it or otherwise withdraw your agreement in any way, even for example if you changed your mind while still within the five day period in which they were demanding that everyone sign and return at least the Release Agreement (I do not recall them saying anything that would indicate that the five day deadline for returning signed Release Agreements did not apply to the other two agreements as well).

k.   I do not recall anyone asking any questions, and there was no Q&A session that followed their announcement. The presenters told us that if

we had any questions we could email Human Resources; they never told us that the person who sued had attorneys or that we could talk to that person's attorneys. They never told us that the company's interests, and/or Human Resources' interests, were or could be adverse to our interests in terms of any questions we might have about the agreements or about the lawsuit that had been filed.

5.      After the conclusion of the meeting, we (all currently employed Underwriters, but no others) were each then sent a separate DocuSign email for electronic signature of each of three separate agreements:

    a.   Agreement titled "Employment Agreement" with our names auto-populated on the signature block but with no place for Better to sign (Docusign email and "Employment Agreement" attached as Exhibit 1);

    b.   Agreement titled "Release Agreement" with our names and email addresses auto-populated on the first page and signed by the Secretary of the corporation with a signature date of October 19, 2020 (Docusign email and "Release Agreement" attached as Exhibit 2); and

    c.   Agreement titled "Retention Bonus Agreement" with our names and email addresses auto-populated on the first page and signed by the Secretary of the corporation with a signature date of October 19, 2020 (Docusign email and "Retention Bonus Agreement" attached as Exhibit 3).

6.      Each DocuSign email stated in the subject line, and twice in the body of the email (including once in larger font): "Please DocuSign: [title of agreement]." And in bold font, it warned: "**Do Not Share This Email.**"

7.      To the best of my recollection, I opened and looked at the Retention Bonus DocuSign email first, then I opened and looked at the Employment Agreement, then last I opened and looked at the Release Agreement, in that sequence. That might have been the sequence in which the emails came through, but I don't

1   specifically remember that well enough to say for sure. Had I been inclined to sign

2   any of those Agreements once I looked at them, I would have signed the Agreement

3   I had just looked at before moving on to the next one.

4       8.      Neither the Retention Agreement nor the Employment Agreement

5   mentioned anything about a lawsuit that had been filed, or gave the name of the

6   person who sued or the name of the case, or indicated any way we could look it up

7   ourselves, or said what the case was about or what job the person who sued had

8   worked for Better, or informed us that the person who sued had a lawyer much less

9   who that person's lawyer(s) were or how to find that out or how to contact them, or

10  told us that the case was about overtime pay for performing underwriting work, or

11  that it was on behalf of any other individuals much less that it was on behalf of us as

12  Underwriters, or that it was a class action or any other sort of action that might affect

13  more than the one person who sued, or that we had a right to join the case or that we

14  might be affected by the case. The Employment Agreement did not mention or

15  highlight that if we signed it, we would be prohibited from being affected by or

16  participating in any pending case that had been filed by anyone (much less one filed

17  on behalf of all Underwriters).

18      9.      I am not an attorney. I was confused about what I would have to agree

19  to in order to get paid any money being offered. The communication was misleading:

20          a.   They did not tell us that if we signed the Employment Agreement we

21              would be prohibited from benefitting from, being affected by, or

22              participating in, whatever lawsuit had been filed. The Employment

23              Agreement did not mention that lawsuit, or highlight that we were at

24              that time potential class or collective action members in that lawsuit but

25              we would purportedly be forfeiting our rights to be part of that lawsuit

26              if we signed the Employment Agreement. The presentation and the

27              DocuSign emails did not tell us that we could sign the Retention

28              Agreement without signing the other two agreements and still get paid

the $10,000 retention bonus for signing only that one agreement. The presentation and the DocuSign emails did not tell us that we could sign the Release Agreement without signing the Employment Agreement and still receive the $5,000 release payment. The presentation and the DocuSign emails did not tell us that we could sign the Employment Agreement without signing the Release Agreement and still be able to sue for overtime. At the time I was first reading those DocuSign emails, I didn't understand whether I could still sue or be covered by a suit for overtime if I signed one agreement but not the other.

b. The presentation and the DocuSign email communications did not tell us that they would not be keeping track of or paying attention to whether we signed the agreements. My understanding from speaking with another co-worker is that they automatically signed it quickly because they didn't want any negative ramifications from not signing.

c. Before and even after looking at the agreements, I did not understand which hours I might be owed overtime for, or whether any court had already decided whether underwriters are owed overtime, or what amount of money I might be owed that I might be able to claim if I was going to bring a claim.

d. Saying in the Release Agreement that if I signed it I would not be releasing the right to "bring" federal overtime claims "that were asserted in the Lawsuit," without making it clear that if I signed the Employment Agreement I would nonetheless be forfeiting my right to "bring" those federal overtime claims "that were asserted in the Lawsuit" in that pending Lawsuit, seems misleading to me and likely to other Underwriters as well.

e. The Employment Agreement did not give any assurances that I, or my fellow Underwriters, would not be retaliated against if we didn't sign it.

f. I did not click the website URL link that was in the Release Agreement. I was worried that Better potentially might be monitoring my online activity in response to receiving the agreements, and I didn't want them to see from the digital trail that would have created that I was interested enough to click the link to look at what was filed in Lorenzo Dominguez's lawsuit.

10. Better sent reminder emails, and if I recall correctly an initial email before the agreements were sent to us by DocuSign, that listed the names of the two individuals in Better's Human Resources department whom we were instructed to contact with any questions. I did not feel comfortable asking any Better management or HR person any questions about the money being offered or the agreements. Had I not seen Lorenzo Dominguez's name mentioned in the Release Agreement as the person who brought a lawsuit, I probably wouldn't ever have reached out to an attorney for advice about the agreements, but I recognized his name as a co-worker of mine in our California group and I knew him and knew he worked a lot of hours to hit high production numbers, so because I knew him in that way I decided I could trust his attorneys and I eventually contacted them. I am currently represented by those attorneys regarding my employment with Better.

11. I did not sign any of the agreements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of September, 2021

_Rudy Chaidez_

_____

Rudy Chaidez

# Exhibit 1



A A A A A U A X 2 E A                    A A A A A U A X 2 E A

---

## Cover Page for Faxing Documents to your DocuSign Envelope

1. Write the number of pages on the line below.
2. Fax the document and cover page to the appropriate number below:

| | |
|---|---|
| U.S. and Canada: | +1 888 258 5388, +1 206 452 7455 |
| London: | +44 330 822 0429 |
| Singapore: | +65 3158 6882 |
| Australia: | +61 280 155 634 |

| | |
|---|---|
| From: | Rudy Chaidez |
| Envelope Subject: | (Please DocuSign: Better Holdco & Better Mortgage Corp - At-Will Employment Agreement (CA |
| Attachments to Fax: | |
| Envelope ID: | 662c9b45-b353-4ecd-94df-86ea6e12d553 |
| Sender Account Name: | Better Holdco Inc. |
| Number of Pages: (Including cover page) | _____ |

DocuSign Customer Support: https://support.docusign.com

Note:
Fax transmissions take approximately one minute per page faxed.
This page may only be used once. If you would like to fax again, you must print a new cover page.

A A A A A U A X 2 E A                    A A A A A U A X 2 E A

### AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION,
### INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT

As a condition of my employment with Better Holdco, Inc. Better Mortgage Corporation, or Better Real Estate, LLC, as applicable (applicable entity referenced as the "**Company**") (together with the Company's divisions, affiliates, sister corporations, parents, and subsidiaries, the "**Company Group**"), and in consideration of my employment with the Company and my receipt of compensation paid to me by the Company, I agree to the following provisions of this Company At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "**Agreement**").

**1.**     **AT-WILL EMPLOYMENT**

I understand and acknowledge that my employment with the Company is for no specified term and constitutes "at-will" employment. I also understand that any representation to the contrary is unauthorized and not valid unless in writing and signed by the CEO or General Counsel of the Company. Accordingly, I acknowledge that my employment relationship may be terminated at any time, with or without good cause or for any or no cause, at my option or at the option of the Company, with or without notice. I further acknowledge that the Company may modify job titles, salaries, and benefits from time to time as it deems necessary.

**2.**     **CONFIDENTIALITY**

I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information (as defined below). I will not (i) use Company Confidential Information for any purpose whatsoever other than for the benefit of the Company Group in the course of my employment, (ii) disclose Company Confidential Information to any unauthorized third party, or (iii) publish or submit for publication, any article or book relating to or containing Company Confidential Information, without the prior written authorization of the General Counsel of the Company. I agree that I obtain no title to any Company Confidential Information, and that the Company Group retains all Confidential Information as the sole property of the Company Group. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company Group. I understand that my obligations under this section shall continue after termination of my employment.

I understand that "**Company Confidential Information**" means information (including any and all combinations of individual items of information) that the Company Group has or will develop, acquire, create, compile, discover or own, that has value in or to the Company Group's business which is not generally known and which the Company Group wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company Group to me, and information developed or learned by me during the course of my employment with the Company, and unauthorized disclosure of which could be detrimental to the interests of the Company Group. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company Group, or to the Company Group's business or products, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company Group's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company Group on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company Group either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company Group property.

I further recognize that the Company Group has received, and in the future may receive information from third parties (for example, customers, suppliers, licensors, licensees, partners, and collaborators) which the Company Group is required to maintain and treat as confidential or proprietary information of such third party.  I agree to use such third party confidential information only as directed by the Company Group and to not use or disclose such third party confidential information in a manner that would violate the Company Group's obligations to such third parties.  I agree at all times during my employment with the Company and thereafter that I owe the Company Group and its associated third parties a duty to hold all such third party confidential information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company Group's agreement with such third parties.  I further agree to comply with any and all Company Group policies and guidelines that may be adopted from time to time regarding associated third parties.

Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by the Company Group to me; (ii) becomes publicly known or made generally available after disclosure by the Company Group to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by the Company Group.  To the extent that I have any question as to whether information qualifies as Company Confidential Information, I agree to contact the Company's General Counsel and obtain his or her permission before using or disclosing such information in any way.  Similarly, prior to disclosure when compelled by applicable law, I shall provide prior written notice to the General Counsel of the Company.  I understand that nothing in this Agreement limits employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

### 3.  FORMER EMPLOYER CONFIDENTIAL INFORMATION

I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company Group to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep such proprietary information or trade secrets in confidence.  I further agree that I will not bring onto the Company Group's premises or transfer onto the Company Group's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company Group has been consented to in writing by such third party and the Company.

### 4.  INVENTIONS AND OWNERSHIP

I have read, understand, and agree to the terms of the Company's Invention Ownership Policy, as described in Exhibit A to this Agreement.  In addition, to the extent applicable, I have disclosed on Exhibit A all prior inventions that I have developed entirely on my own time and are entirely unrelated to the Company and any Company Confidential Information, and which inventions I agree not to incorporate into a Company product, process or service without the Company's prior written consent.

### 5.  CONFLICTING OBLIGATIONS

I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company Group is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

In addition, I represent that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired

by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company Group, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party, as well as any reasonable attorneys' fees and costs, except as prohibited by law.

## 6. RETURN OF COMPANY PROPERTY AND MATERIALS

I understand that anything that I create or work on for the Company Group while working for the Company belongs solely to the Company and that I cannot remove, retain, or use such information without the Company's express written permission. Accordingly, upon separation from employment with the Company or upon the Company's request at any other time, I will immediately deliver to the Company, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information (including third party confidential information), all Company equipment including all Company computers, external storage devices, thumb drives, mobile devices and other electronic media devices ("Electronic Media Equipment"), all tangible embodiments of the Inventions, all electronically stored information and passwords to access such information, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property. I understand that I may keep a copy of the Company's employee handbook and personnel records relating to my employment.

In connection with my obligation to return information to the Company, I agree that I will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained in Company Electronic Media Equipment before I return the information to the Company.

In addition, if I have used any personal Electronic Media Equipment or personal computer servers, messaging and email systems or accounts, applications for computers or mobile devices, and web-based services ("Electronic Media Systems") to create, receive, store, review, prepare or transmit any Company information, including, but not limited to, Company Confidential Information, I agree to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information and, if I locate such information, I agree to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company information from those equipment and systems. I agree to cooperate reasonably with the Company to verify that the necessary copying is completed (including upon request providing a sworn declaration confirming the return of property and deletion of information), and, upon confirmation of compliance by the Company, I agree to delete and expunge all Company information.

I understand that I have no expectation of privacy in Company property, and I agree that any Company property is subject to inspection by Company Group personnel at any time with or without further notice. As to any personal Electronic Media Equipment or personal Electronic Media Systems that I have used for Company purposes, I agree that the Company, at its sole discretion, may have reasonable access, as determined by the Company in good faith, to such personal Electronic Media Equipment or personal Electronic Media Systems to review, retrieve, destroy, or ensure the permanent deletion of Company information from such equipment or systems or to take such other actions necessary to protect the Company Group or Company property, as determined by the Company Group reasonably and in good

DocuSign Envelope ID: 663C9B45-B353-45CD-94DF-86EA6E42D553

faith. I also consent to an exit interview and an audit to confirm my compliance with this section, and I will certify in writing that I have complied with the requirements of this section.

### 7.   TERMINATION CERTIFICATION

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "**Termination Certification**" attached hereto as <u>Exhibit C</u>, and, upon the Company's request, participate in good faith in an exit interview with the Company.

### 8.   NOTIFICATION OF NEW EMPLOYER

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement. I also agree to keep the Company advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

### 9.   CONFLICT OF INTEREST GUIDELINES

I agree to diligently adhere to all policies of the Company Group, including the Company's insider trading policies, the Company's Conflict of Interest Guidelines, which is attached as <u>Exhibit D</u> to this Agreement, and the Company's Data and Information Security Policy, which has also been provided to me. I understand that these Conflict of Interest Guidelines and the Data and Information Security Policy may be revised from time to time during my employment.

### 10.   REPRESENTATIONS

Without limiting my obligations under the Invention Ownership Policy, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep confidential information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

### 11.   AUDIT

I acknowledge that I have no reasonable expectation of privacy in any Company Electronic Media Equipment or Company Electronic Media Systems. All information, data, and messages created, received, sent, or stored in Company Electronic Media Equipment or Company Electronic Media Systems are, at all times, the property of the Company. As such, the Company Group has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company Group is licensed to use the software on the Company Group's devices in compliance with the Company Group's software licensing policies, to ensure compliance with the Company Group's policies, and for any other business-related purposes in the Company Group's sole discretion.

I understand that it is my responsibility to comply with the Company Group's policies governing use of the Company Group's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.  In addition, as to any personal Electronic Media Equipment or personal Electronic Media Systems or other personal property that I have used for Company purposes, I agree that the Company Group may have reasonable access to such personal Electronic Media Equipment or personal Electronic Media Systems or other personal property to review, retrieve, destroy, or ensure the permanent deletion of Company Group information from such equipment

DocuSign Envelope ID: 663C9B45-B353-45CD-94DF-865A6E42D553

or systems or property or take such other actions that are needed to protect the Company Group or Company property, as determined by the Company Group reasonably and in good faith.

I am aware that the Company Group has or may acquire software and systems that are capable of monitoring and recording all Company Group network traffic to and from any Company Electronic Media Equipment or Company Electronic Media Systems. The Company Group reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through Company Electronic Media Equipment or Company Electronic Media Systems, with or without notice to me and/or in my absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company Group's internal networks. The Company Group further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company Group may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

## 12. ARBITRATION AND EQUITABLE RELIEF

I have read, understand, and agree to the terms of the Arbitration Agreement, as described in <u>Exhibit E</u> to this Agreement.  Specifically, I agree that in consideration of my employment with the Company, its promise to arbitrate all employment-related disputes with me, and my receipt of the compensation, pay raises and other benefits paid to me by the Company, at present and in the future, any and all controversies, claims, or disputes that I may have with the Company (including any Company Group employee, officer, director, trustee, shareholder or benefit plan of the Company, in their capacity as such or otherwise), arising out of, relating to, or resulting from my employment or relationship with the Company or the termination of my employment or relationship with the Company, including any breach of this Agreement, shall be subject to binding arbitration as described in <u>Exhibit E</u>.

## 13. MISCELLANEOUS

A. *Governing Law*. This Agreement will be governed by the laws of the State of California without regard to California's conflicts-of-law, except that any dispute regarding the enforceability of the arbitration section of this Agreement shall be governed by the FAA.

B. *Assignability*.  This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns.   Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C. *Entire Agreement*.  This Agreement, together with its Exhibits and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subjects covered in this Agreement and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations. Any subsequent changes in my duties, compensation, conditions or any other terms of my employment will not affect the validity or scope of this Agreement.

D. *Severability*. If a court or other body of competent jurisdiction finds, or the parties to this Agreement mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this Agreement will continue in full force and effect.

E.   *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the CEO or General Counsel of the Company and me. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach. For the avoidance of doubt, I agree that change in my duties, title, or compensation will not affect in any respect the validity, enforceability, or scope of this Agreement.

F.   *Survivorship.* The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

## 14.   PROTECTED ACTIVITY NOT PROHIBITED

I understand that nothing in this Agreement limits or prohibits me from filing and/or pursuing a charge or complaint with, or otherwise communicating or cooperating with or participating in any investigation or proceeding that may be conducted by, any federal, state or local government agency or commission, including the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, and the National Labor Relations Board ("**Government Agencies**"), including disclosing documents or other information as permitted by law, without giving notice to, or receiving authorization from, the Company. In addition, nothing in this Agreement, including its definition of Company Confidential Information, is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, nor to deny employees the right to disclose information pertaining to sexual harassment or any unlawful or potentially unlawful conduct, as protected by applicable law. I further understand that I am not permitted to disclose the Company's attorney-client privileged communications or attorney work product. In addition, I hereby acknowledge that the Company has provided me with notice in compliance with the Defend Trade Secrets Act of 2016 regarding immunity from liability for limited disclosures of trade secrets. The full text of the notice is attached in Exhibit B.

Date: _____      _____
                                            Signature

                                            Rudy Chaidez

                                            _____
                                            Name of Employee (typed or printed)

DocuSign Envelope ID: 663C9B45-B353-45CD-94D5-86EA6E42D553

# EXHIBIT A

## Company's Invention Ownership Policy

A.      *Assignment of Inventions*.  As between the Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, ideas, drawings, designs, logos, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of the Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in **Section G** below (collectively, "**Inventions**"), are the sole property of the Company.  I also agree to promptly make full written disclosure to the Company of any Inventions, and to deliver and assign and hereby irrevocably assign fully to the Company all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to the Company of ownership of Inventions that are not yet in existence.  I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.  I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

B.      *Pre-Existing Materials*.  I will inform the Company in writing before incorporating any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company, including without limitation, any such inventions that meet the criteria set forth herein under **Section G**  ("**Prior Inventions**") into any Invention or otherwise utilizing any such Prior Invention in the course of my employment with the Company, and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto.  I will not incorporate any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third party into any Invention without the Company's prior written permission.  I have provided below, in this Exhibit A, a list describing all Prior Inventions that relate to the Company's current or anticipated business, products, or research and development or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on this Exhibit A, they will not materially affect my ability to perform all obligations under this Agreement.

C.      *Moral Rights*.   Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**").  To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D.      *Maintenance of Records*. I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company.  The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company.  As between the Company and myself, the records are and will be available to and remain the sole property of the Company at all times.

E.     *Further Assurances*.  I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions.  I further agree that my obligations under this **Section** Error! Reference source not found. shall continue after the termination of this Agreement.

F.     *Attorney-in-Fact*.  I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to the Company in **Section 0**, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

G.     *Exception to Assignments*.  I understand that the provisions of this Agreement requiring assignment of inventions (as defined under Section A above) to the Company do not apply to any invention that qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B). I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and are not otherwise disclosed on this Exhibit A to permit a determination of ownership by the Company. Any such disclosure will be received in confidence.

DocuSign Envelope ID: 663C9B45-B353-45CD-94DF-86FA6E42D553

## LIST OF PRIOR INVENTIONS
## AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

\_\_\_ No inventions or improvements

\_\_\_ Additional Sheets Attached

Date: _____

_____
Signature

Rudy Chaidez
_____
Name of Employee (typed or printed)

DocuSign Envelope ID: 663C9B45-B353-45CD-94D5-86EA6E42D553

## <u>EXHIBIT B</u>

**CALIFORNIA LABOR CODE SECTION 2870
INVENTION ON OWN TIME - EXEMPTION FROM AGREEMENT**

"(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

**SECTION 7 OF THE DEFEND TRADE SECRETS ACT OF 2016**

" . . . An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—(A) is made—(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. . . . An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual—(A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order."

## **EXHIBIT C**

## **TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, custody, or control, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to the Company. Notwithstanding the foregoing, I understand that I may keep a copy of the Company's employee handbook and personnel records relating to me.

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, Invention Assignment Agreement (the "**Agreement**") signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that Agreement.

I understand that pursuant to the Agreement, and subject to its protected activity exclusion, I am obligated to preserve, as confidential, all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

After leaving the Company's employment, I will be employed by _____ in the position of _____.

Date: _____

_____
Signature

_____
Name of Employee (typed or printed)

Address for Notifications:   _____

_____

## EXHIBIT D

### CONFLICT OF INTEREST GUIDELINES

It is the policy of the Company to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1.      Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended.

2.      Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.      Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.      Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is, or appears to be, a personal or social involvement.

5.      Initiating or approving any form of personal or social harassment of employees.

6.      Investing or holding outside directorship in suppliers, customers, or competing companies, where such investment or directorship might influence a decision or course of action of the Company.

7.      Borrowing from or lending to employees, customers, or suppliers.

8.      Acquiring real estate of interest to the Company.

9.      Improperly using or disclosing to the Company any proprietary information or trade secrets of any other employer or other person or entity with whom obligations of confidentiality exist.

10.     Unlawfully discussing costs, customers, sales, or markets with competing companies or their employees.

11.     Making any unlawful agreement with distributors with respect to prices.

12.     Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13.     Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in immediate termination of employment.

These guidelines are not intended to limit or prohibit employees from filing and/or pursuing a charge or complaint with, or otherwise communicating or cooperating with or participating in any investigation or proceeding that may be conducted by, any federal, state or local government agency or commission, including the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, and the National Labor Relations Board ("**Government Agencies**"), including disclosing documents or other information as permitted by law, without giving notice to, or receiving authorization from, the Company. In addition, nothing in these guidelines is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, nor to deny employees the right to disclose information pertaining to sexual harassment or any unlawful or potentially unlawful conduct, as protected by applicable law. Employees may not disclose the Company's attorney-client privileged communications or attorney work product.

## EXHIBIT E

### ARBITRATION AGREEMENT

A.  *Arbitration*. In consideration of my employment with the Company, its promise to arbitrate all employment-related disputes with me, and my receipt of compensation and other company benefits, at present and in the future, I agree that any and all controversies, claims, or disputes that I have or may in the future have with the Company (including any company employee, officer, director, trustee, or benefit plan of the Company, in their capacity as such or otherwise), arising out of, relating to, or resulting from my employment or relationship with the Company or the termination of my employment or relationship with the Company, including any breach of this Agreement, shall be subject to binding arbitration pursuant to the federal arbitration act (9 U.S.C. Sec. 1 *et seq.*) (the "FAA"). The FAA's substantive and procedural provisions shall exclusively govern and apply with full force and effect to this arbitration agreement, including its enforcement, and any state court of competent jurisdiction shall compel arbitration in the same manner as a federal court under the FAA. I further agree that, to the fullest extent permitted by law, I may bring any arbitration proceeding only in my individual capacity, and not as a plaintiff, representative, or class member in any purported class, collective, or representative lawsuit or proceeding. I understand, however, that nothing in this Agreement prevents me from bringing a representative lawsuit or proceeding as permitted by the California Labor Code's Private Attorneys General Act of 2004. To the fullest extent permitted by law, I agree to arbitrate any and all common law and/or statutory claims under local, state, or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Worker Adjustment and Retraining Notification Act, the Fair Labor Standards Act, the Fair Credit Reporting Act, the Employee Retirement Income Security Act of 1974, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, the California Labor Code, claims relating to employment status, claims relating to compensation (cash, equity, bonus, or otherwise), claims relating to classification, claims of wrongful termination, and breach of contract. To the fullest extent permitted by law, I also agree to arbitrate any and all disputes arising out of or relating to the interpretation or application of this Agreement to arbitrate, but not disputes about the enforceability, revocability, or validity of this Agreement to arbitrate or the class, collective, and representative proceeding waiver herein. With respect to all such claims and disputes that I agree to arbitrate, I hereby expressly agree to waive, and do waive, any right to a trial by jury. I further understand that this Agreement to arbitrate also applies to any disputes that the Company may have with me. I understand that nothing in this Agreement requires me to arbitrate claims that cannot be arbitrated under the Sarbanes-Oxley Act or other law that expressly prohibits arbitration of a claim notwithstanding the application of the FAA.

(1) *Exception for harassment claims.* Not withstanding **Section A**, I understand that the arbitration provision does not apply to any controversies, claims, or disputes alleging or asserting claims of harassment.

(2) *Exception for discrimination claims.* Notwithstanding **Section A**, I understand that the arbitration provision does not apply to any controversies, claims, or disputes alleging or asserting claims of discrimination.

B.  *Administration of arbitration*. I agree that any arbitration will be administered by JAMS pursuant to its employment arbitration rules & procedures (the "**JAMS Rules**"), which are available at http://www.JAMSadr.com/rules-employment-arbitration/. If the JAMS Rules cannot be enforced as to the arbitration, then the parties agree that they will arbitrate this dispute utilizing JAMS comprehensive arbitration rules and procedures or such rules as the arbitrator may deem most appropriate for the dispute. I agree that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, applying the standards set forth for such motions under the California Code of Civil Procedure. I agree that the parties shall maintain the confidential nature of the arbitration proceedings, including all discovery

associated with the proceedings, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision. I agree that the arbitrator shall issue a written decision on the merits. I also agree that the arbitrator shall have the power to award any remedies available under applicable law, and that the arbitrator may award attorneys' fees and costs to the prevailing party, where permitted by applicable law. I agree that the decree or award rendered by the arbitrator may be entered as a final and binding judgment in any court having jurisdiction thereof. I understand that the Company will pay for any administrative or hearing fees charged by the arbitrator or JAMS except that I shall pay any filing fees associated with any arbitration that I initiate, but only so much of the filing fees as I would have instead paid had I filed a complaint in a court of law that would have had jurisdiction over such complaint. Subject to the FAA's exclusive applicability to the enforcement of this Agreement to arbitrate, I agree that the arbitrator shall administer and conduct any arbitration hearing or proceeding applying California substantive and decisional law and the California Code of Civil Procedure, including the California Civil Discovery Act. I agree that any arbitration under this Agreement shall be conducted in the county in California in which I work.

      C.    *Remedy*. For purposes of seeking provisional remedies only, I agree that the Company and I shall be entitled to pursue any provisional remedy permitted by the California Arbitration Act (California Code Civ. Proc. § 1281.8), or otherwise provided by this Agreement. Except for such provisional relief, I agree that any relief otherwise available to the Company or me under applicable law shall be pursued solely and exclusively in arbitration pursuant to the terms of this Agreement.

      D.    *Administrative relief*. I understand that this Agreement does not prohibit me from pursuing an administrative claim with a local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, including, but not limited to, the department of fair employment and housing, the equal employment opportunity commission, the national labor relations board, the securities and exchange commission, or the workers' compensation board. This agreement does, however, preclude me from pursuing a court action regarding any such claim, except as permitted by law.

      E.    *Voluntary nature of agreement*. I acknowledge and agree that I am executing this Agreement voluntarily and without any duress or undue influence by the Company or anyone else. I further acknowledge and agree that I have carefully read this Agreement and that I have asked any questions needed for me to understand the terms, consequences, and binding effect of this Agreement and fully understand it, including that I ***am waiving my right to a jury trial***. I agree that I have been provided an opportunity to seek the advice of an attorney of my choice before signing this Agreement.



# AAAAAUAX2C2          AAAAAUAX2C2

---

## Cover Page for Faxing Documents to your DocuSign Envelope

1. Write the number of pages on the line below.
2. Fax the document and cover page to the appropriate number below:

|  |  |
|---|---|
| U.S. and Canada: | +1 888 258 5388, +1 206 452 7455 |
| London: | +44 330 822 0429 |
| Singapore: | +65 3158 6882 |
| Australia: | +61 280 155 634 |

| | |
|---|---|
| From: | Rudy Chaidez |
| Envelope Subject: | Please DocuSign: Retention Agreement |
| Attachments to Fax: | |
| Envelope ID: | e7bae1a4-ba30-4d5d-8c37-50e3475923ef |
| Sender Account Name: | Better Holdco Inc. |
| Number of Pages: (Including cover page) | _____ |

DocuSign Customer Support: https://support.docusign.com

Note:
Fax transmissions take approximately one minute per page faxed.
This page may only be used once. If you would like to fax again, you must print a new cover page.

# AAAAAUAX2C2          AAAAAUAX2C2

DocuSign Envelope ID: E7BAE1A4-9A30-4D5D-8C37-59E347E923EF

Date:
Employee Name:   Rudy Chaidez
Email Address:  rchaidez@better.com
Re: Retention Bonus

VIA DocuSign

Dear  Rudy Chaidez

This Retention Bonus Agreement (this "Agreement") establishes the terms of your retention bonus opportunity with Better Mortgage Corporation ("Better," "we," "us"). We consider your continued service and dedication to Better essential to our business. To incentivize you to remain employed with Better, we are pleased to offer you a retention bonus, as described in this Agreement.

In recognition of your continued service with Better through and until April 31, 2021, (the "Retention Period"), we are offering you a retention bonus in the amount of $10,000, less all applicable withholdings and deductions required by law (the "Retention Bonus"). The terms and conditions of the payment of the Retention Bonus are detailed below.

**1. Eligibility**
In order to be eligible for this Retention Bonus, you must (a) be actively employed by Better as an underwriter on the last day of the Retention Period; (b) remain in good standing, with satisfactory performance, as determined by Better in its sole discretion, and not be part of any corrective action process, from the date of this Agreement through the end of the Retention Period; and (c) not have received another non-regular bonus (i.e. sign on) as part of your employment offer to join Better as of August 31, 2020.

**2. Title**
You have been identified as an employee within the Underwriting Department, devoting your best professional efforts, time and skill to the performance of the duties originally undertaken under your current job description. You will continue to report to your existing manager.

**3. Retention Bonus**
If you are eligible to receive the Retention Bonus and sign and return this Agreement within 5 days of receiving this Agreement, one hundred (100) percent of the Retention Bonus will be paid to you on the first regularly scheduled payroll date following your signing of this Agreement.

**4. Termination**
You acknowledge that if your employment with Better ends before the end of the Retention Period, you agree to re-pay to Better any amount of the Retention Bonus that has been paid to you, and you agree to make this re-payment within fifteen (15) days after the termination of your employment.

**5. Effect on Other Benefits**

You acknowledge that payment of the Retention Bonus is not part of normal or expected compensation for purposes of calculating any severance, resignation, redundancy, end-of-service payments, bonuses, long-service awards, retirement benefits, matching contributions or similar payments, to the extent any are applicable.

**6. Assignment**

The obligation to pay the Retention Bonus is solely that of Better, provided that Better may assign its obligations to any entity that succeeds to Better's business. You may not assign your right to receive the Retention Bonus.

**7. No Right to Continued Employment**

The grant of this Retention Bonus opportunity does not give you any right to continue your employment relationship with Better or its affiliates, and you shall remain subject to discharge to the same extent as if this opportunity were not granted to you. You are, and will remain, an at-will employee.

**8. Governing Law**

The validity, interpretation and performance of this Agreement shall, in all respects, be governed by the relevant laws of the State of New York, without regard to conflicts of law principles.

**9. Understandings**

This Agreement contains all of the understandings and representations between Better and you relating to the Retention Bonus and supersedes all prior and contemporaneous understandings, discussions, agreements, representations, and warranties, both written and oral, with respect to any retention bonus.

**10. Modification**

No provision of this Agreement may be modified, altered or amended, except by collective agreement between Better's General Counsel and you in writing.

We hope that this arrangement encourages your continued commitment to Better. If you accept the terms of this Agreement, please sign below in the space provided.

Very truly yours,

BETTER MORTGAGE CORPORATION

By: _____

Nicholas J. Calamari

Secretary

October 19, 2020

Agreed to and accepted by:

_____

[EMPLOYEE NAME]

Date:
_____

cc [People Team]

Exhibit 3



A A A A U A X 2 C X                    A A A A U A X 2 C X

---

## Cover Page for Faxing Documents to your DocuSign Envelope

1. Write the number of pages on the line below.
2. Fax the document and cover page to the appropriate number below:

| U.S. and Canada: | +1 888 258 5388, +1 206 452 7455 |
| London: | +44 330 822 0429 |
| Singapore: | +65 3158 6882 |
| Australia: | +61 280 155 634 |

| From: | Rudy Chaidez |
| Envelope Subject: | Please DocuSign: Release Agreement |
| Attachments to Fax: | |
| Envelope ID: | 0fd18bd7-5d87-4916-b4dd-6e9cde7116f7 |
| Sender Account Name: | Better Holdco Inc. |
| Number of Pages: (Including cover page) | _____ |

DocuSign Customer Support: https://support.docusign.com

Note:
Fax transmissions take approximately one minute per page faxed.
This page may only be used once. If you would like to fax again, you must print a new cover page.

A A A A U A X 2 C X                    A A A A U A X 2 C X

Date:

Employee Name: Rudy Chaidez

Email Address: rchaidez@better.com

Re: Release Agreement

VIA DocuSign

Dear Rudy Chaidez

This Release Agreement (this "Agreement") establishes the terms of a payment to you in the amount of $5,000 (the "Release Payment") by Better Mortgage Corporation ("Better," "we," "us") in exchange for a release of any claims described below, less all applicable withholdings and deductions required by law. The terms and conditions of the payment of the Release Payments are detailed below.

**1. Release Eligibility**

In order to be eligible for this Release Payment, you must (a) have been actively employed by Better as an underwriter since before September 18, 2020, and (b) sign and return this Agreement within five (5) days of its receipt.

**2.  Payment**

The Release Payment will be paid to you on the next regularly scheduled payroll date following your signing of this Agreement.

**3.  Release Background**

A former employee, Lorenzo Dominguez (the "Plaintiff"), has sued Better Mortgage Corporation. The lawsuit is called _Dominguez v. Better Mortgage Corporation_, Case No. 8:20-cv-01784 and was filed in the United States District Court for the Central District of California ("Lawsuit"). The Plaintiff seeks to represent the interests of a proposed California class of all current and former mortgage underwriters from September 18, 2016, forward and a proposed national Fair Labor Standards Act ("FLSA") collective of current and former mortgage underwriters from September 18, 2017, forward.

Plaintiff claims that he and other mortgage underwriters were misclassified as exempt and that Better failed to pay overtime under the FLSA. Plaintiff further claims that Better failed to pay overtime, failed to provide accurate itemized wage statements, failed to provide off-duty meal periods, failed to permit and authorize off-duty rest periods, failed to timely pay wages upon termination of employment, and engaged in unfair business practices, all allegedly in violation of California law.  (The claims made pursuant to California law, but not the FLSA, shall be referred to collectively as the "California Claims.")

## 4. Agreement of Release

By signing this Agreement, I acknowledge that this is just a summary of the claims and the relief sought.  For a copy of the complaint, see https://www.nka.com/assets/documents/cases/better-mortgage-filed-complaint.pdf.  As an employee who works or has worked as a mortgage underwriter at Better during this period, I fall within the definition of this proposed class and/or collective. I understand that the court has not ruled on the issue of whether this case can proceed on a class or collective action basis and that no class has been certified and no collective action has been conditionally certified in the Lawsuit to date.  I understand that Better denies and disputes these claims.

I acknowledge that I have been paid all wages owed to me.  I acknowledge that a good faith dispute exists as to whether I am owed wages, overtime, meal and rest break premiums, waiting time penalties, and/or other penalties.

By signing this Agreement and in exchange for the Release Payment above, I voluntarily and knowingly waive my right to bring, recover, release, and settle any and all claims (except those under the FLSA) that were or could have been asserted in the Lawsuit (including claims for failure to pay overtime, failure to provide accurate itemized wage statements, failure to provide meal and rest periods, failure to pay wages owed upon termination, or unfair business practices), that I have or may have against Better and its parents, subsidiaries, affiliates, related and correspondent entities, and each of those entities' current and former directors, officers, employees, representatives, administrators, insurers, agents, and attorneys, and any successors-in-interest and assigns (hereinafter, the "Better Releasees") up to and including the date that I sign this Agreement.  The waived claims include but are not limited to any wage claim(s) or cause(s) of action that could have been asserted as part of the Lawsuit (other than the FLSA); the disputed California Claims; any related claims for wages, meal and rest break premiums, penalties, waiting time penalties, attorneys' fees, and interest; any claims under the California Labor Code, California Wage Orders, or California Private Attorneys' General Act; and any and all claims for violations of the wage and hour laws of states and localities other than California to the extent permitted by law.

I understand, acknowledge, and agree that the waiver and release set forth in this Section includes claims that I am or may be unaware of.  I waive my rights under California Civil Code Section 1542, which provides as follows:

> A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her, must have materially affected his or her settlement with the debtor or released party.

I understand that I will not be given anything of value other than as described in this Agreement if I enter into this Agreement.  I understand that I will not be retaliated against in any way if I enter into this Agreement or if I decide not to enter into this Agreement.  The terms and conditions of my employment will not be impacted in any way by my decision whether or not to enter into this Agreement.  By signing this Agreement I represent that I am freely and voluntarily entering into this Agreement without pressure or coercion from Better.

Better and I acknowledge that the above release does <u>not</u> limit or prohibit (1) either party's right, where applicable, to file or participate in any investigative proceeding involving any federal, state, or local governmental agency (although I will not be permitted to accept personal relief for claims released in this Agreement), and (2) any rights or claims, whether specified above or not, that cannot be waived as a matter of law pursuant to federal, state, or local statute. If it is determined that any claim covered by this Agreement cannot be waived as a matter of law, I expressly agree that the Agreement will nevertheless remain valid and fully enforceable as to the remaining released claims. I am not aware of any facts (including any injuries or illnesses) which might cause me to file a workers' compensation claim against Better.  It is Better's and my intent to release only such claims that can legally be released.

I understand that, at some point in the future, Better and Plaintiff may or may not enter into a class-wide settlement and that a court may or may not give approval to that settlement.  Any such settlement could result in a settlement formula that provides more money to me or it could result in a settlement formula that provides less money to me. I acknowledge that, by signing this Agreement, I am precluded from participating in any class action or settlement alleging violation of the California Claims.

I am entering into this Agreement freely and voluntarily after having been advised of my right to consult with an attorney of my choice, including the attorney who represents Lorenzo Dominguez, the Plaintiff.  However, I understand that Better will not pay attorney's fees or costs, if any, associated with any consultation with any attorney.  The attorneys who represent the Plaintiff against Better are: Matthew C. Helland (helland@nka.com) and Daniel S. Brome (dbrome@nka.com) at NICHOLS KASTER, LLP, 235 Montgomery St., Suite 810, San Francisco, CA 94194, T: (415) 277-7235, F: (415) 277-7238; Jason Christopher Marsili (jmarsili@rmrllp.com) at ROSEN MARSILI RAPP LLP, 3600 Wilshire Blvd., Suite I 800, Los

Angeles, CA 90010-2622, T: (213) 389-6050, F: (213) 389-0663; and, C. Andrew Head
(ahead@headlawfirm.com) and Bethany Hilbert (bhilbert@headlawfirm.com) at HEAD LAW
FIRM, LLC, 730 Peachtree St. NW, Suite 600, Atlanta, GA 30308 (virtual office); 4422 N.
Ravenswood Ave., Chicago, IL 60640 (resident office), T: (404) 924-4151, F: (404) 796-7338.

## 5. Termination

You acknowledge that, if your employment with Better terminates during the pendency
of any of the claims described above, you may retain the Release Payment paid prior
to the end of your employment as consideration for the Release in Paragraph 4 above,
which shall remain in full force and effect.

## 6. Effect on Other Benefits

You acknowledge that payment of the Release Payment is not part of normal or
expected compensation for purposes of calculating any severance, resignation,
redundancy, end-of-service payments, bonuses, long-service awards, retirement
benefits, matching contributions or similar payments, to the extent any are applicable.

## 7. Assignment

The obligation to pay the Release Payment is solely that of Better, provided that Better
may assign its obligations to any entity that succeeds to Better's business. You may
not assign your right to receive the Release Payment.

## 8. No Right to Continued Employment

The grant of this Release Payment opportunity does not give you any right to continue
your employment relationship with Better or its affiliates, and you shall remain subject
to discharge to the same extent as if this opportunity were not granted to you. You are,
and will remain, an at-will employee.

## 9. Governing Law

The validity, interpretation, and performance of this Agreement shall, in all respects, be
governed by the relevant laws of the Better office in which you work.

## 10. Understandings

This Agreement contains all of the understandings and representations between Better
and you relating to the Release Payment and supersedes all prior and

contemporaneous understandings, discussions, agreements, representations, and warranties, both written and oral, with respect to any Release Payment.

**11. Modification**

No provision of this Agreement may be modified, altered, or amended, except by collective agreement between Better's General Counsel and you in writing.

**12. Severability**

If any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable, then when possible, consistent with the purpose of this Agreement, any such invalid provision may be reformed, and as reformed, enforced, and the remainder of this Agreement shall always remain in full force and effect.

We hope that this arrangement encourages your continued commitment to Better. If you accept the terms of this Agreement, please sign below in the space provided.

Very truly yours,

BETTER MORTGAGE CORPORATION

By:_____

Nicholas J. Calamari
Secretary
October 19, 2020

Agreed to and accepted by:

_____

[EMPLOYEE NAME]

Date:

_____

cc [People Team]