ADAM J. KARR (S.B. #212288)
akarr@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California  90071-2899
Telephone:   (213) 430-6000
Facsimile:    (213) 430-6407

SUSANNAH K. HOWARD (S.B. #291326)
showard@omm.com
RACQUEL B. MARTIN (S.B. #331285)
rmartin@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California  94111-3823
Telephone:   (415) 984-8700
Facsimile:    (415) 984-8701

PAUL A. HOLTON (S.B. #313047)
pholton@omm.com
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, California  92660-6429
Telephone:   (949) 823-7112
Facsimile:    (949) 823-6994

Attorneys for Defendant
BETTER MORTGAGE CORPORATION

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORENZO DOMINGUEZ, individually, on behalf of others similarly situated, and on behalf of the general public | Case No. 8:20-cv-01784 JLS-KES |
| Plaintiff, | **OPPOSITION TO PLAINTIFF'S MOTION TO INVALIDATE UNCOUNSELED RELEASES AND WAIVER AGREEMENTS OBTAINED *EX PARTE* AND FOR CORRECTIVE NOTICE** |
| v. | |
| BETTER MORTGAGE CORPORATION, | Hearing date: March 25, 2022 |
| Defendant. | Hearing time:    10:30 a.m. |
| | Courtroom:   10A, 10th Floor |
| | Judge:       Hon. Josephine L. Staton |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................... 1

II.  FACTUAL BACKGROUND ........................................................ 2

    A.   The Parties.......................................................................... 2

    B.   Communications Related to the Releases and Arbitration
         Agreements. ......................................................................... 3

    C.   Video-Conference Group Sessions and Recap Emails. ....... 3

    D.   Voluntary Release Agreements Emailed to Underwriters.... 5

    E.   Arbitration Agreements Emailed to Underwriters................ 6

    F.   Discovery Regarding the Releases and Arbitration Agreements. ........ 8

III. ARGUMENT ................................................................................ 9

    A.   Plaintiff Cannot Establish A Basis For Invalidating Either The
         Releases Or The Arbitration Agreements. .......................... 9

         1.   Better's Communications Regarding the Releases Were
               Not Coercive. .......................................................... 11

         2.   Better's Communications Regarding the Releases were
               Neither Misleading nor Confusing. ......................... 14

         3.   The Language of the Release is Clear. ..................... 19

         4.   The Arbitration Agreements are Likewise Valid and
               Enforceable. ............................................................ 21

             a.   The Arbitration Agreements did not "Target"
                   Underwriters. ................................................. 22

             b.   Better Provided Relevant Information Regarding
                   this Action with the Arbitration Agreements. ..... 22

    B.   There is No Basis for Invalidating the Agreements or for
         Restricting Better's Future Communications with Putative Class
         and Collective Action Members. ....................................... 24

IV.  CONCLUSION ........................................................................... 25

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. Sw. Fuel Mgmt.*,
  No. CV 16-4547 FMO, 2018 U.S. Dist. LEXIS 203389 (C.D. Cal.
  Feb. 20, 2018) ................................................................................................. 11

*Armendariz v. Found. Health Psychcare Serv., Inc.*,
  24 Cal. 4th 83 (2000) ................................................................................ 21, 22

*Billingsley v. Citi Trends, Inc.*,
  560 F. App'x 914 (11th Cir. 2014) .................................................................. 22

*Castro v. PPG Indus.*,
  No. CV 20-2110 PA, 2021 U.S. Dist. LEXIS 6579 (C.D. Cal. Jan. 8,
  2021) ......................................................................................................... 11, 21

*Chamber of Commerce of the United States v. Bonta*,
  13 F.4th 766 (9th Cir. Sep. 15, 2021) ............................................................. 23

*Chindarah v. Pick Up Stix, Inc.*,
  171 Cal. App. 4th 796 (2009) ........................................................ 1, 9, 20, 21

*Coles v. Marsh*,
  560 F.2d 186 (3d Cir. 1977) ...................................................................... 10, 24

*Cty. of Santa Clara v. Astra USA, Inc.*,
  No. C 05-03740 WHA, 2010 U.S. Dist. LEXIS 78312 (N.D. Cal.
  July 8, 2010) ............................................................................................. 15, 18

*Domingo v. New England Fish Co.*,
  727 F.2d 1429 (9th Cir. 1984) ......................................................................... 10

*Green v. Plantation of La., LLC*,
  No. 2:10-0364, 2012 U.S. Dist. LEXIS 146488 (W.D. La. Sep. 17,
  2012) ........................................................................................................... 1, 21

*Guifu Li v. Perfect Day Franchise*,
  270 F.R.D. 509 (N.D. Cal. 2010) ............................................................... 10, 12

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) ...................................................................................*passim*

*Irvine v. Destination Wild Dunes Mgmt.*,
  132 F. Supp. 3d 705 (D.S.C. 2015) .................................................................. 12

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Johnson v. Serenity Transp., Inc.*,
  No. 15-cv-02004-JSC, 2017 U.S. Dist. LEXIS 156804 (N.D. Cal.
  Sep. 25, 2017) .................................................................................................... 15

*Kirby v. Kindred Healthcare Operating*,
  No. 5:19-CV-00833-JLS-DFM, 2020 U.S. Dist. LEXIS 146449
  (C.D. Cal. May 1, 2020) ................................................................................*passim*

*Kutzman v. Derrel's Mini Storage, Inc.*,
  354 F. Supp. 3d 1149 (E.D. Cal. 2018) ............................................................... 17

*In re M.L. Stern Overtime Litig.*,
  250 F.R.D. 492 (S.D. Cal. 2008) ......................................................................... 10

*Marino v. CACafe, Inc.*,
  No. 16-cv-6291 YGR, 2017 U.S. Dist. LEXIS 64947 (N.D. Cal.
  Apr. 28, 2017) ....................................................................................................... 14

*In re NFL's Sunday Ticket Antitrust Litig.*,
  No. ML 15-2668 PSG, 2021 U.S. Dist. LEXIS 111365 (C.D. Cal.
  Apr. 20, 2021) ....................................................................................................... 22

*O'Connor v. Uber Techs., Inc.*,
  No. C-13-3826 EMC, 2013 U.S. Dist. LEXIS 172477 (N.D. Cal.
  Dec. 6, 2013) ........................................................................................................ 24

*Oconner v. Agilant Sols., Inc.*,
  444 F. Supp. 3d 593 (S.D.N.Y. 2020) ................................................................. 12

*Ontiveros v. Safelite Fulfillment, Inc.*,
  No. CV 15-7118-DMG, 2017 U.S. Dist. LEXIS 222414 (C.D. Cal.
  Oct. 16, 2017) ....................................................................................................... 15

*Parks v. Eastwood Ins. Servs., Inc.*,
  235 F. Supp. 2d 1082 (C.D. Cal. 2002) ............................................................... 21

*Parris v. Sup. Court*,
  109 Cal. App. 4th 285 (2003) ................................................................................. 9

*Perez v. Leprino Foods Co.*,
  No. 117CV00686AWIBAM, 2021 WL 916261 (E.D. Cal., Mar. 10,
  2021) ..................................................................................................................... 18

*Perry v. Thomas*,
  482 U.S. 483 (1987) ............................................................................................. 22

- iii -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Piekarski v. Amedisys Ill., Inc.*,
 4 F. Supp. 3d 952 (N.D. Ill. 2013)..........................................................................15

*Quezada v. Schneider Logistics Transloading & Distrib.*,
 No. CV 12-2188 CAS, 2013 U.S. Dist. LEXIS 47639 (C.D. Cal.
 Mar. 25, 2013) ............................................................................................................12

*Robinson v. Chefs' Warehouse, Inc.*,
 No. 3:15-cv-05421-RS (KAW), 2019 U.S. Dist. LEXIS 119274
 (N.D. Cal. July 17, 2019) ...........................................................................................9

*Salazar v. Driver Provider Phx. LLC*,
 532 F. Supp. 3d 832 (D. Ariz. 2021)........................................................................12

*Slavkov v. Fast Water Heater I, LP*,
 No. 14-cv-04324-JST, 2015 U.S. Dist. LEXIS 149013 (N.D. Cal.
 Nov. 2, 2015) .............................................................................................................20

*Stafford v. Brink's, Inc.*,
 No. CV 14-1352-MWF(PLAx), 2015 U.S. Dist. LEXIS 192037
 (C.D. Cal. Aug. 14, 2015) .............................................................................11, 13, 17

*Swamy v. Title Source, Inc.*,
 No. C 17-01175 WHA, 2017 U.S. Dist. LEXIS 186535 (N.D. Cal.
 Nov. 10, 2017) .....................................................................................................12, 21

**Statutes**

9 U.S.C. § 2...........................................................................................................................22

**Other Authorities**

Manual for Complex Litigation (Fourth) § 21.12 (2011).........................................10

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

1

## I.    INTRODUCTION

2     It is well settled law that employer defendants have the right to communicate

3 truthfully with putative class members, including to offer to settle or enter into

4 employment related agreements, prior to certification. *See Gulf Oil Co. v. Bernard*,

5 452 U.S. 89, 101-02 (1981); *Chindarah v. Pick Up Stix, Inc.*, 171 Cal. App. 4th 796,

6 803 (2009).  When such communications result in putative class members entering

7 into individual settlement agreements or arbitration agreements, those agreements are

8 presumptively valid and enforceable, just as any other contract. *See Chindarah*, 171

9 Cal. App. 4th at 803 ("The trial court correctly found the releases barred the

10 Chindarah plaintiffs from proceeding with the lawsuit . . ."); *Green v. Plantation of*

11 *La., LLC*, No. 2:10-0364, 2012 U.S. Dist. LEXIS 146488 (W.D. La. Sep. 17, 2012)

12 (enforcing arbitration agreements entered into by putative class members while

13 litigation was pending).

14     Consistent with this binding precedent, shortly after Plaintiff Lorenzo

15 Dominguez ("Plaintiff") commenced this action, Defendant Better Mortgage

16 Corporation ("Better" or the "Company") began distributing At-Will Employment

17 Agreements that contained an arbitration provision ("Arbitration Agreement") to all

18 employees (not just underwriters), and offered currently-employed underwriters

19 $5,000 to voluntarily release most claims arising from the facts alleged in Plaintiff's

20 Complaint ("Releases").  As set forth in further detail below, Better clearly, fairly,

21 and thoroughly communicated the nature of Plaintiff's claims (as well as included a

22 link to the Complaint), the terms of the Release, and that entering into the Release

23 was entirely voluntary.  The Release specifically stated that an underwriter may

24 consult an attorney of his or her choice, provided contact information for Plaintiff's

25 counsel, and gave underwriters ample time to consider the offer.  The Arbitration

26 Agreements were communicated to underwriters at the same time, along with a

27 separate communication explaining how agreeing to arbitrate claims may affect the

28 underwriters' ability to participate in this lawsuit.  To date, almost 200 underwriters

1   chose to sign the Release and almost 500 underwriters have signed the Arbitration
2   Agreement.

3         Plaintiff, incensed at the loss of some members of his putative class, brings
4   this motion asking the Court for sweeping relief:  (i) to invalidate both the Releases
5   and the Arbitration Agreements on the grounds that they were in some way coercive
6   or misleading and (ii) to bar Better from communicating with the putative class
7   members.  As to their first request, Plaintiff has failed to satisfy *his* burden to show
8   that the binding agreements must be invalidated because the "specific
9   communications" surrounding them omitted material information, "warranting
10  corrective action."  *Kirby v. Kindred Healthcare Operating*, No. 5:19-CV-00833-
11  JLS-DFM, 2020 U.S. Dist. LEXIS 146449, at *9 (C.D. Cal. May 1, 2020) (Staton J.).
12  The second request also fails, because here, too, Plaintiff has failed to satisfy his
13  burden to show that interfering with Better's communications with underwriters is in
14  any way warranted.  *Gulf Oil Co.*, 452 U.S. 89 at 102.  Given Plaintiff's failure to
15  demonstrate that Better's communications were improper, any limitations on
16  Defendant's communications with unrepresented putative class members would be
17  unconstitutional. *See id.* at 103.  Plaintiff's motion has no merit, and should be denied
18  in its entirety.

19  **II.  FACTUAL BACKGROUND**

20      **A.  The Parties.**

21        Better is a home mortgage originator that is licensed to provide home loans to
22  Americans in 46 states and the District of Columbia.  (Meyerhoff Decl. ¶ 2.)[1]  Better

23  _____

24  [1] In this Opposition, Better relies on two declarations from Kenna Meyerhoff,
    Better's Senior Director of Human Resources Business Partners.  The first is the
25  Declaration of Kenna Meyerhoff in Support of Defendant's Motion to Deny Class
    Certification Under Federal Rule of Civil Procedure 23 and Motion to Deny
26  Conditional Certification Under Fair Labor Standards Act, which has already been
    filed with the Court as Dkt. No. 55 (the "Meyerhoff Decl.").  The second, which is
27  being filed with this Opposition, is the Declaration of Kenna Meyerhoff in Support
28  of Defendant's Opposition to Plaintiff's Motion to Invalidate Uncounseled Releases

OPPN. TO MTN. TO INVAL. AGREEMENTS
    CASE NO. 8:20-CV-01784 JLS-KES

seeks to provide faster, simpler, and more accessible tools for home ownership.  (*Id.*)  Plaintiff worked as an underwriter in Better's Orange County office from December 3, 2019 until resigning on August 17, 2020.  (*See* SAC ¶ 6.)

### B.   Communications Related to the Releases and Arbitration Agreements.

Plaintiff's motion is premised on (and depends on) a mischaracterization of Better's communications with underwriters.  But, contrary to Plaintiff's claims, Better comprehensively presented both the Releases and Arbitration Agreements to underwriters, along with ample information regarding this action and the employees' legal rights.  Further details regarding Better's communications to underwriters are set forth below.

### C.   Video-Conference Group Sessions and Recap Emails.

In October 2020, Better met with underwriters virtually to review a number of items pertaining to their employment.  The topics covered included:  (i) updates to employee compensation following Better's compensation review process; (ii) terms and conditions for incentive compensation; (iii) Better's offer of a $10,000 retention bonus to underwriters who committed to remain employed by Better for six months; (iv) Better's offer of $5,000 to underwriters who agreed to release most of the claims asserted in *Dominguez* (except for the FLSA claim); and (v) the roll-out of Better's At-Will Employment Agreement to all employees (which contains the Arbitration Agreement).  (Supp. Meyerhoff Decl. ¶ 3.)

With respect to the Releases, the slide deck used during these presentations stated the following:

- We are reviewing a legal claim against the company, alleging that we've misclassified the Underwriting position - stating UW ['underwriting'] roles should be eligible for overtime pay. We do not believe this

and Waiver Agreements Obtained *Ex Parte* and For Corrective Notice (the "Supp. Meyerhoff Decl.").

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

1    allegation to be true.

2    • With that, we take this extremely seriously, and are undergoing an
3    FLSA audit to ensure correct classification.

4    • Today, you'll be receiving a voluntary release of claims agreement.

5    • Signing this (again, VOLUNTARY) will give you the right to
6    voluntarily release Better of all claims as it relates to the lawsuit.

7    • If you choose to sign, you're eligible for a release payment of $5K.

8    • If you choose to sign, please do so by Friday 10/23.

9    • We may make adjustments to compensation and classification as
10   necessary coming out of the FLSA audit findings.

11   • Our ongoing focus will always be on rewarding your performance and
12   contributions to the company.

13   (Supp. Meyerhoff Decl. ¶ 3, Ex. A (emphasis in original).)  Notably, and contrary to

14   Plaintiff's mischaracterization in his brief, Better clearly identified the lawsuit as

15   being about underwriter overtime and emphasized repeatedly that the Release was

16   "VOLUNTARY."

17   Following each meeting, Better emailed each underwriter "a recap of the

18   highlights" from the meeting.  (Meyerhoff Decl. ¶ 3, Ex. A.)  The recap email

19   acknowledged that Better covered "a lot of information" during the meetings and

20   reminded underwriters about Plaintiff's pending lawsuit, explaining that, "as we

21   discussed" during the meeting, Plaintiff filed "a legal claim . . . against Better,

22   alleging that [Better] misclassified the [u]nderwriting job" and that Plaintiff "believes

23   [underwriters] should be eligible for overtime pay."  (*Id.*)  The email further

24   (i) "flag[ged]" that the At-Will Employment Agreement being distributed to

25   underwriters "contains an arbitration provision, which could also limit what claims

26   [underwriters] could join as part of that lawsuit" and (ii) reiterated that signing the

27   Release was "totally **voluntary**."  (*Id.* (emphasis in original).)  Finally, Better

28   explained that the Releases and At-Will Employment Agreements would be sent

- 4 -

separately to each underwriter's work email.  (*Id.*)  Critically, Plaintiff fails to even mention—let alone discuss—this recap email in his brief.

### D.  Voluntary Release Agreements Emailed to Underwriters.

The Releases sent to each underwriter via email provided additional detail regarding this lawsuit, including:  Plaintiff's name, the case caption and case number, a description of Plaintiff's claims, a link to Plaintiff's Complaint (on Plaintiff's counsel's website), a clear statement that underwriters may consult with an attorney, contact information for Plaintiff's counsel, and detailed information concerning the employees' legal rights and the impact of any release.  (*See* Meyerhoff Decl. ¶ 8, Ex. C.)  Regarding the latter, the Release states:

> I understand that, at some point in the future, Better and Plaintiff may or may not enter into a class-wide settlement and that a court may or may not give approval to that settlement.   Any such settlement could result in a settlement formula that provides more money to me or it could result in a settlement formula that provides less money to me.   I acknowledge that, by signing this Agreement, I am precluded from participating in any class action or settlement alleging violation of the [claims asserted by Plaintiff].

(*Id.*)  As was stressed during the virtual meetings, the Release language reiterated that the decision to release any claims was voluntary:

> By signing this Agreement and in exchange for the Release Payment above, I voluntarily and knowingly waive my right to bring, recover, release, and settle any and all claims (except those under the FLSA) that were or could have been asserted in the Lawsuit (including claims for failure to pay overtime, failure to provide accurate itemized wage statements, failure to provide meal and rest periods, failure to pay wages owed upon termination, or unfair business practices), that I have or may have against Better. . . .

(*Id.*)  In addition, the Release underscored that employees would not be retaliated against regardless of whether they chose to sign the Release:

> I understand that I will not be retaliated against in any way if I enter into this Agreement or if I decide not to enter into this Agreement.   The terms and conditions of my employment will not be impacted in any way by my decision whether or not to enter into this Agreement. By

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

1
2

>signing this Agreement I represent that I am freely and voluntarily entering into this Agreement without pressure or coercion from Better.

3

(*Id.*)

4

Approximately 90% of then-eligible underwriters (at least 188 out of

5

approximately 204) voluntarily choose to execute the Release.  (*Id.* ¶ 8.)  Further

6

illustrating the appeal of Better's offer to underwriters, some underwriters returned

7

the signed Release with comments taking issue with Plaintiff's allegations.   For

8

example, one employee wrote:

9
10
11
12

>I read the case filing document and can confirm I have always known I am an exempt employee (salaried only/not eligible for overtime) and I've always been allowed to take my mandatory lunch/breaks. The company and my managers have always looked out for my overall happiness/welfare and I've witnessed the same for my fellow employees.

13

(*Id.* ¶ 8, Ex. C.)  Of the few employees who chose not to sign a Release, at least two

14

even went as far as to email Better HR to affirm that choice.  (Supp. Meyerhoff Decl.

15

¶ 4, Exs. B-C.)  This alone confirms that underwriters fully understood that signing

16

the Release was optional.[2]

17

## E.   Arbitration Agreements Emailed to Underwriters.

18

Each underwriter also received a link to the At-Will Employment Agreement

19

(which contains the Arbitration Agreement) in his or her Better work email account.

20

(Meyerhoff Decl. ¶ 4.)  The cover emails asked each employee to click on the link,

21

review the Agreement, and to indicate his or her agreement via electronic signature.

22

(*Id.*)  Because Better had provided comprehensive information regarding Plaintiff's

23

lawsuit during the virtual meetings, in the recap email, and with the Release, Better

24

did not separately provide this same information with the Arbitration Agreement.

25

The Arbitration Agreement also applies reciprocally, requiring arbitration for

26

employees' disputes with Better, as well as "any disputes that [Better] may have with

27
28

---

[2] Notably, one of these two underwriters ultimately changed her mind and signed the release.  (*See* Supp. Meyeroff Decl. ¶ 4, Ex. C.)

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

1  [employees.]"  (Meyerhoff Decl. ¶ 4, Ex. B.)  These disputes include "any and all

2  common law and/or statutory claims under local, state, or federal law, including, but

3  not limited to, claims under . . . the California Labor Code. . . ." (*Id*.)  The arbitration

4  provision further provides:

5        [A]ny and all controversies, claims, or disputes that [an
         employee has] or may in the future have with the Company
6        . . . arising out of, relating to, or resulting from [their]
         employment or relationship with the Company or the
7        termination of [their] employment or relationship with the
         Company . . . shall be subject to binding arbitration
8        pursuant to the federal arbitration act (9 U.S.C. Sec. 1 *et
         seq*.) (the "FAA").
9

10  (*Id*.)  The arbitration provision also requires any arbitration to be administered by

11  "JAMS pursuant to its employment arbitration rules & procedures" and provides a

12  hyperlink to those rules and procedures.  (*Id*.)  While there are exceptions to

13  arbitration in the Agreement, none are applicable here.[3]

14       At least 541 current and former Better underwriters have signed the Arbitration

15  Agreement, all of which contain a class and collective action waiver and require these

16  individuals to arbitrate any employment-related claims they may have against Better

17  on an individual basis.  (*See* Meyerhoff Decl. ¶ 6.)  Beginning in January 2021, and

18  contrary to Plaintiff's claim that only underwriters were asked to sign Arbitration

19  Agreements, ***all other Better employees and all newly hired employees received the***

20  ***same agreement***, with the same arbitration clause, with their offer letter.  (*Id*. ¶ 5.)

21  ───────────────

22  [3] These exceptions include "disputes about the enforceability, revocability, or
    validity of this Arbitration Agreement to arbitration or the class, collective, and
23  representative proceeding waiver herein," "claims that cannot be arbitrated under the
    Sarbanes-Oxley Act," "controversies, claims, or disputes alleging or asserting claims
24  of harassment," "controversies, claims, or disputes alleging or asserting claims of
    discrimination," and "claims that cannot be arbitrated under . . . other law that
25  expressly prohibits arbitration of a claim notwithstanding the application of the
26  FAA."  (*Id*.)  The arbitration agreements do not prohibit employees from pursuing
    "an administrative claim with a local, state, federal administrative body or
27  government agency that is authorized to enforce or administer laws related to
28  employment. . . ."  (*Id*.)

**F.      Discovery Regarding the Releases and Arbitration Agreements.**

On December 12, 2021, Better served Plaintiff with discovery requests regarding Plaintiff's communications with underwriters regarding the Releases and Arbitration Agreements.  (Declaration of Susannah K. Howard ("Howard Decl.") ¶ 2.)  Later the same day, Plaintiff served Better with discovery requests seeking contact information for underwriters that had signed either a Release or an Arbitration Agreement, copies of all signed Releases and Arbitration Agreements, as well as all communications regarding the Releases and Arbitration Agreements.  (*Id*.)  On January 10, 2022, both parties responded to the discovery requests served on December 12.  (*Id*. ¶ 3.)  On January 24, 2022, after the parties had finalized a protective order, Better provided amended interrogatory responses to Plaintiff that included the contact information for underwriters who had signed a Release or Arbitration Agreement.  (*Id*. ¶ 4.)  On January 27, 2022, Better made its first production of documents, containing signed Releases and Arbitration Agreements, as well as non-privileged communications regarding the Releases and Arbitration Agreements.  (*Id*. ¶ 5.)  Better made a supplemental document production on February 8, 2022, which contained additional responsive documents that were largely duplicative of the documents produced on January 27.  (*Id*.)  To date, Better has produced 5,274 documents (38,117 pages) responsive to Plaintiff's requests.  (*Id*.)

Plaintiff, by contrast, has not produced any documents in response to Better's discovery requests. (Howard Decl. ¶ 6.)  Rather, Plaintiff has asserted that he has no non-privileged documents reflecting communications regarding the Release and/or Arbitration Agreements, and has stated he has no statements from putative class or collective action members regarding the Release and/or Arbitration Agreements other than the Declaration of Rudy Chaidez, filed with Plaintiff's motion.  (*Id*. ¶ 6, Ex. A.)  Mr. Chaidez's employment with Better terminated on October 21, 2020— two days after he purportedly attended a virtual meeting that reviewed the Release, the Arbitration Agreement and other employment topics.  (Supp. Meyerhoff Decl.

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

¶ 6.)  Although Mr. Chaidez states in his declaration that he reviewed the At-Will Employment Agreement first, Better's records indicate that Mr. Chaidez reviewed the Release at 6:27 p.m. on October 20, 2020, and reviewed the At-Will Employment Agreement at 6:30 p.m. on October 20, 2020.  (*Id*. ¶ 6, Exs. E-F.)  As Mr. Chaidez acknowledges in his declaration, he did not sign either agreement.

## III.   ARGUMENT

### A.   Plaintiff Cannot Establish A Basis For Invalidating Either The Releases Or The Arbitration Agreements.

Both the Release and Arbitration Agreement are binding contracts that can only be invalidated if Plaintiff can meet the high bar of establishing that Better's communications surrounding those agreements were misleading or coercive. Plaintiff fails to meet that burden here.

Under both California and federal law, employers are permitted to enter into agreements with individual putative class members while a putative wage and hour class action is pending.  *Chindarah*, 171 Cal. App. 4th at 803; *Robinson v. Chefs' Warehouse, Inc.*, No. 3:15-cv-05421-RS (KAW), 2019 U.S. Dist. LEXIS 119274, at *10 (N.D. Cal. July 17, 2019) ("Here, Defendant has been contacting putative class members in attempts to settle their individual claims and reduce the size of the potential class. ***While Plaintiffs would surely prefer that this not occur, the conduct is legal***.") (emphasis added).  Indeed, parties are generally "free to communicate with potential class members before class certification."  *Parris v. Sup. Court*, 109 Cal. App. 4th 285, 300 (2003); *see also Gulf Oil Co.*, 452 U.S. at 101-02.  Reinforcing this right, the Supreme Court has held that it would violate the First Amendment to require parties or their counsel to obtain prior judicial approval before communicating to putative class members, except to prevent serious misconduct. *Gulf Oil Co.,* 452 U.S. 89 at 103.  As the Court explained, a district court "may not exercise the power [to restrict such communications] without a specific record showing by the moving party of the particular abuses by which it is threatened. *Id*.

at 102 (quoting from *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977)).

Applying *Gulf Oil*, courts in the Ninth Circuit have held that a defendant can initiate contact with putative class members to offer them settlements, so long as it is not an "improper, misleading, or coercive pre-certification communication." *In re M.L. Stern Overtime Litig.*, 250 F.R.D. 492, 495 (S.D. Cal. 2008); *see also* Manual for Complex Litigation (Fourth) § 21.12 (2011) ("Defendants and their counsel generally may communicate with potential class members in the ordinary course of business, ***including discussing settlement before certification***, but may not give false, misleading, or intimidating information, conceal material information, or attempt to influence the decision about whether to request exclusion from a class certified under Rule 23(b)(3)") (emphasis added).[4]

Although the Ninth Circuit has yet to establish a standard for determining when communications are coercive or misleading, district courts within the Circuit have found that such an analysis "generally entails parsing the specific communications." *Kirby*, 2020 U.S. Dist. LEXIS 146449 at *9 (internal quotations and citation omitted). "Failure to append the complaint, provide plaintiffs' counsel's contact information, explain plaintiffs' claims, or clearly describe the status of the case are commonly regarded (in various combinations) as omissions warranting

---

[4] Plaintiff's argument that the Releases and Arbitration Agreements are improper unilateral "opt-out" notices lacks any merit whatsoever. First, none of Plaintiff's "opt-out" authorities, which prohibit the sending of unilateral opt-out notices, even considers the question of whether a defendant may enter into pre-certification arbitration agreements or settlement agreements with putative class members. *See Guifu Li v. Perfect Day Franchise*, 270 F.R.D. 509, 517-18 (N.D. Cal. 2010) (defendants admitted that "they presented opt-out forms to workers"); *Domingo v. New England Fish Co*., 727 F.2d 1429, 1441 (9th Cir. 1984) (finding court-imposed restrictions of communications between potential class members and the plaintiff's counsel were improper). Second, while the Arbitration Agreements and Releases between Better and its underwriters may, in fact, have the effect of precluding certain individuals from participating in this action as putative class members, so did the individual settlement agreements in *Chindarah*, and the Court of Appeal held those were valid contracts—not improper opt-out notices.

corrective action.  Generally speaking, the goal is informed consent[.]"  *Id.* (internal citations omitted); *see also Castro v. PPG Indus.*, No. CV 20-2110 PA (MRWx), 2021 U.S. Dist. LEXIS 6579, at *21-22 (C.D. Cal. Jan. 8, 2021) (refusing to invalidate release agreements signed by putative class members where defendants provided a copy of the complaint and plaintiff's counsel's contact information).

Here, Better's communications with underwriters regarding the Releases and the Arbitration Agreements allowed underwriters to make informed decisions and were neither coercive nor misleading.  There is thus no basis to invalidate either agreement or to send a curative notice to underwriters who have signed these agreements.

### 1. Better's Communications Regarding the Releases Were Not Coercive.

Plaintiff first contends the agreements were "inherently coercive" because Better and the underwriters had an employer-employee relationship.  Not so.  As this Court has held, while there is a ***risk*** of coercion when the parties are in an employment relationship, "this context alone does not render the communications coercive."  *Kirby*, 2020 U.S. Dist. LEXIS 146449 at *7; *see also Castro*, 2021 U.S. Dist. LEXIS 6579 at *21-22 (upholding release agreements presented by defendant employer to employees).  Indeed, as Plaintiff's cases illustrate, communications between an employer and an employee often are found ***not*** to be coercive.  *See Stafford v. Brink's, Inc.*, No. CV 14-1352-MWF(PLAx), 2015 U.S. Dist. LEXIS 192037, at *8 (C.D. Cal. Aug. 14, 2015) ("The Court finds that the letter and release sent to the putative class members here is not, on balance, [a] coercive pre-certification communication to members of the proposed class.").

Other cases cited by Plaintiff only find actual coercion when an employer forces an employee into a one-on-one situation to sign at a particular time or place—circumstances not present here.  *See Kirby*, 2020 U.S. Dist. LEXIS 146449 at *7 (employees offered agreements during in-person one-on-one meetings); *Acosta v.*

1   *Sw. Fuel Mgmt.*, No. CV 16-4547 FMO (AGRx), 2018 U.S. Dist. LEXIS 203389, at

2   *4 (C.D. Cal. Feb. 20, 2018) (employer's attorneys called employees into involuntary

3   one-on-one meetings to secure employer-friendly declarations); *Guifu Li*, 270 F.R.D.

4   at 512 (employer "required[] one-on-one meetings with managers during work hours

5   and at the workplace"); *Quezada v. Schneider Logistics Transloading & Distrib.*, No.

6   CV 12-2188 CAS (DTBx), 2013 U.S. Dist. LEXIS 47639, at *2 (C.D. Cal. Mar. 25,

7   2013) (same); *Irvine v. Destination Wild Dunes Mgmt.*, 132 F. Supp. 3d 705, 706

8   (D.S.C. 2015) (same).

9           Under established state and federal standards, Better's conduct falls far short

10   of the coercion required to set aside an arbitration agreement.  As set forth above,

11   Better did not conduct any one-on-one meetings regarding either agreement.  The

12   virtual meetings, held over Zoom, were group sessions that only previewed the

13   Arbitration Agreements and Releases (along with other topics); underwriters were

14   ***not*** asked to sign anything during those meetings.  *See Swamy v. Title Source, Inc.*,

15   No. C 17-01175 WHA, 2017 U.S. Dist. LEXIS 186535 (N.D. Cal. Nov. 10, 2017)

16   (finding that an employer hosting four conference calls with putative class members

17   was not coercive).  Moreover, as evidenced by the slides used during these meetings,

18   Better repeatedly stressed that the Releases were wholly voluntary.[5]  (*See* Supp.

19   Meyerhoff Decl. ¶ 3, Ex. A.)  After these meetings, the agreements were separately

20   emailed to each underwriter and, with respect to the Releases, Better gave

21   underwriters five days to independently review and decide whether to sign.[6]  (*See*

22   _____

23   [5] To the extent the Declaration of Rudy Chaidez suggests that Better did not explain

24   that signing the Release was entirely voluntary, Mr. Chaidez statements, based purely
     on his recollection, should be disregarded in favor of the documentary record,

25   reflecting what Better actually communicated to underwriters.

26   [6] In arguing that five days to consider an agreement is insufficient, Plaintiff relies on
     cases in which defendants provided only two days to consider the agreements at issue.

27   *See Salazar v. Driver Provider Phx. LLC*, 532 F. Supp. 3d 832 (D. Ariz. 2021)
     (refusing to enforce arbitration agreement, in part, because employees only had two

28   days to sign); *Oconner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593 (S.D.N.Y. 2020)

OPPN. TO MTN. TO INVAL. AGREEMENTS
                          CASE NO. 8:20-CV-01784 JLS-KES

Meyerhoff Decl. ¶¶ 7-8, Ex. C ("In order to be eligible for this Release Payment, you must . . . sign and return this Agreement within five (5) days of its receipt.").)  This process was not coercive.  *See, cf. Stafford*, 2015 U.S. Dist. LEXIS 192037 at *8 (finding that mailing agreements to putative class members was not coercive).[7]

In another poor attempt to compare this matter to *Kirby*, Plaintiff argues that Better improperly discouraged underwriters from participating in this case by stating that Better disputes the claims and that underwriters could recover less than the $5,000 being offered for the Release.  But *Kirby* focused on the defendant's warning to the putative class members that a lawsuit "could take years" and they "could recover nothing."  2020 U.S. Dist. LEXIS 146449 at *11.  Better made no such statements.  Indeed, Better stressed that the outcome of a lawsuit may result in damages ***above*** or ***below*** the settlement amount.  (*See* Meyerhoff Decl., ¶ 8, Ex. C.)

Plaintiff's additional argument that the Release's boilerplate contract language amounted to intimidation borders on the absurd.  Specifically, Plaintiff takes issue with the Release's inclusion of a standard employment at-will clause, making clear to underwriters that signing the Release would not change their at-will employment status.  (*See* Meyerhoff Decl., ¶ 8, Ex. C ("No Right to Continued Employment.  The grant of this Release Payment opportunity does not give you any right to continue your employment relationship with Better or its affiliates, and you shall remain subject to discharge to the same extent as if this opportunity were not granted to you.  You are, and will remain, an at-will employee.").)  Additionally, the "Termination" clause Plaintiff complains about simply explains that underwriters may retain the Release payment even if they terminate their employment with Better while this

---

(same).

[7] Plaintiff misconstrues Better's former counsels' delay in making a formal appearance as being part of a master plan to communicate with underwriters in an inappropriate matter.  There is no basis for such an assertion.  Indeed, as set forth in Better's unopposed motion to set aside default, Better's delay in responding to the Complaint was entirely inadvertent.  (Dkt. No. 34.)

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

action is pending.  (*See id.* ("Termination.   You acknowledge that, if your employment with Better terminates during the pendency of any of the claims described above, you may retain the Release Payment paid prior to the end of your employment as consideration for the Release in Paragraph 4 above, which shall remain in full force and effect.").)  Such language is neither intimidating nor coercive.

Finally, Plaintiff cites dicta to contend that the overall popularity of the Releases (signed by over 90% of underwriters) "suggests a degree of coercion."  *See Marino v. CACafe, Inc.*, No. 16-cv-6291 YGR, 2017 U.S. Dist. LEXIS 64947, at *6 (N.D. Cal. Apr. 28, 2017) (finding releases invalid due to "deceptive omissions of material information"—not the number of individuals who signed the release).  Not only does this argument fail to consider that at least two underwriters communicated to Better HR that they did not plan to sign the Release, which proves that underwriters did not feel coerced[8], but it also overlooks that the agreements may have been well received simply because the vast majority of putative class members are not interested in pursuing Plaintiff's allegations against Better.  (*See* Supp. Meyerhoff Decl., ¶ 4, Exs. B-C.)

## 2.  Better's Communications Regarding the Releases were Neither Misleading nor Confusing.

Plaintiff makes a hodgepodge of arguments in support of his claim that Better's communications regarding the Releases were in some way misleading or confusing. Not only are these contentions unfounded, they are unsupported by Plaintiff's cited authority.

Plaintiff first contends that Better's communications were insufficient because Better failed to provide underwriters with a copy of the Complaint.  But not only is

---

[8] Indeed, one of these underwriters subsequently changed her mind and decided to sign the release because she believed that "Better has been fair in the overall compensation and overall caring for their employees and am thankful to be part of the team."  (Supp. Meyeroff Decl., ¶ 4 Ex. C.)  This supports the conclusion that underwriters simply were not interested in pursuing Plaintiff's claims.

this contention untrue, it misstates the law.   Indeed, as an initial matter, when presenting a settlement offer to putative class members, there is no requirement that the Complaint be attached to the settlement offer and proposed release.   *See Cty. of Santa Clara v. Astra USA, Inc.*, No. C 05-03740 WHA, 2010 U.S. Dist. LEXIS 78312, at \*16 (N.D. Cal. July 8, 2010) ("While there is no strict requirement to include a complaint [], the putative class must have been given the necessary information to choose whether to accept the settlement checks.").   Rather, the Release must only make clear the nature of Plaintiff's claims, so that each putative class member can make an informed decision about whether to sign it.   *See id*.   Here, Better did ***both***, providing a link to the Complaint and clearly explaining Plaintiff's claims.

To the extent Plaintiff argues that linking to a complaint is insufficient, his cited authority does not support such a claim.   *See  Kirby*, 2020 U.S. Dist. LEXIS 146449 at \*9 (dealing with instruction that putative class members may access the complaint from the court); *Johnson v. Serenity Transp., Inc.*, No. 15-cv-02004-JSC, 2017 U.S. Dist. LEXIS 156804, at \*21 (N.D. Cal. Sep. 25, 2017) (invalidating release, in part, because employer did not provide access to the complaint at the time it transmitted the release); *Piekarski v. Amedisys Ill., Inc.*, 4 F. Supp. 3d 952, 956 (N.D. Ill. 2013) (listing linking to a complaint as one step of opting out of an arbitration agreement, but not holding that alone was insufficient); *Ontiveros v. Safelite Fulfillment, Inc.*, No. CV 15-7118-DMG (RAOx), 2017 U.S. Dist. LEXIS 222414, at \*1 (C.D. Cal. Oct. 16, 2017) (dealing with instruction that the complaint can be accessed on the docket or through plaintiff's counsel).   Moreover, Plaintiff's counsel's claim that they ultimately removed the Complaint from the linked web page is simply false, as navigating to the webpage listed in the Release brings the viewer to a general description of the Complaint and ***links to the Complaint in its first paragraph***.   Further, Better had no knowledge that Plaintiff altered its webpage in any fashion until Plaintiff filed this motion.   Nor is there any merit or evidence to Plaintiff's contention that Better linked to the Complaint for a questionable purpose:

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

to either track which employees clicked on the link, or to intimidate employees and make them think twice before clicking on the link. Not only is that blatantly untrue, but Plaintiff cites to no authority establishing that such a consideration is even relevant to this analysis. In any event, Better linked to the Complaint to provide quick and efficient access to underwriters who wished to access it, while also allowing underwriters to have easy access to Plaintiff's counsels' website and contact information, should they wish to reach out.

In addition to providing a link to the Complaint, Better thoroughly explained Plaintiff's claims in the Release and surrounding communications. The Release, for example, specifically states that a former employee has brought a lawsuit and describes each asserted claim in plain language:

> A former employee, Lorenzo Dominguez (the "Plaintiff"), has sued Better Mortgage Corporation. The lawsuit is called *Dominguez v. Better Mortgage Corporation*, Case No. 8:20-cv-01784 and was filed in the United States District Court for the Central District of California ("Lawsuit"). The Plaintiff seeks to represent the interests of a proposed California class of all current and former mortgage underwriters from September 18, 2016, forward and a proposed national Fair Labor Standards Act ("FLSA") collective of current and former mortgage underwriters from September 18, 2017, forward.

> Plaintiff claims that he and other mortgage underwriters were misclassified as exempt and that Better failed to pay overtime under the FLSA. Plaintiff further claims that Better failed to pay overtime, failed to provide accurate itemized wage statements, failed to provide off-duty meal periods, failed to permit and authorize off-duty rest periods, failed to timely pay wages upon termination of employment, and engaged in unfair business practices, all allegedly in violation of California law.

(Meyerhoff Decl. ¶ 8, Ex. C.) The nature of the claims was also set forth in the recap email sent to underwriters on October 19, 2020. (*Id.*, ¶ 3, Ex. A ("[T]here is a legal claim brough under the [FLSA] that's been filed against Better, alleging that [Better] misclassified the Underwriting job" and "plaintiff believes these roles should be eligible for overtime pay.").) The Release further sets forth the procedural posture of the case and explains how underwriters fall within the definition of the class:

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

1
2
3
4
5

> As an employee who works or has worked as a mortgage underwriter at Better during this period, I fall within the definition of this proposed class and/or collective. I understand that the court has not ruled on the issue of whether this case can proceed on a class or collective action basis and that no class has been certified and no collective action has been conditionally certified in the Lawsuit to date. I understand that Better denies and disputes these claims.

6  (*Id.*, ¶ 8, Ex. C.)

7      Plaintiff does not and cannot contend that this description of the claims is

8  inaccurate or misleading. Nor do his cases support such an argument; one of these

9  cases found that a letter was not "inappropriate" simply because it "contain[ed] some

10  self-serving advocacy for defendant's position". *See Stafford*, 2015 U.S. Dist.

11  LEXIS 192037 at *11. The other case permitted a curative notice to be sent after

12  defendants disparaged plaintiffs, misstated plaintiff's counsels' firm name, failed to

13  send a copy of the complaint, and omitted the case number and the court information.

14  *See Kutzman v. Derrel's Mini Storage, Inc.*, 354 F. Supp. 3d 1149, 1156 (E.D. Cal.

15  2018). Neither case is factually similar to Better's conservative statement of facts,

16  and neither held releases invalid without an opportunity to cure any alleged defect.

17      Although Plaintiff contends Better's description is "designed to confuse its

18  non-lawyer employees," in fact, Better's description of Plaintiff's claim is simple and

19  straightforward: "a legal claim brought under the [FLSA] … alleging that [Better]

20  misclassified the Underwriting job," and explaining that "plaintiff believes these

21  roles should be eligible for overtime pay." (Meyerhoff Decl. ¶ 3, Ex. A.) Such

22  language is far from "legalese." To the extent Plaintiff contends that underwriters

23  cannot understand the concept of missed "meal breaks" and "rest periods," such

24  terms are regularly used in the workplace, and in court-approved notices to putative

25  class and collective action members regarding wage and hour claims.[9] *See, e.g. Perez*

26  _____

27  [9] Although Mr. Chaidez contends that he did not fully understand the language in the

28  Release, his opinion is entitled to little weight given that his employment with Better terminated the day after he received the Release (and therefore he had little time or

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

1   *v. Leprino Foods Co.*, No. 117CV00686AWIBAM, 2021 WL 916261, at *2 (E.D.
2   Cal., Mar. 10, 2021) (Approving class notice with the following language:  "This
3   lawsuit is about:  … whether Leprino's policies and practices effectively … failed to
4   provide proper meal and rest breaks.").

5       Plaintiff's contention that Better improperly failed to explain how it arrived at
6   the proposed settlement amount of $5,000 also fails.  While Plaintiff relies on *Astra*
7   *USA, Inc.*, that case dealt with a letter accompanying a refund for overcharged drugs
8   that:  (i) did not provide an explanation of the plaintiffs' claims; (ii) misled putative
9   class members about the status of the case; and (iii) misled putative class members
10  about the calculation of the refunds.  2010 U.S. Dist. LEXIS 78312 at *1.  As set
11  forth above, neither the Release nor the related communications contained any
12  misleading information.  The *Astra* decision is therefore inapposite.

13      Plaintiff's reliance on *Kirby* fares no better.  In *Kirby*, the defendants did not
14  articulate how they arrived at a $350 settlement offer.  *Kirby*, 2020 U.S. Dist. LEXIS
15  146449 at *11.  But that was just one consideration when, "combine[d]" with other
16  "inadequacies and omissions," "render[ed] Defendants' communications with
17  putative class members misleading," *Id.* At *10-12.  None of the other considerations
18  in *Kirby*—failing to include the plaintiff's counsel's name or contact information,
19  failure to attach a complaint with the release, failure to articulate a clear and
20  understandable description of the plaintiff's claims, and failure to explain the status
21  of the case—are present here.  *Id.*

22      Finally, Plaintiff contends the Release was misleading because it did not
23  mention that Better had defaulted by failing to timely respond to the Complaint, and
24  that the parties had scheduled a mediation.  This argument is disingenuous, at best.
25  Plaintiff knows full well that *both* these events occurred *after* the Release agreements

26  _____

27  incentive to consider it), in light of the plain language of the Release, and in light of
28  the communications of other underwriters indicating that they understood the
    Release.  (*See* Supp. Meyerhoff Decl. ¶¶ 4, 6, Exs. B-C.)

- 18 -

were distributed to underwriters and *after* the five-day response deadline.  The order of default was not entered by the clerk of the court until October 27, 2020 (*see* Dkt. No. 18), and the parties did not agree to attend mediation until November 2020 (*see* Dkt. No. 23).

### 3.     The Language of the Release is Clear.

Plaintiff asserts the Release was "intentionally confusing" because it asks underwriters to release any claims that "***could have been asserted***" by Plaintiff, including violations of any state laws outside of California.  (*See* Meyerhoff Decl., ¶ 8, Ex. C.)  But Plaintiff overlooks that releasing claims that *could* be brought under the same facts is commonplace in settlement agreements, to protect a defendant from facing the same allegations dressed up under a different cause of action.  Further, the Release explains this term by listing examples of such claims, "including claims for failure to pay overtime, failure to provide accurate itemized wage statements, failure to provide meal and rest periods, failure to pay wages owed upon termination, or unfair business practices."  (*See id.*)

Plaintiff further contends (without any legal support) that the Releases should be invalidated because Better did not inform the underwriters that Plaintiff had filed a letter with the California Labor and Workforce Development Agency pursuant to the California Private Attorneys General Act ("PAGA").  But such disclosure is not required, particularly given that, at the time the Releases were sent to underwriters, Plaintiff had not yet amended his Complaint to add a PAGA claim.  PAGA claims are included in the Release simply because they may be alleged based on the facts in the case, and therefore Better properly wanted those claims released as part of the settlement (as with any other claim that could have been brought based on the same alleged facts).[10]

---

[10] Plaintiff also misstates the law as to the ability to release PAGA claims.  Indeed, Plaintiff cites only to authority addressing pre-dispute waiver of PAGA claims, which is not at issue here, or authority refusing to "resolve whether settlements of

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

Next, Plaintiff contends that asking underwriters to attest they have been paid all wages owed violates California Labor Code section 206.5 and that asking them to do so while also acknowledging that "a good faith dispute exists as to whether [the underwriter] is owed wages," is in some way confusing.  But in *Chindarah*, the court concluded that wages are not "due" if there is a good faith dispute as to whether they are owed.   171 Cal. App. 4th at 803.   Thus, these sentences address different categories of wages—those that are disputed by Plaintiff in this action, and those that are not.  As *Chindarah* further held, "there is no statute providing that an employee cannot release his claim to past overtime wages as part of a settlement of a bona fide dispute over those wages." *Id*.  Thus, there is nothing either confusing or improper about this language.

Finally, Plaintiff takes issue with language in the Release precluding underwriters from "participating in any class action," speculating—without any evidence—that underwriters may have read this language to mean that they could not even act as witnesses in this action.  First, this interpretation makes no sense in the context of the agreement.  This phrase appears in a paragraph discussing whether an underwriter's ability to receive funds from a *settlement* of a class action, and nowhere mentions participation as a witness.[11]  Second, Plaintiff provides no support for the absurd belief that an underwriter would refuse to sign a release merely because it would prevent him or her from participating as a witness in this action.  Finally, the authority on which Plaintiff relies involved a group of less sophisticated employees. *Slavkov v. Fast Water Heater I, LP*, No. 14-cv-04324-JST, 2015 U.S. Dist. LEXIS 149013 (N.D. Cal. Nov. 2, 2015) (finding that a "group of plumbing and water heater

---

PAGA [] claims require judicial approval." *Slavkov v. Fast Water Heater I, LP*, No. 14-cv-04324-JST, 2015 U.S. Dist. LEXIS 149013, *17 n.1 (N.D. Cal. Nov. 2, 2015).
[11] Plaintiff has reached out to Better's underwriters via LinkedIn with inflammatory descriptions of this lawsuit.  (*See* Supp. Meyerhoff Decl., ¶ 5, Ex. D)  Had Plaintiff been able to locate an underwriter who misunderstood the Release in the manner Plaintiff suggests, surely Plaintiff could have procured a declaration to that effect.

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

installers" may not be aware that they can still act as witnesses).  Here, by contrast, underwriters are financial services professionals trained to review and assess financial information against legal and other requirements.

Given that the Release and related communications were not in any way misleading or confusing, there is no basis for this Court to invalidate the Releases or to send a curative notice.  *See Swamy v. Title Source, Inc.*, 2017 U.S. Dist. LEXIS 186535, 2017 WL 5196780 at \*5 (N.D. Cal. Nov. 10, 2017) (refusing to interfere with company's ex parte communications with employees that contained no misleading, intimidating, or otherwise improper information); *Parks v. Eastwood Ins. Servs., Inc.*, 235 F. Supp. 2d 1082, 1085 (C.D. Cal. 2002) (declining to manage pre-cert communications between employee and employer when they were fair and neutral); *Castro*, 2021 U.S. Dist. LEXIS 6579, at \*21-22 (upholding pre-cert release agreements given "the totality of the circumstances, including the facts that Defendants provided a copy of the operative 1st AC and plaintiff's counsel's contact information").

### 4.    The Arbitration Agreements are Likewise Valid and Enforceable.

As with the Releases, Plaintiff has not met the heavy burden required to invalidate the Arbitration Agreements.  *Chindarah* holds that individual settlement agreements with putative class members are enforceable, and its reasoning supports the broader proposition that individual agreements between defendants and putative class members—including individual arbitration agreements—are generally enforceable.  *See* 171 Cal. App. 4th at 803 ("The trial court correctly found the releases barred the Chindarah plaintiffs from proceeding with the lawsuit . . ."); *see also Green*, 2012 U.S. Dist. LEXIS 146488 (enforcing arbitration agreements entered into by putative class members while litigation was pending).  "[U]nder California law, as under federal law, an arbitration agreement may only be invalidated for the same reasons as other contracts."  *Armendariz v. Found. Health Psychcare Serv.,*

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

*Inc.*, 24 Cal. 4th 83, 98 (2000).  Arbitration agreements should be "neither favored nor disfavored, but simply placed on an equal footing with other contracts."  *Id.* at 127.  *See also* 9 U.S.C. § 2; *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) (under the FAA, "[a] court may not . . . construe [an arbitration] agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.").  If, as *Chindarah* holds, individual release agreements between a defendant and putative class members are permissible upon disclosure of the underlying dispute, arbitration agreements presented under the same circumstances and with the very same disclosures should likewise be upheld.

Notwithstanding *Chindarah*, Plaintiff argues the Arbitration Agreements should be invalidated because (a) only underwriters were asked to sign them and (b) the Arbitration Agreements omitted material information.  Both contentions are incorrect.

### a.   The Arbitration Agreements did not "Target" Underwriters.

Plaintiff first contends the Arbitration Agreements should be invalidated because they were only sent to putative class members.  But that is not true.  "Better presented all other current employees as well as newly hired employees (including underwriters) with the same [Arbitration Agreement]." (Meyerhoff Decl., ¶ 5.)  For this reason alone, Plaintiff's cited authority is inapposite.  *See Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 918 (11th Cir. 2014) (finding arbitration agreement rollout coercive because it was only rolled out to putative class members"); *In re NFL's Sunday Ticket Antitrust Litig.*, No. ML 15-2668 PSG (JEMx), 2021 U.S. Dist. LEXIS 111365, at *18 (C.D. Cal. Apr. 20, 2021) (upholding arbitration agreement because the plaintiffs "were not singled out for receipt of the revised agreement").

### b.   Better Provided Relevant Information Regarding this Action with the Arbitration Agreements.

Plaintiff next contends that Better failed to communicate various background

information regarding this action in the Arbitration Agreement itself.   However, Plaintiff completely ignores that, as discussed in Section III.A.2, *supra*, **all of this information was provided to current underwriters in the recap email and the Release**—which underwriters received at **the same time** they received the Agreement.  All of those materials were sent to the exact same people on the exact same day.   Surely the law does not require employers to send two copies of everything to every employee in such a circumstance.   Providing two copies of everything would make no material impact to the underwriters' ability to make an informed decision about the Release and the Agreement.[12]

Plaintiff's contention that Better failed to explain how the Arbitration Agreement could affect underwriters' ability to participate in this action also is incorrect.  For example, in the recap email, Better stated:  "We also want to flag for you that the Employment Agreement contains an arbitration provision, which could also limit what claims you could join as part of [Plaintiff's] lawsuit." (*See* Meyerhoff Decl., ¶ 3, Ex. A.)

The argument that Better improperly required underwriters to sign the Arbitration Agreements as a condition of employment also is unavailing.   Both California and federal law allow employers to require arbitration agreements as a condition of employment.[13]   And, to the extent Plaintiff wishes to argue whether the

---

[12] With respect to underwriters who were hired after October 2020, they were presented with the Arbitration Agreement (as part of the At-Will Employment Agreement) at the time of their offer of employment, as were all other new employees.   The underwriters therefore agreed to arbitration before they began working for Better and before they plausibly qualified as putative class or collective action members in this case.

[13] While Plaintiff contends that AB-51 made imposing forced arbitration agreements unlawful in California, that rule is currently before the Ninth Circuit through a pending petition for en banc review.  *See Chamber of Commerce of the United States v. Bonta*, 13 F.4th 766 (9th Cir. Sep. 15, 2021).  Moreover, at the time the Arbitration Agreements were first distributed to underwriters (in the Fall of 2020), AB-51 had been enjoined by the District Court.  *Id.* at 772-773.

OPPN. TO MTN. TO INVAL. AGREEMENTS
CASE NO. 8:20-CV-01784 JLS-KES

arbitration provision itself will be enforceable, that is not the question before this Court.  Here, the question is whether Better may enter into an arbitration agreement with putative class members—not whether those agreements are enforceable.  *See O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2013 U.S. Dist. LEXIS 172477, at *8 (N.D. Cal. Dec. 6, 2013) (finding that whether the arbitration provision is enforceable is "not properly before the Court"; instead, the question was whether the Court could "assert control over communications by [an employer] with members of the putative class").[14]

> **B.    There is No Basis for Invalidating the Agreements or for Restricting Better's Future Communications with Putative Class and Collective Action Members.**

Because Plaintiff has failed to demonstrate that Defendant's communications are improper, there is no basis for this Court to invalidate any of the Releases or Arbitration Agreements.   Nevertheless, in the event the Court finds these communications were in some way deficient, the Court must give "explicit consideration to the narrowest possible relief which would protect the respective parties." *Gulf Oil*, 452 U.S. at 102 (quoting *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977)).  Invalidating the Releases and Arbitration Agreements, as Plaintiff requests, is the most extreme possible relief and should thus be rejected.  Rather, should the Court believe any relief is necessary, the appropriate course of action would be to permit Better to issue a "curative notice" that includes any information the Court believes should have been included in Better's original communications, and allow underwriters to void either agreement at their election within 30 days, similar to what this Court ordered in *Kirby*.  *See* 2020 U.S. Dist. LEXIS 146449 at *5-6.

With respect to Better's future communications with underwriters, there is no

---

[14] Because Better expected its employees to sign the Agreements as a condition of continued employment, Plaintiff's arguments related to providing time for opt-outs are moot.

1   basis for this Court to impose restrictions.  In the seminal case regarding permissible

2   communications with putative class members, the Supreme Court held that pre-

3   certification communications with putative class members generally must be

4   permitted under the First Amendment.  *See Gulf Oil*, 452 U.S. at 100.  Explaining

5   that any order preventing counsel from communicating with putative class members

6   "involved serious restraints on expression," the Court went on to conclude that a court

7   may not limit communications between parties and potential class members unless

8   there is "a clear record and specific findings that reflect a weighing of the need for a

9   limitation and the potential interference with the rights of the parties."  *Id.*  Here, no

10  class has been certified, and Plaintiff presents no evidence of any improper

11  communication with proposed class members.  In fact, Plaintiff does not argue that

12  underwriters have been prejudiced or harmed by the communication from Better.

13  Plaintiff also fails to show how continued contact with the putative class members is

14  prejudicial to the non-existent "class."  For this reason alone, Plaintiff's request to

15  limit Better's communications with the putative class should be denied.

16  **IV.   CONCLUSION**

17         Better respectfully requests that Plaintiff's motion be denied in its entirety and

18  that the Releases and Agreements be given full force and effect.

19   Dated:  February 11, 2022               O'MELVENY & MYERS LLP

20                                           ADAM J. KARR
                                             SUSANNAH K. HOWARD
21                                           PAUL A. HOLTON
                                             RACQUEL B. MARTIN
22

23                                           By:   /s/ Susannah K. Howard
                                                   Susannah K. Howard
24
                                             Attorneys for Defendant
25                                           Better Mortgage Corporation

26

27

28