Matthew C. Helland, CA State Bar No. 250451
Helland@nka.com
Daniel S. Brome, CA State Bar No. 278915
dbrome@nka.com
NICHOLS KASTER, LLP
235 Montgomery St., Suite 810
San Francisco, CA  94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Jason Christopher Marsili (CA SBN 233980)
jmarsili@rmrllp.com
ROSEN MARSILI RAPP LLP
3600 Wilshire Blvd., Suite I 800
Los Angeles, CA  90010-2622
Telephone: (213) 389-6050
Facsimile: (213) 389-0663

*Attorneys for Plaintiff and Others Similarly Situated*
*Additional Counsel Listed on Following Page*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lorenzo Dominguez, individually, on behalf of others similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>Better Mortgage Corporation,<br><br>Defendant. | Case No. 8:20-cv-01784-JLS-KES<br><br>**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO INVALIDATE UNCOUNSELED RELEASES AND WAIVER AGREEMENTS OBTAINED *EX PARTE* AND FOR CORRECTIVE NOTICE**<br><br>Date:           March 25, 2022<br>Time:           10:30 a.m.<br>Courtroom:    10A |

C. Andrew Head (admitted *pro hac vice*)
ahead@headlawfirm.com
Bethany Hilbert (admitted *pro hac vice*)
bhilbert@headlawfirm.com
HEAD LAW FIRM, LLC
730 Peachtree St NE, Suite 600
Atlanta, GA 30308 (virtual office)
4422 N. Ravenswood Ave.
Chicago, IL 60640 (resident office)
Telephone: (404) 924-4151
Facsimile: (404) 796-7338

REPLY SUPP. PLTF'S MOTION TO INVALIDATE UNCOUNSELED RELEASES AND AGREEMENTS

1

# TABLES OF CONTENTS

2

3    **I.   Evidence Obtained in Discovery Confirms A Misleading Blitz Campaign.** .......... 4

4      A.  The October 2020 Underwriter Arbitration and Release Agreement Blitz. .............. 4

5         i.   *Arbitration/Waiver Agreements Sent Only to Underwriters* ................................... 4

6         ii.  *Defendant's Whitewash Attempt: Call a New Disclosure a "Recap"* ................... 6

7      B.  Company-Wide Rollout of Arbitration Agreements Without Disclosures. ............... 8

8         i.   *Defendant Gave No Disclosures Whatsoever after October 2020* ........................ 8

9         ii.  *Anything Highlighting "Arbitration" As New Was Scrubbed.* .............................. 8

10   **II.  Correcting Defendant's Misleading and Inaccurate Representations.** ................ 10

11   **III.  The Rollouts Were Improper Class Communications** ........................................ 16

12     A.  The Totality of the Circumstances Warrants the Relief Plaintiff Seeks. ................. 16

13     B.  Misrepresentations and Falsehoods Permeated the Rollout Campaigns. ................. 19

14     C.  There Was Inherent Coercion – Defendant Essentially Concedes It. ...................... 22

15   **IV.  This Campaign Warrants Plaintiff's Requested Relief.** ..................................... 25

16

17

18

19

20

21

22

23

24

25

26

27

28

MEM. SUPP. PLTF'S MOTION TO INVALIDATE UNCOUNSELED RELEASES AND AGREEMENTS

# TABLES OF AUTHORITIES

**Cases**

*Acosta v. Sw. Fuel Mgmt.*, No. CV 16-4547 FMO (AGRx), 2018 U.S. Dist. LEXIS 22554
(C.D. Cal. Feb. 2, 2018) ........................................................................................7

*Air Commun. & Satellite Inc. v. Echostar Satellite Corp.*, 38 P.3d 1246 (Colo. 2002)....16

*Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914 (11th Cir. 2014)...............22, 23, 24, 25

*Burrell v. Crown Cent. Petroleum*, 176 F.R.D. 239 (E.D. Tex. 1997).............................15

*Camilotes v. Resurrection Health Care Corp.*, No. 10 C 366, 2012 U.S. Dist. LEXIS
8731 (N.D. Ill. Jan. 25, 2012).........................................................................19

*Camp v. Alexander*, 300 F.R.D. 617 (N.D. Cal. 2014)...................................................16

*Carnegie v. H&R Block, Inc.*, 687 N.Y.S.2d 528 (Sup. Ct. 1999) ....................................24

*Chamber of Commerce of the United States v. Bonta,* 13 F.4th 766 (9th Cir. 2021)........18

*Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216 (S.D.N.Y. 2020)................17

*Cox Nuclear Med. v. Gold Cup Coffee Servs.*, 214 F.R.D. 696 (S.D. Ala. 2003).............18

*Cty. of Santa Clara v. Astra USA, Inc.*, 2010 U.S. Dist. LEXIS 78312 (N.D. Cal. July 8,
2010).......................................................................................................14

*Espinoza v. Galardi S. Enters.*, No. 14-21244-CIV, 2015 U.S. Dist. LEXIS 173408 (S.D.
Fla. Dec. 31, 2015) ......................................................................................18

*Felps v. Mewbourne Oil Co.*, No. 18-811, 2020 U.S. Dist. LEXIS 124523 (D.N.M. July
15, 2020).................................................................................................21, 22

*Gray v. Rent-A-Center W., Inc.*, 314 F. App'x 15 (9th Cir. 2008)....................................16

*Gutierrez v. Stericycle, Inc.*, No. LA CV15-08187 JAK (JEMx), 2018 U.S. Dist. LEXIS
231865 (C.D. Cal. Oct. 24, 2018)....................................................................16

*In re Allergan Biocell Textured Breast Implant Prods. Liab. Litig*, No. 19-MD-2921
(BRM) (JAD), 2020 U.S. Dist. LEXIS 123681 (D.N.J. July 14, 2020) ........................18

*In re Sch. Asbestos Litig.*, 842 F.2d 671 (3d Cir. 1988) ...................................................17

*Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165 (9th Cir. 2003)......................................13

*Jimenez v. Menzies Aviation Inc*, 2015 U.S. Dist. LEXIS 108223 (N.D. Cal. Aug. 17, 2015) ............................................................................................................25

*Johnson v. Serenity Transp., Inc.*, No. 15-cv-02004-JSC, 2017 U.S. Dist. LEXIS 156804 (N.D. Cal. Sep. 25, 2017). .......................................................................17

*Kirby v. Kindred Healthcare Operating*, No. 5:19-cv-00833-JLS-DFM, 2020 U.S. Dist. LEXIS 146449 (C.D. Cal. May 1, 2020)...............................................passim

*Kooiman v. Siwell, Inc.*, No. 8:20-cv-00565-JLS-DFM, 2021 U.S. Dist. LEXIS 59098 (C.D. Cal. Jan. 4, 2021) ...........................................................................22

*Kubala v. Supreme Prod. Servs.*, 830 F.3d 199 (5th Cir. 2016).........................................16

*Marino v. CACafe, Inc.*, No. 16-cv-6291 YGR, 2017 U.S. Dist. LEXIS 64947 (N.D. Cal. Apr. 28, 2017)............................................................................................24, 25

*McKee v. Audible, Inc.*, 2018 U.S. Dist. LEXIS 179978 (C.D. Cal. Apr. 6, 2018) ..........25

*McKeen-Chaplin v. Provident Sav. Bank*, 862 F.3d 847 (9th Cir. 2017) .........................14

*McKenzie Law Firm, P.A. v. Ruby Receptionists, Inc.*, No. 3:18-cv-1921-SI, 2020 U.S. Dist. LEXIS 94299 (D. Or. May 29, 2020) ..................................................14

*Mitchell v. CoreLogic, Inc.*, No. SA CV 17-2274-DOC (DFMx), 2019 U.S. Dist. LEXIS 221927 (C.D. Cal. July 19, 2019).............................................................13, 24

*Mullen v. GLV, Inc.*, 334 F.R.D. 656 (N.D. Ill. 2020).........................................................7

*Oconner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593 (S.D.N.Y. 2020).................13, 23, 25

*Ontiveros v. Safelite Fulfillment, Inc.,* 2017 U.S. Dist. LEXIS 222414 (C.D. Cal. Oct. 16, 2017).........................................................................................................14

*Patel v. 7-Eleven, Inc.*, 322 F. Supp. 3d 244 (D. Mass. 2018) .........................................16

*Salazar v. Driver Provider Phx. LLC*, 532 F. Supp. 3d 832 (D. Ariz. 2021)....................13

*Snarr v. HRB Tax Grp., Inc.*, No. 19-cv-03610-SK, 2021 U.S. Dist. LEXIS 194077 (N.D. Cal. May 13, 2021)..............................................................................16, 24

*Talavera v. Leprino Foods Co.*, 2016 U.S. Dist. LEXIS 29633 (E.D. Cal. Mar. 8, 2016)18

*Thieriot v. Celtic Ins. Co.*, No. C 10-04462 LB, 2011 U.S. Dist. LEXIS 4504 (N.D. Cal. Jan. 13, 2011).........................................................................................................13

*Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370 (6th Cir. 2005) .....................23

REPLY SUPP. PLTF'S MOTION TO INVALIDATE UNCOUNSELED RELEASES AND AGREEMENTS

In opposing Plaintiffs' motion to invalidate Defendant's arbitration and waiver agreement campaign, Defendant concedes that courts will not enforce post-filing arbitration agreements as a bar to participation in a pending class/collective action unless the employer had disclosed by the time it presented the agreements that signing would bar participation in such pending class/collective action filed on their behalf.

Yet Defendant's record evidence of the information it provided during the October 19, 2020 Zoom video conference meeting(s) with underwriters concedes, as it must, that it did not disclose: the plaintiff's name, case caption, court, plaintiff's counsel's contact information, or that signing the Employment Agreement would bar participation in a pending class/collective action lawsuit filed on their behalf (the "Omitted Information"). In fact, this evidence does not even show that Defendant mentioned the word "arbitration," or stated that the "At Will Employment Agreement" contained arbitration and class/collective waiver provisions during the meeting(s).[1] The emails rolling out arbitration agreements to underwriters immediately after the meeting(s) on October 19, 2020, sent at 5:07 pm and 6:28pm ET similarly failed to provide this crucial information.

Nonetheless, Defendant stakes its argument that it should be excused for not disclosing that information in the Employment Agreement on the contention that it contemporaneously disclosed it (i) in the Release Agreement and (ii) by a "recap" email:

> [The Release] communicated the nature of Plaintiff's claims (as well as included a link to the Complaint)…The Arbitration Agreements were communicated to underwriters at the same time, along with a separate communication explaining how agreeing to arbitrate claims may affect the underwriters' ability to participate in this lawsuit. . . .
> ***all of this information was provided to current underwriters in the recap email and the Release***—which underwriters received at ***the same time*** they received the [Arbitration] Agreement. All of those materials were sent to the exact same people on the exact same day.[2]

Defendant, however, impales itself on that very stake. <u>Because that didn't happen.</u>

---

[1] Defendant claims the Zoom meeting(s) were not recorded. (Decl., ¶ 25.)

[2] (Opposition [Dkt. 66], Page IDs 617, 639) (emphasis original)

First, the "recap" email. Defendant did not send it until the next day - October 20, 2020, after all agreements had been sent by DocuSign for signatures the day before. (Second Meyerhoff Decl. [Dkt. 66-1], Ex. B, Page ID 657 ("recap" email sent "October 20, 2020 at 9:49:37 AM UTC-4")).  Defendant's record evidence and discovery production reveals that the "recap" email was the first time sequentially that it ever even uttered the word "arbitration," mentioned to underwriters that arbitration agreement would bar participation in a pending lawsuit (without, however, evern mentioning a class/collective action waiver), or informed them that the release payment was conditioned on signing the arbitration agreement. But by the time underwriters were sent that October 20th "recap" email, more than 140 had already viewed the Employment Agreement sent October 19th, and more than 110 had already signed it, without ever receiving the "recap" disclosure. (Second Head Declaration ("Decl."), ¶ 93.)

That leaves the Release to bail Defendant out. But the separately emailed Release never mentioned arbitration, much less disclosed – as Defendant was obligated to do prior to presentment – that signing the separate Employment Agreement would bar participation in this case.[3] Nor could it suffice even if it *had* made that disclosure since Defendant did not ensure that the Releases were read (or even sent) before underwriters signed the Employment Agreements. Indeed, it sent the Employment Agreements to 35 underwriters at 5:05 pm ET, but did not send their Releases until 5:42 pm ET, by which time 26 of them had already signed the Employment Agreement. In total, 94 underwriters opened and viewed the Employment Agreement before ever opening and viewing a Release – thus, without having first been presented disclosure of even the case name and (slight) details of this pending lawsuit – and 76 had already signed the Employment Agreement before they ever opened and viewed a Release. (Decl., ¶ 91.)

---

[3] According to Defendant's document production, it provided the Release to most (but not all) putative class/collective members who signed arbitration agreements in October, 2020 . (Decl., ¶ 92 (document production contained no record that Defendant sent Release Agreement to 16 putative class/collective members who signed Employment Agreements in October, 2020)).

Compounding this problem, Defendant's discovery production reveals that Defendant has made <u>no</u> attempt to provide <u>any</u> disclosure regarding a pending lawsuit and the effect that signing an Employment Agreement would have on underwriters' participation after November 2020. Defendant's evidence of record concedes by omission, as it must, that it did not provide the Release, or the "recap" email, when presenting any arbitration agreements to underwriters for signature after October 2020 (except for a few, at the latest, in November 2020). No underwriters hired after the Release period (i.e., after September 18, 2020) received the Release Agreement. Underwriters hired after the October 20, 2020 "recap" email did not receive that "recap" or any other disclosure that signing the Employment Agreement would bar participation in a pending lawsuit regarding their unpaid overtime as underwriters. (Decl., ¶ 13.) And when it rolled out those same arbitration agreements again to all currently employed underwriters in January 2021, it again provided no such disclosures.

Thus, to date Defendant claims[4] well-over 200 underwriters signed Employment Agreements[5] since the October blitz, meaning they signed (i) <u>without</u> being presented "with a separate [accompanying] communication explaining how agreeing to arbitrate

---

[4] Defendant claims 481 underwriters signed total (first Declaration of Kenna Meyerhoff [Dkt. 55], ¶ 6), but its production only reflects around 200 signed agreements from October 2020 (Decl., ¶ 91), meaning most have signed since, many of which have not been produced. (Brome Decl. ¶ 4 (approximately 126 post-November 2020 agreements).)

[5] As a preliminary matter, in both its opposition [Dkt. 66] and its separately filed motions to preemptively deny class/collective certification [Dkts. 53 and 54], Defendant made the strategic litigation choice to limit the scope of arbitration agreements it is relying on for its positions to "the same at-will employment agreement represented by Exhibit B" to the Meyerhoff Decl. (*See* Meyerhoff Decl. [Dkt 55], ¶¶ 4-6, Ex. B ("the same at-will employment agreement represented by Exhibit B" provided to underwriters in October, 2020 and "[b]eginning in January 2021"; "To date, at least 481 underwriters have signed the at-will employment agreement represented by Exhibit B")); Opposition [Dkt. 66], Page ID 638 (the same employment agreement as Exhibit B, citing Meyerhoff Decl.,¶ 5); Defendant's motion to deny certification [Dkt. 53, Page ID 462; Dkt. 54, Page ID 481] ("the same at-will employment agreement," citing Meyerhoff Decl., ¶ 5). It thus waives reliance on arbitration terms in any other agreement.

1 claims may affect the underwriters' ability to participate in this lawsuit" and (ii) <u>without</u>

2 being presented with an accompanying Release Agreement. (Decl., ¶ 13.)

3     Defendant's arbitration and waiver blitz campaign is due to be invalidated for these

4 and additional compelling reasons gleaned from the documents as articulated below.

5 **I.**     **Evidence Obtained in Discovery Confirms A Misleading Blitz Campaign.**

6     A. <u>The October 2020 Underwriter Arbitration and Release Agreement Blitz.</u>

7        *i.  Arbitration/Waiver Agreements Sent Only to Underwriters*

8     Defendant was served with the Complaint and PAGA letter in this case on

9 September 28, 2020 (Decl., ¶ 4), and retained the Constangy firm in September, 2020 to

10 represent it in this matter. (Bauer Decl. [Dkt. 34-1], ¶ 2) At that time, no underwriters had

11 arbitration agreements (Decl., ¶ 8, ("we don't have ANY arbitration language to offers

12 right?" (reply: "nope")), so it immediately planned a rollout: on October 6, 2020,

13 Defendant's HR management was called to "an important mtg w/ legal re: FLSA

14 Arbitration/Settlement Strategy." (Decl., ¶ 7.)

15     Defendant had already planned on rolling out additional compensation to

16 underwriters (requesting and receiving approval for that $4.4 million budget item on

17 September 16, 2020). Ironically, what prompted that budget item request was its

18 recognition that ████████████████████████████████████

19 ████████████████████████████:

20 ████████████████████████████████████████████

21 ████████████████████████████████████████████

22 ████████████████████████████████████ [6]

23     Knowing that its underwriters were working unpaid overtime, having confirmed

24 that it did not have arbitration agreements with its underwriters, and wanting their

25 releases, Defendant pivoted to merge its planned retention payments with new post-

26 dispute arbitration agreements and releases. Its plan was to ██████████████,

27 _____

28 [6] (Decl., ¶ 21.) Other evidence from Defendant's production similarly illustrates ████████████████████████████████. (Decl. ¶¶ 88–90.)

REPLY SUPP. PLTF'S MOTION TO INVALIDATE UNCOUNSELED RELEASES AND AGREEMENTS



" (*Id.*)

6   Defendant then invited all underwriters to an "Underwriting Huddle" set for 4:00
7   PM on October 19, 2020 over Zoom. (Decl., ¶ 15.) It is undisputed that attendance was
8   mandatory and during work hours. Defendant's record evidence regarding this "huddle,"
9   contained in the Meyerhoff Declarations [Dkt. 55, 66-1.], shows there was no mention of
10  the word "arbitration," no disclosure of the Omitted Information, the agreements were not
11  provided, and their content was neither displayed nor presented. Instead, after 6 slides of
12  announcing underwriting updates, higher compensation, and retention bonuses, the last 2
13  slides addressed "Release of claims." ([Dkt. 66-1], Ex. A) The only references to a third
14  agreement were to call it an "At Will Employment Agreement" (under a "Compensation
15  Updates" heading), state it "includes updates to our current employment agreements"
16  which they "must sign for continued employment," and falsely state that "All US
17  Employees" and "Everyone at Better will receive" it on October 19, 2020. (*Id.*)

18  Unsurprisingly, this presentation left underwriters confused. (Chaidez Dec. [Dkt.
19  52-4] ¶ 9.) An Underwriting Manager gave upper management the following feedback:

20      As for the latter part [Release of claims], I know this is where most were lost.
21      I am sure the amount of information you all can divulge is limited so it really
        left most confused on what to do….My thoughts are the meeting content
22      should have been separated in a way, a high for the RETENTION and then
        onto the required agreements that needed to be signed. The OT one should
23      have been totally a silo meeting for sure.

24

25  (Decl., ¶ 71) They weren't the only ones confused – even Defendant's Head of People
26  was asking in November, 2020 "is the arbitration the release agreement?" (*Id.* ¶ 85; ¶ 22.)
27  The pressure was then on to obtain quick[7] signatures, in spite of the confusion.

28  _____
[7] This rushed rollout led to internal inconsistencies and mistakes. (Decl. ¶¶ 69–86.)

(Decl., ¶ 14 ("legals said on Friday they wanted this turned around in a day…In the first night we got a great rate of return: 1. 72 Release Returned: 37% response rate. 2. 96 Retention Signed: 45% of eligible employees. 3. 98 Employment Agreement: 46% of population[.]")). Anyone who hadn't signed the arbitration agreement by October 21, 2020 received one-on-one follow-up communication from their managers. (Decl., ¶ 52 ("Below is a list of 15 names that I think we should FU with today if possible. They either signed the Retention Agreement, Release agreement, or both, but have NOT signed the Employee Agreement yet.")) Kenna Meyerhoff instructed management to "thank them for signing the [other] agreements [but] let them know they will need to sign the employment agreement regardless." (*Id.*) Management instructed Underwriting Managers to "chase" underwriters identified (by name) as having failed to sign the arbitration agreement by November 1, 2020. (Decl., ¶ 64) Management had "one on one conversations to address any questions [underwriters] had" about the agreements. (Decl., ¶ 74.) Defendant actively pursued and tracked signatures (Decl. ¶¶ 61–68.)

*ii. Defendant's Whitewash Attempt: Call a New Disclosure a "Recap"*

After sending out the agreements on October 19, 2020, ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█. (Decl., ¶ 11.) ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████. (*Id.*)

*After* █████████████████████████████████

████████████████████████████████████████████

████████████. (Decl., ¶ 12.) The Court may infer that the following █████████

████████████████████████████████████████████



.”[8] (*Id.*)

Defendant tracked how many underwriters signed the arbitration agreement, and celebrated how many people signed so quickly (Decl., ¶ 66.) Defendant's human resources staff praised the fact that 98 arbitration agreements had been signed by 10:42pm on October 19, 2020 as "Great numbers!" adding "Hopefully with the [recap] email going out this AM we'll have even more responses." (*Id.*) Lest there be any doubt that Defendant's focus was on maximizing the pressure for underwriters to sign, Defendant's Deputy Counsel then demanded that underwriters must self-report a decision not to sign either "voluntary" agreement. (Decl., ¶ 82.) So Defendant followed that "recap" email with an email sent October 22, 2020, ordering any underwriters who decide not to sign the "voluntary" Release Agreement to self-report their refusal by email to Defendant's HR management:[9] "Just a friendly reminder that we're looking to have

---

[8] The Complaint also alleged claims under the Labor Code as a class action, but the Release language waived non-FLSA claims, meaning those who signed could still assert their FLSA claims in this case. The Employment Agreement, with its arbitration and class/collective waivers, is what "release[d ability] to join that lawsuit[.]"

[9] Incredibly, Defendant boasts that "of the few employees who chose not to sign a Release, at least two [underwriters] even went as far as to email Better HR to affirm that choice," as if they did so on their own volition -- without disclosing to the Court that the real reason was <u>because they were explicitly ordered to do so</u>. (Decl., ¶ 67.) Regardless, that two of 200+ declined does nothing to show that other putative class members were sufficiently informed. *Acosta v. Sw. Fuel Mgmt.*, No. CV 16-4547 FMO (AGRx), 2018 U.S. Dist. LEXIS 22554, at *20 n.5 (C.D. Cal. Feb. 2, 2018). Nor does Defendant's reliance on isolated "happy camper" putative class members who profess their support. *See Mullen v. GLV, Inc.*, 334 F.R.D. 656, 662 (N.D. Ill. 2020) (defendants essentially suggest their communications were not improper because certain recipients remain

1    folks complete the following by tomorrow, Oct. 23rd. 1. Sign the release and retention

2    agreements OR 2. Let us know that they don't plan to sign them by responding to this

3    [Meyerhoff] email." (Decl., ¶ 67.) If an underwriter self-reported their decision not to

4    sign a release, their notification was forwarded to Defendant's HR management and legal

5    department personnel – and often their Underwriting Manager as well. (Decl., ¶¶ 61, 62.)

6            **B.** <u>Company-Wide Rollout of Arbitration Agreements Without Disclosures.</u>

7           After the October 2020 targeted arbitration/waiver agreement rollout, Defendant

8    decided to require all underwriters to sign the same Employment Agreements again, with

9    no accompanying disclosure of this case or the impact signing would have on

10   participating, by distributing "new" Employment Agreements to *all* employees in January

11   2021, tacking the rollout of those "new" agreements on to its distribution of equity grants,

12   notice of new incentive plans, and new Employee Handbook distribution.$^{10}$

13              *i.  Defendant Gave No Disclosures Whatsoever after October 2020*

14          Defendant's evidentiary submission concedes, by omission, that in rolling out

15   Employment Agreements to all employees in January 2021, Defendant gave underwriters

16   no disclosures whatsoever regarding this lawsuit or the effect that signing those

17   agreements would have on participation in a pending lawsuit – this one.

18             *ii.  Anything Highlighting "Arbitration" As New Was Scrubbed.*

19          Defendant's management personnel drafted a ████████████████████

20   ██████████████████. As originally drafted, it would have ██████████

21   ███████████████████████████████████████████:

22       ███████████████████████████████

23       ███████████████████████████████

24       ███████████████████████████████

25       ────────────────────

26   supporters, so there is no evidence of actual coercion, "[b]ut a communication that is
     even potentially coercive undermines the purposes of Rule 23.").

27   $^{10}$ (Decl., ¶ 28 (November 10, 2020: ████████████████████

28   ████████████████████████████████████████

1

2

████████████████████████████████████████████████████████████████.

3  (Decl., ¶ 32.) And it would have flagged that their previous agreement terms only

4  covered "confidentiality obligations, assignment of inventions, and the return of company

5  property," which might also tip an underwriter off that arbitration was a new term:

6

7  Depending on when you started your employment with Better, you've likely
   already signed a similar agreement that was included with your offer letter,

8  **addressing items such as your confidentiality obligations, assignment of
   inventions, and the return of company property**. However, those previous

9  agreements' exact terms and conditions varied as there had been multiple
   versions over the years. To ensure that the Company's interests have

10  consistent protections and ensure employees' obligations are fair and
    consistent, all employees must sign this new standardized version.

11

12  (Decl., ¶¶ 17–19) (Emphasis added)

13  But Defendant's ████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████. (Decl., ¶¶ 31–33.) The

16  final ████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████." (*Id.*) ████████

21  ████████████████████████. New agreements were sent out January 28, 2021.

22  Defendant then applied pressure once again. Its Deputy Counsel again directly

23  communicated one-on-one by emails sent to any underwriter who had not timely signed

24  the Employment Agreements, threatening termination if not signed within seven days.

25  (Decl., ¶ 54.) Its Senior Corporate Counsel sent emails April 19, 2021 to anyone who

26  failed to sign their Employment Agreements, requiring signature. (Decl., ¶ 34.) As

27  before, management again closely monitored how quickly they were receiving signatures.

28

-9-

1  (Decl., ¶ 35.) Meanwhile, management personnel joked internally about how employees

2  don't read the agreements that they're being asked to sign. (Decl., ¶ 87.)

3  **II.    Correcting Defendant's Misleading and Inaccurate Representations.**

4      Defendant's misrepresentation in its opposition brief highlighted above that

5  underwriters received the Release and the "recap" email contemporaneously with the

6  arbitration agreement is, unfortunately, only one of many.

7      First, Defendant would have the Court believe that its October/November 2020

8  rollout of Employment Agreements containing arbitration and class/collective waiver

9  provisions was not targeted at the underwriters at issue in this case. (*See* Opposition [Dkt.

10  66], Page ID 617). But the only employees to whom Defendant began distributing

11  arbitration agreements "shortly after" Plaintiff filed this action in October, 2020 were

12  underwriters; Defendant only began distributing arbitration agreements "in January,

13  2021" to "all other current employees as well as newly hired employees (including

14  underwriters)" positions until late January, 2021 (*id.*, Page ID 623; Meyerhoff Decl., ¶ 5.)

15  – and did so without providing any litigation disclosures whatsoever. Worse, Defendant

16  lied to the underwriters, telling them during the Zoom meeting that the arbitration

17  agreements were being presented to "all US employees" with a "Date will be received" of

18  "10/19/2020" (Meyerhoff Decl. [66-1], Ex. A, Page ID 654) despite knowing full well

19  that only underwriters were being targeted with the October 19, 2020 rollout (*see* Decl.,

20  ¶¶ 17–51, regarding separate rollouts), misleading them into thinking they were not being

21  targeted at the time so as to avoid arousing suspicion.[11]

22      Second, Defendant's opposition brief avers, without citation to record evidence,

23  that it provided "comprehensive information regarding plaintiff's lawsuit during the

24  [October 19, 2020] virtual [Zoom] meetings, [and] in the recap email":

25

26

27  [11] ████████████████████████████████████████████████████████████

28  █████████████████████████████████████████████. (Decl. ¶ 89.)

> Because Better had provided comprehensive information regarding plaintiff's lawsuit during the virtual meetings, in the recap email, and with the Release, Better did not separately provide this same information with the Arbitration Agreement.

(Opposition, Page ID 622.) But Defendant's evidence (Declarations of Kenna Meyerhoff) says no such thing as to the meetings and recap email, and the Chaidez Declaration remains unrebutted that at no point during the Zoom meeting(s) did Defendant provide the Omitted Information. Indeed, Ms. Meyerhoff's only testimony of the specific information provided to underwriters about Plaintiff's lawsuit during the meeting(s) is the slide deck attached as Exhibit A to Meyerhoff's second Declaration. Buried on page 10 of that meeting slide deck is the following, none of which would allow an underwriter to find this case, know who to contact, or understand their rights and potential claims:

> We are reviewing a legal claim against the company, alleging that we've misclassified the Underwriting position – stating UW roles should be eligible for overtime pay. We do not believe this allegation to be true….you'll be receiving a **voluntary** release of claims agreement. Signing this (again, VOLUNTARY) (sic) will give you the right to voluntarily release Better of all claims as it relates to the lawsuit.

Defendant's evidence reveals that the "recap" email similarly did not provide the case caption, plaintiff's name, plaintiff's counsel or their contact information, the court where the action is pending, the filing date, that it was filed as a class or collective action on their behalf that they have a present right to join, or that they would be covered by the case if they do not exclude themselves if class certification is granted.

Third, Defendant represents "Better did not conduct any one-on-one meetings regarding either agreement." (Opposition [Dkt. 66], Page ID 628) At least one Underwriting Manager "ha[d]…one on one conversations to address any questions they had [about the October 2020 agreements]." (Decl., ¶ 72.) And Underwriting Managers, Human Resources personnel, and even Defendant's Deputy General Counsel sent direct one-on-one email communications ordering underwriters to sign arbitration agreements or face discipline including termination. (*See* Decl., ¶¶ 51–58, 64.)

Fourth, despite Plaintiff's evidence that the hyperlink in the Release no longer allowed access to a copy of the Complaint on Plaintiff's counsel's website after October 23, 2020 during the October/November 2020 rollout period, Defendant argues that because that website currently (in 2022) contains a functioning link to the Complaint, it must also have contained that functioning link on and after October 23, 2020 during the fall 2020 rollout blitz. (Opposition [Dkt. 66], Page ID 631) That, however, is not the case. (Brome Decl., ¶ 3 (from 10/23/20 to 12/27/21, the website did not link Complaint).)

Fifth, Defendant attempts to distinguish the caselaw by representing "underwriters were **_not_** asked to sign anything during those meetings." (Opposition, Page ID 628). False. During the meetings, underwriters were told that they were <u>required</u> to sign the Employment Agreement that would be emailed to them immediately after the meeting, and were notified that Defendant was asking them to sign voluntary Release Agreements.

Defendant's legal arguments fare no better.

First, Defendant's recitation of facts in this Court's *Kirby* opinion is misleading:

> Other cases cited by Plaintiff only find actual coercion when an employer forces an employee into a one-on-one situation to sign at a particular time or place—circumstances not present here. *See Kirby*, 2020 U.S. Dist. LEXIS 146449 at *7 (employees offered agreements during in-person one-on-one meetings).

(Opposition [Dkt. 66], Page ID 627.) To the contrary, most of the release agreements that this Court deemed voidable in *Kirby* were instead <u>mailed to current and former employees at their home addresses where they could be opened, reviewed, and considered in private</u>, unlike the facts here where underwriters were called to a mandatory video meeting during work hours, sent agreements with a tight turnaround requirement, required to sign a mandatory arbitration agreement as a condition of continued employment (and payment of any signed releases), and required to self-report if they chose not to sign the release. *Kirby v. Kindred Healthcare Operating*, No. 5:19-cv-00833-JLS-DFM, 2020 U.S. Dist. LEXIS 146449, at *6-7 (C.D. Cal. May 1, 2020) (ruling settlement agreements voidable, including those that defendant sent to home

addresses); *see also* Plaintiff's Declaration in *Kirby* attaching examples of letters and settlement packets mailed to home addresses, No. 5:19-cv-00833-JLS-DFM [Dkt. 50-1]. Only "some employees" were offered the agreements during one-on-one meetings in *Kirby*. *Id.*, at *7. Defendant also argues that unlike in *Kirby*, where the employer told putative class members that they "could recover nothing" if they asserted claims in the lawsuit, "Better made no such statements." (Opposition [Dkt. 66], Page ID 629) In Defendant's "recap" email, however, Defendant stated its functional equivalent, opining on a lawsuit's claim that "Underwrit[ers]…should be eligible for overtime pay" by stating "We do not believe this allegation to be true."

Second, Defendant faults Plaintiff's reliance on the *Salazar* and *Oconner* opinions by falsely saying those were cases "in which defendants provided only two days to consider the agreements at issue."[12] (Opposition [Dkt. 66], Page ID 628, n. 6) Not true – in both *Salazar* and *Oconner*, as here, defendants provided only four days to consider the agreements. *See Salazar v. Driver Provider Phx. LLC*, 532 F. Supp. 3d 832, 835 (D. Ariz. 2021) (agreements sent December 17th required to be signed "no later than December 21st"); *Oconner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 599 (S.D.N.Y. 2020) (agreements sent out August 22nd to be signed by August 26th).

Third, Defendant argues that "Plaintiff's cases [do not] support…an argument [that the Release was misleading],"[13] (Opposition [Dkt. 66], Page ID 633) addressing only two

---

[12] Defendant contends it "gave underwriters ample time to consider the offer." This Court disagrees: "affording just seven days to accept the offer creates further pressure on the putative class members." *Mitchell v. CoreLogic, Inc.*, No. SA CV 17-2274, 2019 U.S. Dist. LEXIS 221927, at *10 (C.D. Cal. July 19, 2019). This Court routinely requires 45-60 days to consider class notices, and courts have held that even 30 days is too short to consider class settlement notices. *See, e.g., Thieriot v. Celtic Ins. Co.*, No. C 10-04462, 2011 U.S. Dist. LEXIS 4504, at *13-14 (N.D. Cal. Jan. 13, 2011) (30 day opt-out window was too short). Regardless, the Ninth Circuit held that even giving 3 days is "irrelevant" where, as here, the employee cannot negotiate or decline a mandatory agreement. *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1172 (9th Cir. 2003).

[13] Defendant also misrepresents that "Plaintiff does not…contend that [the Release's] description of claims is inaccurate or misleading." Plaintiff, however, devoted an entire

(*Stafford* and *Kutzman*) but ignoring Plaintiff's multitude of other cited authorities explicitly finding the type of language and/or omissions alleged here misleading. *See, e.g., Kirby*, 2020 U.S. Dist. LEXIS 146449, at *12 (C.D. Cal. May 1, 2020) (omitting any information that would allow recipient to determine damages, legalese, and slanted characterization of case status "render[] the communications misleading"); *Cty. of Santa Clara v. Astra USA, Inc.*, 2010 U.S. Dist. LEXIS 78312, at **15-16 (N.D. Cal. July 8, 2010) (invalidating releases to protect putative class "from misleading information" because defendant's release "should not have concealed material information" and "at a minimum should have explained…how closely [defendant's settlement] calculations aligned with plaintiff's allegations.")

Defendant also argues, without legal support, that this Court lacks discretion to control class/collective member communications because its underwriters are "sophisticated…financial services professionals trained to review and assess financial information against legal and other requirements." First, there is no such free pass -- courts have even barred a defendant's communication with potential class members that were law firms, based on a finding of similar abusive tactics. *See, e.g., McKenzie Law Firm, P.A. v. Ruby Receptionists, Inc.*, No. 3:18-cv-1921-SI, 2020 U.S. Dist. LEXIS 94299, at *15-16 (D. Or. May 29, 2020). But Defendant did not give underwriters any "legal requirements" for them to "review and assess against," such as the *McKeen-Chaplin v. Provident Sav. Bank*, 862 F.3d 847 (9th Cir. 2017) ruling that those underwriters were owed overtime, or any disclosure whatsoever of potential damages.

Defendant also mischaracterizes *Ontiveros v. Safelite Fulfillment, Inc.,* 2017 U.S. Dist. LEXIS 222414 (C.D. Cal. Oct. 16, 2017) as merely "dealing with instruction" on how to obtain the complaint with the release, when instead the settlement packet contained *direct hyperlinks to the court dockets for downloading*; notwithstanding those

---

section of its brief to that exact contention, titled "**The Release Agreement was contradictory, misleading, intimidating, and interfered with the purposes of Rule 23 and FLSA opt-in notice.**" (Plaintiff's brief [Dkt. 52-1], beginning at Page ID 389).

1  direct hyperlinks, the court made a finding of fact that defendant's packet "did not

2  include a copy of the [] Complaint," an "omission" it found "material." *Id.*, at *9.

3      And in perhaps its greatest misrepresentation of legal authority, Defendant

4  contends that post-filing waiver and arbitration agreements obtained by *ex parte*

5  communication with potential class and collective action members are "presumptively

6  valid and enforceable," citing *Chindarah* not only for that bold proposition but also as if

7  it was deciding a court's discretion to invalidate waivers due to improper class/collective

8  communications: "*Chindarah* holds [that] individual release agreements between a

9  defendant and putative class members are permissible upon disclosure of the

10  underlying dispute." (Opposition, Page IDs 617, 638) But *Chindarah* did not say

11  anything of the sort. Courts (including this District) recognize that *Chindarah* merely

12  decided whether a California statute prohibited settlement of wage claims, without

13  addressing whether the communications were improper or the court's discretion under

14  *Gulf Oil* and Rule 23 to manage those communications (or basing its ruling on whether

15  there was "disclosure of the underlying dispute"):[14] "*Chindarah*  supports the conclusion

16  that [individual agreements could bar class claims;] [h]owever, this question must be

17  evaluated in light of issues that arise when a defendant in a putative class proceeding

18  communicates with putative class members before a motion for class certification is

19

20  [14] Defendant repeats this error in complaining that Plaintiff's cited authorities (such as *Guifu Lu*) invalidating improper unilateral "opt-out" notices "lack merit" because they did not consider "whether a defendant may enter into pre-certification arbitration or settlement agreements", then arguing that because *Chindarah* held the settlement agreements did not violate a California statute, "the Court of Appeal held those were valid contracts—not improper opt-out notices." (Opposition [Dkt. 66], Page ID 626 n.4.) Again, the court in *Chindarah* did not decide the question presented here: whether the agreements should be invalidated as improper class/collective communications. And if Defendant was attempting to argue that soliciting potential class members to sign opt-out notices is somehow different from soliciting them not to join, courts reject any such distinction. *Burrell v. Crown Cent. Petroleum*, 176 F.R.D. 239, 243 (E.D. Tex. 1997) ("defendant attempting to influence potential plaintiffs not to join an embryonic class action would be just as damaging to the purposes of Rule 23 as a defendant that influences members of an already-certified class to opt out.").

decided…[c]ourts applying the *Gulf Oil* standard have found that [an employer's] ex
parte communications soliciting opt-outs, or even simply discouraging participation in a
case, undermine the purposes of Rule 23 and require curative action by the court."
*Gutierrez v. Stericycle, Inc.*, No. LA CV15-08187 JAK (JEMx), 2018 U.S. Dist. LEXIS
231865, at *31-32 (C.D. Cal. Oct. 24, 2018) (citations and quotations omitted).

Indeed, the opposite presumptions apply: post-filing agreements obtained by *ex
parte* communications with putative class/collective action members in this manner are
presumptively coercive and invalid. *See, e.g., Snarr v. HRB Tax Grp., Inc.*, No. 19-cv-
03610-SK, 2021 U.S. Dist. LEXIS 194077, at *26-27 (N.D. Cal. May 13, 2021) ("The
number of these cases [invalidating post-filing arbitration rollouts] makes clear that
similar ploys to Defendants' have been attempted in other cases; courts have uniformly
found that such conduct is unfair to putative plaintiffs and inappropriate."); *Kirby*, 2020
U.S. Dist. LEXIS 146449, at *7 ("the risk of coercion and abuse is higher in the context
of an employer-employee relationship"); *Patel v. 7-Eleven, Inc.*, 322 F. Supp. 3d 244,
251 (D. Mass. 2018) (courts review communications in an "ongoing business
relationship, such as employer-employee…with heightened scrutiny"); *Kubala v.
Supreme Prod. Servs.*, 830 F.3d 199, 205 (5th Cir. 2016) (Higginbotham, J., concurring)
(arbitration agreement extracted "once notified of an employee's FLSA [by] threaten[ing]
to fire the employee unless he agrees to arbitrate…is one of questionable validity.");
*Camp v. Alexander*, 300 F.R.D. 617, 625 (N.D. Cal. 2014) ("[E]x parte solicitation of
opt-outs by a defendant before class certification is improper."); *Air Commun. & Satellite
Inc. v. Echostar Satellite Corp.*, 38 P.3d 1246, 1253 (Colo. 2002) (soliciting opt-outs
before certification "constitutes a serious challenge to the authority of the court to have
some control over [class] communications," particularly when it affects numerosity); *cf.*,
*Gray v. Rent-A-Center W., Inc.*, 314 F. App'x 15, 16 (9th Cir. 2008) ("Disparity in
bargaining power is endemic in contracts between employees and employers.").

**III.   The Rollouts Were Improper Class Communications**

A. <u>The Totality of the Circumstances Warrants the Relief Plaintiff Seeks.</u>

Defendant wants a rule that Plaintiff must prove misconduct, confusion, and intimidation -- and that some undetermined sufficient number of putative class members must come forward and file sworn statements attesting to being confused or misled by an employer's *ex parte* arbitration/waiver agreement blitz[15] – before the Court can exercise its discretion to invalidate the waivers. That is not the rule. An order invalidating these agreements as a bar to this action "does not require a finding of actual misconduct—rather, the key is whether there is potential interference with the rights of the parties in a class action." *Kirby*, 2020 U.S. Dist. LEXIS 146449 at *4 (citation omitted).[16]

This Court is authorized to invalidate pre-notice waiver agreements that sought or threatened the potential class members' choice of remedies, even if (unlike here) the communications were not misleading and confusing:

> A district court's duty and authority under Rule 23(d) to protect the integrity of the class and the administration of justice generally is not limited only to those communications that mislead or otherwise threaten to create confusion and to influence the threshold decision whether to remain in the class. Certainly communications that seek or threaten to influence the choice of remedies are, in some instances, subject to the strictures of *Gulf Oil* and are therefore within a district court's discretion to regulate.

*In re Sch. Asbestos Litig.*, 842 F.2d 671, 683 (3d Cir. 1988); *see also Espinoza v. Galardi S. Enters.*, No. 14-21244-CIV, 2015 U.S. Dist. LEXIS 173408, at *15-16 (S.D. Fla. Dec.

---

[15] "[Defendant's] protest that only a few [work]ers have submitted declarations in support of Plaintiffs' motion misses the point. Plaintiffs bring this motion precisely because [defendant] discouraged [work]ers from participating in this lawsuit. [Citations Omitted.] To accept [that] argument would reward employers for engaging in such conduct since the more successful they are at discouraging [work]ers from participating the more likely they are to prevent any judicial curative action." *Johnson v. Serenity Transp., Inc.*, No. 15-cv-02004-JSC, 2017 U.S. Dist. LEXIS 156804, at *17-18 (N.D. Cal. Sep. 25, 2017).

[16] To warrant remedying class/collective communications, Plaintiff also need not prove that the agreements were unconscionable. *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 271 (S.D.N.Y. 2020) ("[T]he standards for what is unconscionable and what merits remediation pursuant to Rule 23(d) are not the same….A procedure that does not 'shock the conscience' . . . may still be one that so lends itself to potential for confusion or being misled as to merit the Court's discretionary relief under Rule 23(d).")

-17-

31, 2015) (refusing to enforce post-suit arbitration agreements "[d]espite the absence of an interrogative, intimidating atmosphere and any confusion inherent in the agreement" because the rollout was "clearly coercive" and "designed to undermine this litigation."); *Cox Nuclear Med. v. Gold Cup Coffee Servs.*, 214 F.R.D. 696, 697-98 (S.D. Ala. 2003) ("the movant must show that the particular form of communication at issue is abusive in that it threatens the proper functioning of the litigation.")

Defendant also seems to want a rule that the Court should separately parse each communication in a vacuum, and only exercise its control if a communication standing on its own is sufficiently egregious. But that too is not the rule. *See Talavera v. Leprino Foods Co.*, 2016 U.S. Dist. LEXIS 29633, at *14-15 (E.D. Cal. Mar. 8, 2016) ("Whether a communication is misleading or coercive—…[warranting] judicial intervention—often depends not on one particular assertion, but rather the overall message or impression left by the communication…a Court therefore 'must examine 'the context in which the communications were made and the effect of the communications'") (citations omitted); *In re Allergan Biocell Textured Breast Implant Prods. Liab. Litig*, No. 19-MD-2921 (BRM) (JAD), 2020 U.S. Dist. LEXIS 123681, at *37 (D.N.J. July 14, 2020) (court cannot "consider the propriety of the release in a vacuum, focusing solely on the words contained therein," and instead considers circumstances of the conveyance as a whole).

And Defendant expects unfettered *ex parte* access to continue its misleading and coercive campaign to extract uncounseled arbitration and waiver agreements from its underwriters affecting participation in this action. It admits it continued to impose arbitration agreements on California underwriters as a condition of employment without <u>any</u> accompanying litigation disclosure,[17] and continued to communicate directly, one-on-one with California underwriters to demand they sign arbitration agreements (on

---

[17] Indeed, it continues to involuntarily impose arbitration on California underwriters even after the Ninth Circuit held that doing so violates Cal. Lab. Code § 432.6 in *Chamber of Commerce of the United States v. Bonta,* 13 F.4th 766 (9th Cir. 2021). While violating § 432.6 does not invalidate agreements, its brazen approach provides additional context.

threat of termination) – even after Plaintiff's Motion was filed (Decl., ¶ 54) and may be distributing releases as part of its latest mass layoff[18] - to the extent they fail to disclose crucial information they should also be invalidated.

### B. Misrepresentations and Falsehoods Permeated the Rollout Campaigns.

In communicating with putative class members, including settlement discussions before class certification, defendants and their counsel "may not give false, misleading, or intimidating information, conceal material information, or attempt to influence the decision about whether to request exclusion from a class certified under Rule 23(b)(3)." *Kirby*, 2020 U.S. Dist. LEXIS 146449, at *8. "Two types of communications are generally concerning to courts–'those containing misrepresentations and those which may discourage persons from opting into the class.'" *Camilotes v. Resurrection Health Care Corp.*, No. 10 C 366, 2012 U.S. Dist. LEXIS 8731, at *11 (N.D. Ill. Jan. 25, 2012). Both are present here, in abundance.

Plaintiff's motion and pre-discovery evidentiary submission (Dkt. 52-1 - 4) highlighted the many ways that Defendant's rollout campaign was misleading, coercive, designed to chill participation, and rife with the likelihood of potential abuse.  Since filing that motion, Plaintiff obtained discovery, and now highlights various additional misrepresentations and inaccuracies listed and explained more fully below:

| **Employment Agreement (arbitration)** | **Release Agreement** |
|---|---|
| Underwriters falsely told at mandatory meeting that all employees were being sent Employment Agreements 10/19/20 | |
| Meeting misrepresented that signing Release "[releases] all claims as it relates to the lawsuit." It only released non-FLSA claims; *arbitration agreement* barred claiming in this lawsuit. | Same |
| Class and collective waiver *never* mentioned. No mention of "arbitration" or that signing Employment Agreement bars | Same |

---

[18] https://www.nytimes.com/2022/03/08/business/better-mortgage-lender-layoffs.html

| | |
|---|---|
| participation until "recap" email sent next day after DocuSign rollout, by which time most had already signed Agreement before receiving "recap" | |
| Many were sent Employment Agreement first, not sent Release until later | Same |
| No requirement, and no effort to ensure or even encourage, viewing Release before viewing and deciding whether to sign Employment Agreement | Same |
| Most viewed Employment Agreement and/or viewed and signed Employment Agreement before opening and viewing Release – thus unable to consider Release contents in viewing and deciding whether to sign Employment Agreement | Same |
| "Recap" email sent next day listed claims filed as only FLSA; said Release gives "release to join that lawsuit and/or bring similar claims." Untrue. | Same |
| New information (arbitration, effect of signing Agreement) falsely presented as a "recap" of information at the meeting | Same |
| Pressured to sign by one-on-one directives from management; "chase[d] down;" threatened termination for not signing | Ordered to self-report any decision not to sign "voluntary" Release; if so, notified their managers/Legal |
| | Employees not intending to stay "had little…incentive to consider it" |

| | |
|---|---|
| Release payment was conditioned on signed Employment Agreement, but this was not disclosed until "Recap" email | Same |
| Many signed within mere seconds of opening and viewing | Same |
| Legal announced it expected receiving signatures "in one day" | Same |
| New hires and January 2021 rollout of same Employment Agreement not accompanied by <u>any</u> disclosure that a lawsuit is pending on their behalf or effect of signing on it | |

Defendant's roll-out was fraught with misrepresentations. Defendant told underwriters during the Zoom meeting that all employees were receiving Employment Agreements that day, which could have caused underwriters to be less suspicious that they were being targeted. That was untrue: Defendant knew that other employees were not being sent Employment Agreements at that time. Defendant misrepresented at the Zoom meeting that signing the Release Agreement "will…release Better of all claims as it relates to the lawsuit." That was untrue; it only released non-FLSA claims.

Defendant took that deception one step further with its October 20th "recap" email. The "recap" email only mentioned a legal claim for overtime brought under the FLSA (despite the California law class claims): "Regarding the Release, …there is a legal claim brought under the Fair Labor Standards Act ("FLSA") that's been filed." It stated "if you choose to sign, [the $5,000 payment] will be in exchange for your release to join that lawsuit and/or bring similar claims." But Defendant knew signing the Release would not "release [ability] to join that lawsuit" – it was the separate Employment Agreement, not the Release, that would prohibit joining this class or collective action – and knew that the Release would not "release…bring[ing] similar claims," because it did not (and could not) release FLSA claims. *See, e.g., Felps v. Mewbourne Oil Co.*, No. 18-811, 2020 U.S. Dist. LEXIS 124523, at *17-18 (D.N.M. July 15, 2020) (ordering curative notice and anticipatorily granting putative class members right to invalidate releases, finding a release that first referred only to state law claims but then broadly to releasing all unpaid overtime claims "is at best confusing and at worst misrepresents the scope of the

recipient's agreement to settle" causing recipient who signed to "reasonably yet mistakenly believe that he or she is not entitled to participate in this litigation for any purpose and thus would not take the affirmative steps necessary to opt into this [FLSA] action"). "Unfortunately, the drafters of such unenforceable provisions are often rewarded because of the chilling effect they have; a California employee is likely to believe the contractual provision to be binding and may therefore simply forego pursuit of her statutory rights." *Kooiman v. Siwell, Inc.*, No. 8:20-cv-00565-JLS-DFM, 2021 U.S. Dist. LEXIS 59098, at *14-15 (C.D. Cal. Jan. 4, 2021).

Defendant withheld details regarding the specific damages, penalties and interest being sought on their behalf, or the potential damages amounts available on each claim, or any information that would allow them to estimate the amounts they were potentially owed or could potentially recover from settlement or judgment in considering the offer. *See, e.g., Felps*, 2020 U.S. Dist. LEXIS 124523, at *15 (granting putative class members right to invalidate releases where "the Settlement Letter…[did not] even indicate the relief sought by Plaintiff. In particular, [it] makes no mention of the fact that Plaintiff seeks liquidated damages [on] FLSA claims and treble damages [on state law] claims.").

All of the above combined to make the rollout misleading, and the Court can infer the purpose behind this deception was deterrence and chilling participation in this lawsuit. The Court should therefore grant the requested relief. *See, e.g., Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 922 (11th Cir. 2014) (invalidating agreements: "Whatever right Citi Trends may have had to ask its employees to agree to arbitrate, the district court found that its effort in the summer of 2012 was confusing, misleading, coercive, and clearly designed to thwart unfairly the right of its [employees] to make an informed choice as to whether to participate in this FLSA collective action.")

C. <u>There Was Inherent Coercion – Defendant Essentially Concedes It.</u>

It is undisputed that the Employment Agreement containing the arbitration and class/collective waivers was mandatory, a condition of employment expressly "required for continued employment with Better," with continued employment (and even payment

-22-

of the amount owed for a signed Release) contingent on signing, and underwriters were
threatened with termination for not signing it. Defendant offered no opt-out option, the
Employment Agreement was presented on a take-it-or-leave-employment basis, it
contained no carve-out for pending litigation,[19] and Defendant gave no assurances of no
retaliation for refusing to sign the Employment Agreement. These facts are on all fours
with those that led to invalidating agreements in *Billingsley* and *Oconner*.

But the facts here offer more than just that inherent coercion.

First, distinguishing this case from the facts of record in all other opinions relied on
by the parties, Defendant essentially concedes that an underwriter's incentive for signing
the Release Agreement was keeping their job, by its admission *in judicio* that because
Plaintiff's witness Rudy Chaidez's employment terminated the day after he received the
release, he "therefore…had little… incentive to consider it." (Opposition, Page ID 633, n.
9) If only those who wanted to keep their jobs had incentive to consider it, coercion may
be presumed: the incentive is fear of job loss,[20] not the reasonableness of the offer terms.

Second, as detailed above, the facts here involve management pressuring
underwriters to sign agreements on a tight four day timeline, <u>requiring any underwriter
who refuses to sign to report themselves to HR if they decide not to sign the Release</u>
(which was then communicated to their managers), and one-on-one directives requiring
signature on the Employment Agreements with direct threats of potential termination.

Third, the data reveals that many underwriters signed the Employment Agreement
and/or the Release Agreement within mere seconds of opening and viewing each
document, which presents additional indicia that underwriters felt pressured to sign
without reading (much less understanding) the agreements they were being asked to sign.

---

[19] Prudent employers carve out pending litigation on behalf of potential class/collective
members from arbitration agreements, so as to avoid having those agreements voided in
their entirety as to any and all claims in any case.)

[20] Indeed, the coercion is not only fear of termination from current employment but also
"having to inform prospective employers that they were terminated[.]" *Walker v. Ryan's
Family Steak Houses, Inc.*, 400 F.3d 370, 385 (6th Cir. 2005).

(Decl., ¶ 96 (approximately 71 Employment Agreements and 52 Releases were signed in October, 2020 within less than 60 seconds of first opening and viewing the 14-page and/or 5-page agreements; 99 and 74 within less than 2 minutes)) Tellingly, underwriters who received one-on-one directives to sign took as little as five seconds to open then sign the 14-page Employment Agreement. (Decl., ¶ 96)

Fourth, the Employment Agreement was coercive because an underwriter who gave a release of their state law claims by signing the Release would not receive the $5,000 consideration for the release they provided, unless they also signed the Employment Agreement – and Defendant in fact withheld payment until they did so. *See generally Snarr*, 2021 U.S. Dist. LEXIS 194077, at *29-30 (invalidating arbitration agreement rollout out after class action filed, finding it coercive because it required consent to arbitration in order to receive that to which plaintiff was already entitled).

Fifth, the sheer speed with which the agreements were rolled out after being served with this lawsuit, with signatures pursued in blitzkrieg fashion (legal expecting signatures "in one day"), demonstrates coercion warranting invalidating agreements. *See, e.g., Billingsley*, 560 F. App'x at 919 (invalidating arbitration agreements rolled out to putative collective members post-filing "in a 'blitzkrieg fashion'"); *Marino v. CACafe, Inc.*, No. 16-cv-6291 YGR, 2017 U.S. Dist. LEXIS 64947, at *6 (N.D. Cal. Apr. 28, 2017) ("The speed with which the emailed release requests were distributed after Zheng was served with the lawsuit [is a factor] suggest[ing] that defendants sought to ensure that putative class members were not given full information before they signed the releases.").

Finally, this Court held "the offer is coercive given that it was made without any indication of the strength or extent of the plaintiffs' claims and that only seven days are afforded to consider [it]." *Mitchell*, 2019 U.S. Dist. LEXIS 221927, at *9.

But again, coercion is not a required finding. "The test…is whether the contact is coercive, misleading, *or* an attempt to affect a class member's decision to participate in the litigation." *Carnegie v. H&R Block, Inc.*, 687 N.Y.S.2d 528, 531 (Sup. Ct. 1999) (citations omitted) (emphasis added).

## IV.   This Campaign Warrants Plaintiff's Requested Relief.

Defendant prefers that if this Court finds any relief is necessary, the "appropriate course of action" would be merely to permit Defendant[21] to issue a "curative notice" that does what it should have done, and let underwriters "void either agreement … similar to … *Kirby*." (Opposition [Dkt. 66], Page ID 640.)

But Defendant here – first targeting only putative class/collective members in October, 2020 then attempting to cover its tracks by requiring them and other employees to sign "new" Employment Agreements in January, 2021 – presented arbitration agreements without having made **any** disclosure that signing would impact participation in this pending class/collective action, whereas *Kirby* addressed releases that were accompanied by presentment of some (but not all) required litigation disclosures. When a defendant rolls out arbitration agreements with class/collective waivers to currently employed potential class/collective members without having disclosed that signing would impact their rights to participation in a pending lawsuit filed on their behalf, the remedy for that complete failure to first disclose the effects of signing is to deem those terms unenforceable as applied to the pending lawsuit. *See, e.g., Billingsley,* 560 Fed. App'x. At 923-24; *Jimenez v. Menzies Aviation Inc*, 2015 U.S. Dist. LEXIS 108223, at *18 (N.D. Cal. Aug. 17, 2015); *McKee v. Audible, Inc.*, 2018 U.S. Dist. LEXIS 179978, at *15-16 (C.D. Cal. Apr. 6, 2018); *Oconner*, 444 F. Supp. 3d at 598.

That leaves the Releases. Because the facts here are in many ways more egregious than *Kirby*, the Court should deem them unenforceable too, and order Plaintiff's proposed "curative notice" language (which Defendant did not oppose)[22] adapted accordingly.

If any agreement is instead deemed voidable, it should be deemed revoked unless affirmatively accepted by the (unopposed) signature process in the proposed notice.

---

[21] Plaintiff issues the curative notice. *Marino*, 2017 U.S. Dist. LEXIS 64947, at *8.
[22] Defendant articulates no opposition to the language or procedure of Plaintiff's proposed "curative notice" documents filed as Exhibit 1 to the Head Declaration [Dkt. 52-3].

Dated: March 11, 2022

**HEAD LAW FIRM, LLC**

By:     /s/ C. Andrew Head
         C. Andrew Head

Attorney for Plaintiff and Others Similarly Situated

REPLY SUPP. PLTF'S MOTION TO INVALIDATE UNCOUNSELED RELEASES AND AGREEMENTS